IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHAMPIONSWORLD, LLC,

        Plaintiff,

    v.

UNITED STATES SOCCER
FEDERATION, INC., MAJOR LEAGUE
SOCCER, LLC and DOES 1 through
10, inclusive,

        Defendants.

Case No. 06 C 5724

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions by Defendants United States Soccer Federation (hereinafter, the "USSF") and Major League Soccer (hereinafter, "MLS") to Stay or Dismiss the claims against them pursuant the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq*. For reasons that follow, Defendants' Motions are **granted**.

### I.  BACKGROUND

At issue is the arbitrability of a dispute over the arrangement and promotion of international professional men's soccer matches played on U.S. soil. Plaintiff ChampionsWorld (hereinafter, "ChampionsWorld") is a defunct promoter of such soccer matches. Defendant USSF is an association recognized by soccer's international governing body, the Fédération Internationale de Football Association (the "FIFA"), as the entity responsible for regulating men's soccer in the United States.

Defendant MLS, for its part, is the premier professional soccer league in the United States.

On May 2, 2006, ChampionsWorld sued Defendants in the Southern District of New York (which later transferred the case to this district), alleging violations of RICO, the Sherman Act, and related state laws. ChampionsWorld's claims derive from a series of "match agreements" it entered into with USSF between 2001 and 2005. Under these agreements, USSF agreed to sanction soccer matches arranged by ChampionsWorld, and ChampionsWorld agreed to pay USSF a "sanctioning fee." ChampionsWorld alleges that USSF wrongly arrogated the authority to extract such sanctioning fees by falsely holding itself out to be the exclusive governing body of men's professional soccer in the United States and by threatening to report ChampionsWorld to FIFA as a "promoter in bad standing." Such a designation, according to ChampionsWorld, would have effectively destroyed its business because FIFA would not permit international soccer teams to play matches arranged by such promoters. ChampionsWorld further claims that MLS conspired with USSF to give MLS favored treatment with regard to its match promotions. ChampionsWorld alleges that, through such anti-competitive, fraudulent, and extortionate acts, Defendants caused ChampionsWorld severe financial harm ultimately leading to bankruptcy.

ChampionsWorld's claims are potentially subject to two different dispute resolution agreements. One arises from FIFA regulations agreed to by ChampionsWorld's CEO, Charles Stillitano ("Stillitano"). In brief, FIFA requires any person arranging international professional men's soccer matches to be a licensed "match agent." Pursuant to this directive, in 2004, Stillitano submitted to FIFA a written "match agent license application." As part of the application, Stillitano declared that he was familiar with, and unconditionally accepted, FIFA's "Match Agent Regulations" ("MARs"). Article 22 of the MARs addresses dispute resolution, providing: "[i]n the event of a dispute between a match agent and a national association, . . . the complaint shall be submitted to the FIFA Players' Status Committee for consideration and resolution." The MARs also provide for appeal of FIFA's arbitration decisions to the independent Court of Arbitration for Sport (the "CAS").

The second pertinent dispute resolution agreement appears in the ChampionsWorld-USSF match agreements. They contain the following forum selection clause:

> The parties hereby consent to the exclusive
> jurisdiction of the courts of the State of
> Illinois in connection with any action or
> proceeding arising out of or relating to the
> Agreement. In addition, it is expressly
> agreed that any judicial action or proceeding
> relating to this Agreement shall be brought in
> the Federal or State courts which cover
> Chicago, Illinois.

The match agreements also provide that each such agreement constitutes the entire agreement between the parties, superceding any prior understandings between the parties, and that the terms of the sanctioning agreements can only be altered by written agreement between USSF and ChampionsWorld.

## II.  DISCUSSION

Defendants' Motions turn on the interplay between each of the two above-quoted dispute resolution agreements and the federal statute governing commercial arbitration.  That statute, the Federal Arbitration Act (the "FAA"), establishes the validity, irrevocability, and enforceability of commercial arbitration agreements.  *See* 9 U.S.C. § 2.  The FAA requires a District Court to stay litigation upon the application of one of the parties if any issue involved in the suit is referable to arbitration.  *See* 9 U.S.C. § 3.

Generally, a commercial dispute is referable to arbitration whenever the underlying contract contains an arbitration clause. 9 U.S.C. § 2.  Where the relevant contract contains a broad arbitration provision, the Act precludes litigation "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002).  The FAA thus embodies a strong federal policy in favor of arbitration.  *See Moses H. Cone Memorial Hosp. v. Mercury Const.*

*Corp.*, 460 U.S. 1, 22 (1983).  At the same time, though, "[a]rbitration is contractual by nature – 'a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.'"  *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citation omitted).

## A.  Applicable Law

Federal law, through the FAA and the Supremacy Clause of the U.S. Constitution, generally controls questions of arbitrability.  *See Moses*, 460 U.S. at 24.  But, as noted above, the FAA only applies where there has been an agreement to arbitrate, and "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Aspects of this dispute could fall under such state contract law.  Certain of ChampionsWorld's arguments arguably question the very existence an of agreement to arbitrate between these parties.  This could be said, for example, of ChampionsWorld's contention that it is not bound by Stillitano's license application, as well as its argument that the match agreements' forum selection clause trumps the MARs' arbitration requirement.

Nevertheless, the record is ambiguous regarding the parties' views on the applicable law.  Although ChampionsWorld asserts in a

footnote that the parties agree on the application of federal law, Defendants have been silent on the matter, and both sides have cited cases relying on Illinois law. *E.g.*, *WFC Commodities Corp. v. Linnco Futures Group, Inc.*, 1998 WL 834374 (N.D. Ill. 1998) (cited by ChampionsWorld) (applying Illinois law regarding whether contracts without an arbitration clause supercede contracts with such a clause); *Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 734 (7th Cir. 2005) (cited by USSF) (applying Illinois law regarding nonsignatory enforcement of arbitration agreements).

In light of these ambiguities, this Court wishes to clarify that it will apply federal to all issues in this matter. In addition to the legal basis for doing so, *see*, e.g., *Gersten v. Intrinsic Technologies, LLP*, 442 F.Supp.2d 573, 577-78 (N.D. Ill. 2006) (Filip, J.) (federal law governs enforcement of arbitration agreement against nonsignatory), the Court also views the defendants' silence on the issue as an assent to the application of federal law and a waiver of their right to object to it. Consequently, the Court will treat any cases cited by either party applying state law as merely persuasive authority.

### B. Agreement to Arbitrate

ChampionsWorld makes three arguments that it did not agree to arbitrate its dispute with Defendants. First, ChampionsWorld argues that Stillitano's license application did not bind it. Second, ChampionsWorld argues that, USSF, as a nonsignatory to the

license agreement, cannot enforce that agreement's arbitration provision. And third, ChampionsWorld contends that the forum selection clause in the ChampionsWorld-USSF sanctioning agreements trumps any rights the license application might give USSF.

### 1. The Binding Effect of Stillitano's License Application

ChampionsWorld argues that Stillitano's application did not bind ChampionsWorld to FIFA's arbitration requirement because Stillitano signed the application in his own name, and FIFA regulations only permit "natural persons" (*i.e.*, not companies like ChampionsWorld) to apply for match agent licenses. This argument contravenes principles of agency and estoppel. An agent's signature binds a principal to an arbitration agreement under the same circumstances as with any other agreement – namely, when (1) the agent was acting on the principal's behalf, and (2) the plaintiff's complaint arises from their relationship. *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3rd Cir. 2001).

As to the first point, when Stillitano signed the match agent license, he was acting on ChampionsWorld's behalf. His signature block on that document names him as CEO of ChampionsWorld. The record also reflects that Stillitano filed for the license in order to carry out his job function with ChampionsWorld of arranging soccer matches.

As to the second point, ChampionsWorld's claims against USSF and MLS arose from Stillitano's relationship with ChampionsWorld. Although ChampionsWorld entered into the allegedly extortionate and fraudulent contracts with USSF both before and after Stillitano submitted his license application, ChampionsWorld, in order to continue operating its match promotion business, ultimately needed – or believed it needed – one of its agents to become a licensed "match agent." The nexus between ChampionsWorld's claims and its relationship with Stillitano is thus sufficiently strong to justify binding ChampionsWorld as a principal of Stillitano's.

But even if an *a priori* agency relationship did not exist between Stillitano and ChampionsWorld, estoppel principles prohibit ChampionsWorld from now repudiating Stillitano's license application after having so directly benefitted from it. *See Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 688 (7th Cir. 2005) ("A nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause."). ChampionsWorld argues that it only indirectly benefitted from the match agent license because, under FIFA regulations, only "natural persons" are permitted to apply for one. This is unpersuasive. ChampionsWorld seems to be implying that it was just along for the ride as Stillitano arranged and profited from international soccer matches. Not only is this a reversal of reality, but whether or not

ChampionsWorld was permitted to **apply** for a match agent license under FIFA rules, ChampionsWorld used Stillitano's license to **act** as a "match agent" and financially benefit from so doing. ChampionsWorld thus cannot now disclaim the match agent license application in order to avoid its arbitration provision.

### 2. USSF's Ability to Enforce the MARs' Arbitration Requirement

ChampionsWorld argues that defendants have no right to force ChampionsWorld to arbitrate, since USSF was not a signatory to the Stillitano license application. Federal arbitration law disagrees. There are circumstances in which one may enforce an arbitration agreement to which one was not a signatory. Courts have held, for example, that where the party resisting arbitration has agreed to adhere to the internal rules of an association that requires arbitration with certain nonsignatory classes of persons or entities, members of the nonsignatory classes can force the resisting party to arbitrate. *See, e.g.*, *R.J. O'Brien & Associates, Inc. v. Pipkin*, 64 F.3d 257, 260 (7th Cir. 1995) (holding that introducing broker consented to arbitration with a futures commission merchant when broker signed national association's registration form incorporating rule requiring arbitration of "disputes between Members and Associates"); *Geldermann, Inc. v. Commodity Futures Trading Com'n.*, 836 F.2d 310, 318 (7th Cir. 1987) (holding that commodities brokerage firm

consented to arbitrate dispute with a customer through written affirmation of board-of-trade's rules, which included mandatory arbitration of disputes with customers).

The circumstance presented here is analogous to these "association rules" cases. Although ChampionsWorld is not a member of FIFA *per se*, ChampionsWorld agreed to adhere to FIFA's arbitration framework, just the same as the association members in cases like *R.J. O'Brien* and *Geldermann* agreed to their respective associations' arbitration frameworks. Moreover, there is authority for allowing an association nonmember to force a member to arbitrate under the association's rules. *E.g.*, *Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400, (3rd Cir. 1987) (holding that association member that has agreed to be bound by association's rule requiring arbitration with customers must arbitrate with nonmember customer).

Additionally, at least one Seventh Circuit case suggests that federal law contemplates nonsignatory enforcement of arbitration agreements where enforcement is sought by an intended third-party beneficiary. *See, IDS Life Ins. Co. v. Sunamerica, Inc.*, 103 F.3d 524, (7th Cir. 1997) (noting in case where an association member agreed to arbitrate disputes with other members that "a nonparty to a contract cannot enforce the contract [ ]**unless it is a third party beneficiary**. . . ."). Here, FIFA's match agent license application specifically identified "national associations" as a

class entitled to arbitration with match agents such as ChampionsWorld. USSF, as a national association, is thus an intended third-party beneficiary of the FIFA arbitration requirement and can enforce it.

Finally, ChampionsWorld's reliance on the case of *Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836, 841 n.9 (7th Cir. 1981), is misplaced. ChampionsWorld cites *Hughes* for the proposition that "[i]n order for a nonsignatory to compel a signatory to arbitrate, the signatory's claims must be 'intimately founded in and intertwined with the underlying contract' that contains the arbitration clause." ChampionsWorld has misread *Hughes*. The *Hughes* court employed the doctrine of equitable estoppel to estop a signatory to an arbitration agreement from avoiding arbitration with a nonsignatory. *Id.* at 838-39. Because the signatory's claims against the nonsignatory were grounded in the contract containing the arbitration agreement, the *Hughes* court held that it would have been fundamentally unfair to allow the signatory to recognize the contract containing the arbitration agreement for the purpose of bringing its claims but simultaneously repudiate the contract to avoid arbitration. *Id.* The *Hughes* court never addressed the general question of whether a nonsignatory can enforce an arbitration agreement – it merely held that a signatory cannot seek to avoid arbitration where it would be inequitable to do so. *See*

*id.* at 838 ("**Whatever the merit** of [the third-party standing] argument, we believe Hughes is equitably estopped from asserting it. . . .") (emphasis added).

### 3. The Effect of the Match Agreements' Forum Selection Clause

ChampionsWorld argues that the forum selection clause in the USSF-ChampionsWorld match agreements requires litigation, rather than arbitration, of ChampionsWorld's claims. But since the Court has found that ChampionsWorld is bound by Stillitano's license application, and that USSF has a right to enforce the match agreements' arbitration requirement, ChampionsWorld's forum selection clause argument is essentially an argument that USSF terminated or waived its arbitration rights by agreeing to the match agreements' forum selection clause. The Court cannot accept this argument.

"[W]aiver of arbitration is not lightly to be inferred." *Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638, 641 (7th Cir. 1981). Courts will only find a waiver of arbitration rights when, "under the totality of the circumstances, the defaulting party acted inconsistently with the arbitration right." *Id.* And of course, in evaluating USSF's actions, the Court must remain mindful of federal law's strong presumption in favor or arbitration. *See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983),

USSF's agreement to the forum selection clause is not so inconsistent with its arbitration rights as to overcome the law's presumption in favor of arbitrability. Courts have held that forum selection clauses are not inherently inconsistent with arbitration agreements, since arbitration awards are not self-enforcing, and the parties may have merely intended to prescribe the method of judicial enforcement of arbitration. *See, e.g.*, *West Shore Pipe Line Co. v. Associated Elec. and Gas Ins. Services Ltd.*, 791 F.Supp. 200, (N.D. Ill. 1992) (finding arbitrabiilty because "[the forum selection clause] could reasonably be interpreted to facilitate litigation following arbitration"); *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 284-85 (2nd Cir. 2005) (finding arbitrability because the forum selection clause could apply to enforcement of an arbitration award); *Patten*, 819 F.2d at 407 (finding no waiver of arbitration where the forum selection clause did not mention arbitration because "arbitration awards are not self enforceable"); and *Personal Sec. & Safety Systems Inc. v. Motorola Inc.*, 297 F.3d 388, 395 (5th Cir. 2002) (finding no waiver despite forum selection clause's "exclusive jurisdiction" language because it could be interpreted to provide for litigation of non-arbitrable matters, such as award enforcement).

The language of the ChampionsWorld-USSF forum selection clause is consistent with an intent to address post-arbitration litigation. That clause provides consent to personal jurisdiction

in Illinois courts and venue in Chicago "in connection with any ***action or proceeding*** arising out of or relating to the Agreement." (Emphasis added). An "action" is "[a] civil or criminal judicial proceeding," *Black's Law Dictionary* 28 (7th Ed. 1999), while a "'proceeding' is a word much used to express the business done in courts," *id.* at 1221. The parties thus formulated the language of the forum selection clause in the language of litigation, not that of arbitration. *Compare with Personal Sec.*, 297 F.3d at 396 (interpreting words "suit or proceeding" in forum selection clause to refer to litigation, rather than arbitration). In any case, the forum selection clause's language here cannot be said to specifically exclude or displace arbitration. *Compare with West Shore*, 791 F.Supp. at 204 ("[A]ny waiver of a mandatory arbitration provision should be explicit in view of the federal policy favoring arbitration.") and *Bank Julius*, 424 F.3d at 284 (enforcing presumption in favor of arbitrability because "Forum Selection Clause ma[de] no reference to arbitration, and so [was] at least ambiguous").

## C. Scope

Having determined that there was an agreement to arbitrate, ChampionsWorld's claims are arbitrable unless they exceed the scope of that agreement. *See Lehman Bros. Inc. v. Certified Reporting Co.*, 939 F.Supp. 1333, 1336 (N.D. Ill. 1996). ChampionsWorld advances two arguments that their claims are beyond the scope of

Article 22.  First, ChampionsWorld reprises its contention that ChampionsWorld is not a "natural person" and so cannot be a "match agent" under FIFA regulations.  ChampionsWorld reasons that, since Article 22 only covers disputes with "match agents," ChampionsWorld cannot be bound by it.  Second, ChampionsWorld argues that Article 21 of the MARs limits Article 22's arbitration language by providing that "[t]he FIFA body responsible for supervising and ruling on any matters connected with the application of these regulations [the MARs] shall be the FIFA Players' Status Committee ["PSC"]."  ChampionsWorld interprets this language to mean that, by designating the PSC as arbitrator, Article 22 only meant to provide for arbitration of disputes over the application of the MARs.

The Court will address ChampionsWorld's scope arguments presently, but it first wishes to address an issue not raised by either party.  It has come to Court's attention that Article 22 contains language that appears on its face to preclude arbitration of this dispute.  Paragraph 3 of that Article provides:

> The FIFA Players' Status Committee shall not consider any dispute under these regulations if more than two years have elapsed since the facts leading to the dispute arose, and in any case no later than six months after the match agent concerned has terminated his activity as such.

Paragraph 23 of the Complaint avers that "Plaintiff ceased its regular business operations on or about May 6, 2005."  This case would thus appear to fall outside the six-months clause in

Article 22.  Additionally, the last of the contracts underlying this dispute appears to have been made in 2004, so there is at least an argument that this dispute falls outside the two-year clause as well.

ChampionsWorld, however, has not raised the above argument. The Court must conclude that, after nearly a year and two full rounds of briefing, ChampionsWorld's failure to argue that Paragraph 3 of Article 22 precludes arbitration of this dispute was strategic and constitutes a waiver of that argument.  *See Scott-Riley v. Mullins Food Products, Inc.*, 391 F.Supp.2d 707, 718 (N.D. Ill. 2005) (noting that arguments not made in response to dispositive motions are waived).  The Court will thus decide the motions before it on the arguments that ChampionsWorld did advance.

Those arguments must be rejected for several reasons.  To begin with, as previously noted, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25.  Consequently, this Court must stay or dismiss ChampionsWorld's claims "unless it may be said that with positive assurance that the arbitration clause is not susceptible of an interpretation that covers [them]."  *Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002).

First, as to the "natural persons" argument, the MARs state that "only a natural person can **apply** for a [match agent] license." (Emphasis added.)  This language does not preclude the possibility

that a company can **act** as a match agent on the basis of a license held by one of its officers. *See, e.g.*, *Washburn v. Rabun*, 755 F.2d 1404, 1406 (11th Cir. 1985) ("Because Alabama Code § 27-7-1(a) requires agents and brokers to be natural persons, the corporation does business under the authority of a license issued to its sole stockholder, officer, and director."). Article 22 of the MARs in any case does not expressly limit who may be considered a "match agent" for the purposes of the PSC's arbitration jurisdiction.

Second, as to ChampionsWorld's argument that Article 21 restricts the PSC's jurisdiction to disputes about the application of the MARs, ChampionsWorld ignores Article 21's lack of limiting language. The fact that Article 21 declares the PSC responsible for ruling on the application of the MARs does not mean the PSC is not responsible for any other type of dispute. Given Article 22's broad language, as well as the fact that Article 22 is the first article under the heading "Disputes,' while Article 21 is under the heading "Rights and duties inherent in the FIFA licence," the MARs can easily be interpreted to govern disputes beyond just those involving the application of the MARs.

## D. Futility

ChampionsWorld argues that even if its claims against Defendants are arbitrable, this Court should deny Defendants' motions because FIFA would be a biased arbitrator that would adhere to inadequate arbitration procedures. To this end, ChampionsWorld

invokes Section 10 of the FAA, which provides for vacatur of arbitration awards when arbitrators are partial, corrupt, or wrongly refuse to hear pertinent evidence. *See* 9 U.S.C. §§ 10(a)(2)&(3). ChampionsWorld contends that, under this provision, this Court would eventually have to vacate any award that FIFA issued. According to ChampionsWorld's argument, it would thus be futile to send this case to arbitration, and so this Court should assume jurisdiction over the matter now.

This argument is a non-starter, however, because ChampionsWorld fails to identify any jurisdictional basis on which this Court could ***prospectively*** nullify a potential arbitration award. The Act only provides for review of the fairness and procedural adequacy of an arbitration ***after*** it has occurred. The Act's silence on the notion of doing so beforehand is dispositive. *See, e.g.*, *In re Globe Bldg. Materials, Inc.*, 463 F.3d 631, 635 (7th Cir. 2006) (invoking the "*expressio unius*" canon of statutory construction ["to express or include the one thing implies the exclusion of the other. . . ."]). Indeed, given that the FIFA arbitration would apparently convene in Switzerland, it is not even clear that this Court could ***retrospectively*** vacate an arbitration award in this case. *See* 9 U.S.C. § 10(a) (providing for arbitration award vacatur by "the United States court in and for ***the district wherein the award was made***") (emphasis added).

Lest one protest that such a result would be unfair, recall that "the passage of the [FAA] was motivated, first and foremost, by a congressional desire to enforce agreements into which parties [have] entered . . . " *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220 (1985). Thus, absent a showing of fraud, unconscionability, or some other basis for voiding its written commitment to arbitrate, ChampionsWorld cannot escape its arbitration obligation simply by claiming bias or unfair procedures. *See Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 307 F.3d 617, 620 (7th Cir. 2002) ("To the extent that an agreement entitles parties to select interested (even beholden) arbitrators, § 10(a)(2) has no role to play."); and Williston, *Contracts* (Rev'd) § 1923A ("In general, a party having knowledge of facts possibly indicating bias or prejudice on the part of an arbitrator cannot remain silent and thereafter on that ground object to his decision."). ChampionsWorld has offered no reason to think that it agreed to FIFA's arbitration rules unknowingly, involuntarily, or otherwise through unconscionable means. *Compare with Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F.Supp.2d 985 (S.D. Ind. 2001) (relied on by ChampionsWorld) (refusing to compel arbitration because arbitration agreement was unenforceable due to unfair arbitration mechanism, procedural unconscionability, violation of the covenant of good faith and fair dealing, and illusory consideration).

### E.   Remedy

Having determined that the instant dispute is arbitrable, the only question remaining is whether this Court should merely stay this action pending arbitration or dismiss it.  USSF has suggested that "[w]here, as here, the arbitration is to occur outside the United States, the proper remedy is dismissal."  USSF only cites cases, however, decided under FAA § 4, which expressly limits the court's power to compel arbitration when the arbitration would occur outside the district in which the court sits.  Defendants here, by contrast, have not moved to compel arbitration, apparently preferring instead to seek a stay pending arbitration under FAA § 3, which does not contain the same jurisdictional limitation as Section 4.  Especially since Section 3 is framed in mandatory language ("shall . . . stay trial of the action"), this Court declines to dismiss the action outright.

Finally, the stay in this matter will apply to MLS as well as USSF.  Where claims against a signatory to an arbitration agreement are "obviously intertwined" with those against nonsignatory parties, courts should stay the entire case under FAA § 3.  *See Hoffman v. Deloitte & Touche, LLP*, 143 F.Supp.2d 995, 1005 (N.D. Ill. 2001).

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Stay or Dismiss Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et*

*seq*., are **granted**, and this action is hereby **stayed** pending arbitration.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated: May 4, 2007