**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

| | |
|---|---|
| CHAMPIONSWORLD LLC,<br><br>               Plaintiff,<br><br>   v.<br><br>UNITED STATES SOCCER FEDERATION,<br>INC., MAJOR LEAGUE SOCCER, LLC, and<br>DOES 1 through 10, inclusive,<br><br>               Defendants. | No. 06 cv 5724<br><br><br>ORAL ARGUMENT<br>REQUESTED |

---

**CHAMPIONSWORLD'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION:**
**(A) FOR RECONSIDERATION OF THE COURT'S MEMORANDUM OPINION AND**
**ORDER DATED MAY 4, 2007; OR, ALTERNATIVELY (B) FOR CERTIFICATION OF**
**THREE CONTROLLING AND CONTESTABLE QUESTIONS OF LAW FOR REVIEW**
**BY THE U.S. COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

---

PRYOR CASHMAN LLP
410 Park Avenue
New York, New York 10022
Telephone: (212) 421-4100
Jamie M. Brickell (admitted *pro hac vice*)
William L. Charron (admitted *pro hac vice*)

- and -

MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, Illinois 60601-6710
(312) 222-0800
Ronald H. Balson
Carrie A. Hall

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ................................................................................................................ 1

I.  THE COURT SHOULD RECONSIDER AND VACATE THE DECISION ................... 1

   A. The Decision Misconstrues The Record
      Concerning The Parties' Intent To Litigate ............................................................ 1

      1. The Decision Misconstrues The Significance Of The Mandatory
         Illinois Forum Selection Clauses Being First-In-Time By Years ........................... 1

      2. The Decision Misconstrues ChampionsWorld's "Beliefs" And
         The Supposed "Need" For Stillitano To Become A Match Agent ........................ 2

      3. The Decision Misconstrues The Legal Effect Of The Mandatory
         And Fully-Integrated Nature Of The Illinois Forum Selection Clauses ................. 3

         a. The Decision Misconstrues The Phrase "Any Action
            Or Proceeding" In The Illinois Forum Selection Clauses ................................. 4

      4. The Decision Contradicts Itself Regarding The Parties' "Intent" ........................... 5

      5. The Decision Misconstrues The Effect
         Of The Bankruptcy Court's Order ..................................................................... 5

   B. The Decision Misconstrued The FIFA License
      And MARs As "Naming ChampionsWorld" And As
      Permitting ChampionsWorld To "Act As A Match Agent" ..................................... 6

      1. The Decision's Conclusion Of "Agency" Is Erroneous ......................................... 7

      2. The Decision's Conclusion That ChampionsWorld Was A
         "Match Agent" Within The Scope Of Article 22 Is Erroneous ............................. 7

II.  THREE CONTROLLING LEGAL ARGUMENTS THAT WERE ALSO
   MISAPPREHENDED BY THE COURT SHOULD BE RECONSIDERED
   OR, ALTERNATIVELY, CERTIFIED FOR INTERLOCUTORY REVIEW ................. 8

   A. The Decision Misconstrues The "Estoppel" Doctrine Under Which
      Non-Signatories May Be Compelled Against Their Will To Arbitrate ...................... 9

   B. The Decision Misconstrues The Requirements For
      Non-Signatories To Be Able To Compel Arbitration .............................................. 11

      1. The "Intertwined With" Test Controls Non-Signatory Standing ........................... 11

      2. "Intended Third Party Beneficiaries" Of "Association Rules"
         Still Must Demonstrate That A Dispute Is Related To *Those Rules* ..................... 12

   C. The Decision Overlooks The Requirement Of The "Touch Matters" Test ................. 14

CONCLUSION ............................................................................................................. 15

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(s)**

Allied Van Lines, Inc. v. Orth Van and Storage, Inc.,
    No. 04 C 6004, 2005 U.S. Dist. LEXIS 13616 (N.D. Ill. June 3, 2005) ....................11, 12

AlliedSignal, Inc. v. B.F. Goodrich Co.,
    183 F.3d 568 (7th Cir. 1999) ...........................................................................14

American Life Insurance Co. v. Parra,
    25 F. Supp. 2d 467 (D. Del. 1998)......................................................................4

Bank Julius Baer & Co. v. Waxfield Ltd.,
    424 F.3d 278 (2d Cir. 2005)...........................................................................3, 4

Banque de Gestion Privee SIB v. Transoptions, Co.,
    No. 92 C 5252, 1993 WL 96453 (N.D. Ill. Mar. 29, 1993)...............................3, 8

Denney v. BDO Seidman, L.L.P.,
    412 F.3d 58 (2d Cir. 2005)...............................................................................12

Denney v. Jenkens & Gilchrist,
    412 F. Supp. 2d 293 (S.D.N.Y. 2005)................................................................12

Grundstad v. Ritt,
    106 F.3d 201 (7th Cir. 1997) ...........................................................................10

Hughes Masonry Co. v. Greater Clark County School Building Corp.,
    659 F.2d 836 (7th Cir. 1981) ......................................................................11, 12

IDS Life Insurance Co. v. SunAmerica, Inc.,
    103 F.3d 524 (7th Cir. 1996) ...........................................................................13

Industrial Elecs. Corp. v. iPower Distributing Group, Inc.,
    215 F.3d 677 (7th Cir. 2000) ......................................................................10, 14

Laborers International Union v. HSA Contractors, Inc.,
    728 F. Supp. 519 (E.D. Wis. 1989)....................................................................7

MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,
    268 F.3d 58 (2d Cir. 2001)...............................................................................10

Masefield AG v. Colonial Oil Indus.,
    No. 05 Civ. 2231 (PKL), 2005 WL 911770 (S.D.N.Y. Apr. 18, 2005) ............10

Maj v. National Securities Network, Inc.,
    702 F. Supp. 184 (N.D. Ill. 1988) ......................................................................8

Metropolitan E. Ctr. for Conditioning And Health v. Qwest Communications
    International, Inc., 294 F.3d 924 (7th Cir. 2002)..................................................5

In re Ocwen Fed. Bank FSB Mortgage Servicing Litig.,
    No. 04 C 2714, 2006 U.S. Dist. LEXIS 34647 (N.D. Ill. May 16, 2006) ...........8

**CASES**  **PAGE(s)**

Patten Securities v. Diamond Greyhound & Genetics, Inc.,
 819 F.2d 400 (3d Cir. 1987)................................................................................4, 13

Personal Sec. & Safety System v. Motorola Inc.,
 297 F.3d 388 (5th Cir. 2002) ....................................................................................3

R.J. O'Brien & Associates, Inc. v. Pipkin,
 64 F.3d 257 (7th Cir. 1995) ....................................................................................13

Redman v. Allen,
 No. 05 C 6818, 2006 U.S. Dist. LEXIS 81497 (N.D. Ill. Nov. 3, 2006)...........................7

Sarantakis v. Gruttadauria,
 No. 02 C 1609, 2003 U.S. Dist. LEXIS 4002 (N.D. Ill. Mar. 14, 2003)...........................14

Shipp v. XA, Inc.,
 No. 06 C 1193, 2006 U.S. Dist. LEXIS 67094 (N.D. Ill. Aug. 31, 2006) ........................12

Spear, Leeds & Kellogg v. Central Life Assurance Co.,
 85 F.3d 21 (2d Cir. 1996)....................................................................................13, 14

Specht v. Netscape Communications Corp.,
 306 F.3d 17 (2d Cir. 2002).......................................................................................14

Stechler v. Sidley Austin Brown & Wood, L.L.P.,
 382 F. Supp. 2d 580 (S.D.N.Y. 2005)........................................................................14

Thomson-CSF, S.A. v. American Arbitration Ass'n,
 64 F.3d 773 (2d Cir. 1995)...................................................................................9, 10

United States v. Olsen,
 No. 98 C 2170, 2001 U.S. Dist. LEXIS 10098 (N.D. Ill. July 18, 2001)...........................1

Veera v. Janssen,
 No. 05 Civ. 2145 (SHS), 2005 WL 1606054 (S.D.N.Y. July 5, 2005) .....................10, 11

Washburn v. Rabun,
 755 F.2d 1404 (11th Cir. 1985) ...............................................................................7, 8

Webster v. Electronic Data Sys. Corp.,
 No. 03 C 3002, 2003 U.S. Dist. LEXIS 15296(N.D. Ill. Sept. 2, 2003) ...........................1

Welborn Clinic v. Medquist, Inc.,
 301 F.3d 634 (7th Cir. 2002) ....................................................................................5

West Shore Pipe Line Co. v. Associated Electric & Gas Insurance Services, Ltd.,
 791 F. Supp. 200 (N.D. Ill. 1992) .............................................................................3

WFC Commodities Corp. v. Linnco Futures Group, Inc.,
 No. 98 C 1354, 1998 WL 834374 (N.D. Ill. Nov. 25, 1998)........................................4

**CASES**                                                                       **PAGE(s)**

Zimring v. Coinmach Corp.,
      No. 00 Civ. 8111 (LMM), 2000 WL 1855115 (S.D.N.Y. Dec. 19, 2000) ........................11

Zurich America Insurance Co. v. Watts Industries,
      417 F.3d 682 (7th Cir. 2005) ......................................................................................9, 10

**STATUTES**

28 U.S.C. § 1292(b) ...............................................................................................................1

**OTHER**

Black's Law Dictionary (7th ed. 1999)...............................................................................4, 5

Plaintiff ChampionsWorld LLC ("ChampionsWorld") respectfully moves for reconsideration of the Court's Memorandum Opinion and Order dated May 4, 2007 (the "Decision") granting the motions of defendants United States Soccer Federation, Inc. ("USSF") and Major League Soccer, LLC ("MLS") (collectively at times, "Defendants") to stay this action pursuant to the Federal Arbitration Act ("FAA"). Alternatively, ChampionsWorld moves for certification of three legal questions for interlocutory review, pursuant to 28 U.S.C. § 1292(b).

## ARGUMENT

## I.  THE COURT SHOULD RECONSIDER AND VACATE THE DECISION

The Court should grant reconsideration of the Decision and vacate its Order staying ChampionsWorld's antitrust and RICO action in favor of FIFA arbitration in Switzerland.[1] Reconsideration of an interlocutory order is appropriate where a court "has misapprehended and misunderstood [the] arguments." United States v. Olsen, No. 98 C 2170, 2001 U.S. Dist. LEXIS 10098, at *6-7 (N.D. Ill. July 18, 2001) (Leinenweber, J.). Respectfully, the Decision contains dispositive errors that demonstrate misapprehension of the record and arguments.

### A.  The Decision Misconstrues The Record Concerning The Parties' Intent To Litigate

#### 1.  The Decision Misconstrues The Significance Of The Mandatory Illinois Forum Selection Clauses Being First-In-Time By Years

The Court found that USSF's mandatory Illinois forum selection clause was "merely intended to prescribe the method of judicial enforcement of arbitration," and that "[t]he language of the ChampionsWorld-USSF forum selection clause is consistent with an intent to address post-arbitration litigation." (Decision at 13.) Respectfully, this finding is at odds with the fact that not even Stillitano had agreed to arbitrate for nearly the entirety of the challenged period. ChampionsWorld could not have "intended" that USSF's mandatory Illinois forum selection clause be limited to "post-arbitration litigation," where the possibility of arbitration did not exist. See, e.g., Webster v. Electronic Data Sys. Corp., No. 03 C 3002, 2003 U.S. Dist. LEXIS 15296, at *6, 8 (N.D. Ill. Sept. 2, 2003) (Leinenweber, J.) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit") (citation omitted).

---

[1] Defined terms have the same meanings ascribed in the Decision.

**2.      The Decision Misconstrues ChampionsWorld's "Beliefs" And
The Supposed "Need" For Stillitano To Become A Match Agent**

The Decision finds that "[a]lthough ChampionsWorld entered into the allegedly
extortionate and fraudulent contracts with USSF both before and after Stillitano submitted his
license application, ChampionsWorld, in order to continue operating its match promotion
business, ultimately needed – or believed it needed – one of its agents to become a licensed
'match agent.'" (Decision at 8.)  Indeed, the Court places substantial emphasis on its finding that
Stillitano was acting solely in his capacity as CEO of ChampionsWorld and, therefore, for the
direct purpose of enabling ChampionsWorld to do its business.  Respectfully, that was not the
case, and the record belies a finding that ChampionsWorld "believed it needed" or actually
needed Stillitano to be a FIFA licensee to conduct its business.

In particular, the record reflects that ChampionsWorld organized international soccer
matches for years, from 2001-2004, before Stillitano became a match agent.  (Compl. ¶¶ 114-
143; Fike Decl. Exs. D, G.)  The record also reflects that FIFA licensed match agents throughout
this time, since 1995, yet never required ChampionsWorld to affiliate itself with a match agent
licensee.  (See Fike Decl. Ex. B: Art. 25.)  Therefore, the record does not support that
ChampionsWorld "needed" Stillitano to become a match agent in order to conduct its business.[2]

Furthermore, and perhaps more importantly, the record reflects that USSF – which holds
itself out as a "member" of FIFA and claims to have always been bound by FIFA's arbitration
and other rules – knew Stillitano was not a match agent before June 2004, yet sanctioned all of
ChampionsWorld's events during that time, subject only to ChampionsWorld executing the
ChampionsWorld/USSF Contracts (with mandatory Illinois litigation clauses).  (Fike Decl. Exs.
D, G: Par. 18.)  Where USSF, a member of FIFA, was regularly approving ChampionsWorld's
events without a FIFA license, there is no basis to find that ChampionsWorld "believed it
needed" or actually needed Stillitano to become a match agent in order to conduct its business.

_____

[2] Stillitano's March 2004 application letter to FIFA made clear that ChampionsWorld had
already organized international matches.  (Fike Decl. Ex. C.)  Stillitano used that fact, together
with his own considerable international promotion experience since 1994 in a variety of contexts
having nothing to do with ChampionsWorld, to support his qualifications for personal licensure –
which, as discussed further below, is all that FIFA would permit.  If FIFA licensure had been an
actual prerequisite for ChampionsWorld's business, one would reasonably expect that FIFA
would have rebuked ChampionsWorld in some way upon receiving Stillitano's March 2004
letter.  FIFA took no action against ChampionsWorld at all.

Moreover, to the extent that ChampionsWorld and USSF continued to do business precisely the same way before and after Stillitano obtained his match agent license (i.e., USSF continued after June 2004 to force ChampionsWorld to execute the same, fully-integrated instruments that USSF solely drafted, with mandatory Illinois forum selection clauses and without references to FIFA arbitration), the record does not support a finding that ChampionsWorld believed Stillitano's licensure was a necessary prerequisite to doing business. By the same token, the record does not support a finding that ChampionsWorld believed it had ever agreed to submit to Swiss arbitration.  See, e.g., Banque de Gestion Privee SIB v. Transoptions, Co., No. 92 C 5252, 1993 WL 96453, at *3 (N.D. Ill. Mar. 29, 1993) ("The duty to arbitrate is a significant one which alters a party's expectations and avenues of recovery.  Given the serious effect that this agreement can have on a party's remedial postures, evidence of an express agreement becomes even more essential").

### 3.    The Decision Misconstrues The Legal Effect Of The Mandatory And Fully-Integrated Nature Of The Illinois Forum Selection Clauses

The Decision's reliance upon Defendants' authorities to reconcile seemingly conflicting forum selection provisions in this case, contained within different contracts, separated by years, and executed by and between different parties, is also in error.  (Decision at 13.)  Defendants' authorities concern disputes between and among the same parties agreeing to seemingly conflicting provisions, but within the same instruments, or in multiple instruments constituting one contractual arrangement, or in instruments executed nearly contemporaneously but where arbitration was first-selected.

In particular, West Shore Pipe Line Co. v. Associated Elec. & Gas Ins. Servs., Ltd., 791 F. Supp. 200, 201 (N.D. Ill. 1992), involved seemingly conflicting provisions within the same document, but with one provision specifying that the jurisdiction of the courts was only triggered "[i]n the event of a judgment entered [] on an arbitration award."  Similarly, Personal Sec. & Safety Sys. v. Motorola Inc., 297 F.3d 388, 395 (5th Cir. 2002), concerned the same parties who were involved in a single "contractual arrangement," where "several documents represent[ed] one agreement" and thus required the court to "interpret the forum selection clause in the context of the entire contractual arrangement [where] we must give effect to all of the terms of that arrangement."  In Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 282 (2d Cir. 2005), the parties initially agreed on a broad arbitration clause, and one month later the same parties

3

executed a separate agreement with a forum selection clause that was "cumulative and not exclusive of any rights or remedies provided under any other agreement." The forum selection clause was also expressly "without limitation" of the parties to bring a proceeding in "other jurisdictions," and was not mandatory but rather provided that an action "may" be determined in the forum provided therein. Id.[3]

Here, by contrast, ChampionsWorld and USSF agreed to mandatory Illinois litigation, within fully-integrated instruments that USSF drafted, long before and even after Stillitano, in his own name, entered into the match agent license agreement with FIFA. Admittedly, because the fact pattern presented herein is so unique and the result Defendants seek is so extraordinary, neither side could locate authorities directly on point. Nevertheless, ChampionsWorld's authorities, which the Decision does not address, are more compelling on these facts.

Specifically, WFC Commodities Corp. v. Linnco Futures Group, Inc., No. 98 C 1354, 1998 WL 834374, at *3 (N.D. Ill. Nov. 25, 1998), held that a mandatory forum selection clause within a fully-integrated contract trumped an arbitration provision from an earlier agreement between the same parties. Similarly, American Life Ins. Co. v. Parra, 25 F. Supp. 2d 467, 476-7 (D. Del. 1998), held that a mandatory forum selection clause proved that the defendant agreed "to exclude all other forums," thereby "preclude[ing] arbitrating disputes."

### a. The Decision Misconstrues The Phrase "Any Action Or Proceeding" In The Illinois Forum Selection Clauses

USSF's mandatory Illinois forum selection clause dictates that the "courts of Illinois" have "exclusive jurisdiction" over "any action or proceeding" relating to the ChampionsWorld/ USSF Contracts. This language is a mandate and clarification that any action (meaning "judicial action") or proceeding (meaning potentially "*any* procedural means for seeking redress from a tribunal or agency") must be brought in the courts in Illinois (as opposed, for instance, to an arbitral tribunal in Switzerland).

The Decision errs by relying on only a portion of the definition of "proceeding" in Black's Law Dictionary (7th ed. 1999), to conclude that "proceeding," within the phrase "any action or proceeding," must mean "business done in courts." (Decision at 13-14.) In fact, Black's defines "proceeding" to mean: "The business conducted by a court or other official

---

[3] The Decision's reliance on Patten Secs. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400, 407 (3d Cir. 1987), a securities exchange case, and the other securities exchange cases cited by the Decision are discussed in Part II.B.2, infra.

body; a hearing…. Any procedural means for seeking redress <u>from a tribunal or agency</u>." <u>Id.</u> at 1221 (emphases supplied). Moreover, by concluding that the terms "action" and "proceeding" within the Illinois forum selection clause both contemplate only courtroom litigation, the Decision erroneously renders one of those terms within the phrase "any action or proceeding" a meaningless nullity. <u>E.g.</u>, <u>Welborn Clinic v. Medquist, Inc.</u>, 301 F.3d 634, 640 (7th Cir. 2002).

### 4. The Decision Contradicts Itself Regarding The Parties' "Intent"

This Court also found that "given that the FIFA arbitration would apparently convene in Switzerland, it is not even clear that this Court could *retrospectively* vacate an arbitration award in this case." (Decision at 18.) This statement further illustrates the Court's misapprehension of the parties' intent. The Decision first concludes that under the FAA the case must be stayed and referred to FIFA arbitration, because the parties supposedly intended to arbitrate overseas and then to seek "judicial enforcement of arbitration" in Illinois. (Decision at 13.) However, the Decision later finds that judicial enforcement in Illinois may not even be possible under the FAA, ostensibly meaning that the parties did not actually intend anything by their mandatory Illinois forum selection clause. (Decision at 18.) The Decision thus impermissibly renders the mandatory Illinois forum selection clause a complete nullity. <u>E.g.</u>, <u>Welborn</u>, 301 F.3d at 640; <u>Metro E. Ctr. for Conditioning And Health v. Qwest Commc'ns Int'l, Inc.</u>, 294 F.3d 924, 926 (7th Cir. 2002) ("People draft documents to achieve *some* objective, … it is not sensible to construe a substantial passage of a legal text as pointless").

### 5. The Decision Misconstrues The Effect Of The Bankruptcy Court's Order

Finally, it must be repeated that this case is the product of the U.S. Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") So Ordering under its exclusive jurisdiction ChampionsWorld's Third Amended Plan of Reorganization, which provides for the prosecution of the "USSF Litigation" as the sole remaining material asset of ChampionsWorld to be liquidated and distributed among its creditors. <u>In re ChampionsWorld, LLC</u>, Case No. 05-11194 (MS) (D.N.J. 2006); Compl. ¶ 113. USSF itself appeared and filed a claim in the Bankruptcy Court as a "creditor" under the same ChampionsWorld/USSF Contracts at issue. USSF also

objected to the anticipated "USSF Litigation" on various grounds, none of which included USSF's newly-contrived argument that ChampionsWorld should be forced to arbitrate.[4]

It is reasonable to conclude that USSF did not raise the FIFA arbitration issue to the New Jersey branch of the federal courts, because USSF's true belief is that the ChampionsWorld/ USSF Contracts control and dictate that ChampionsWorld's claims be litigated. Such belief is consistent with the remainder of the record.

### B. The Decision Misconstrued The FIFA License And MARs As "Naming ChampionsWorld" And As Permitting ChampionsWorld To "Act As A Match Agent"

The Court found that "when Stillitano signed the [FIFA] match agent license, he was acting on ChampionsWorld's behalf. His signature block on that document names him as CEO of ChampionsWorld." (Decision at 7.) Respectfully, this is a misapprehension of the facts and a misstatement of the record. The signature block and the license as a whole do not refer to ChampionsWorld in any way. (Fike Decl. Ex. D.) The FIFA License exists solely in Stillitano's name. (Id.) FIFA's cover letter to USSF enclosing Stillitano's FIFA License similarly states that the license was "issued on behalf of Mr. Charlie Stillitano." (Id.)

The Decision also states that the MARs "do[] not preclude the possibility that a company can *act* as a match agent on the basis of a license held by one of its officers," and that "whether or not ChampionsWorld was permitted to *apply* for a match agent license under FIFA rules, ChampionsWorld used Stillitano's license to *act* as a 'match agent' ...." (Decision at 9, 16-17.) Respectfully, the Court overlooked the MARs' further prohibition on natural agents from "transferring, negotiating, loaning or selling" their licenses to others. (Fike Decl. Ex. B: Arts. 4(2), 12.) Thus, the MARs specifically contemplated and intended that "companies" are excluded from FIFA's match agency structure, either as applicants or as transferees. (Id.)

Similarly, the MARs required Stillitano, not ChampionsWorld, to obtain "professional liability insurance" before FIFA issued its license. (Fike Decl. Ex. B: Arts. 8, 10.) The FIFA License also remains valid until Stillitano, not ChampionsWorld, "terminates his activity," at which time Stillitano is "obliged to return his license." (Id.: Art. 23.) Thus, Stillitano's FIFA License continues to exist even when ChampionsWorld does not.

---

[4] USSF changed counsel between the Bankruptcy Court proceeding (when it was represented by Jenner & Block) and this proceeding (where it is represented by Latham & Watkins).

There is nothing in the MARs to indicate FIFA's intent to bind ChampionsWorld to the FIFA License. Rather, everything in the MARs indicates an intent specifically to exclude ChampionsWorld as a contracting, responsible party, and to bind only Stillitano personally. These facts, overlooked by the Court, cannot be reconciled with the Decision's conclusions that: (a) ChampionsWorld can be bound to the FIFA License under "agency" doctrine; and (b) ChampionsWorld can be deemed a "match agent" for purposes of Article 22 of the MARs. (Decision at 7, 16-17.)

### 1. The Decision's Conclusion Of "Agency" Is Erroneous

Because ChampionsWorld was not a signatory or party to the FIFA License, and was "not permitted" by FIFA to become a party to or transferee of that license, the Decision should be vacated to the extent that it found Stillitano to have signed the FIFA License "on ChampionsWorld's behalf" and as ChampionsWorld's "agent." (Decision at 7.) See Laborers Int'l Union v. HSA Contractors, Inc., 728 F. Supp. 519, 527 (E.D. Wis. 1989) (rejecting agency theory where union was "not mentioned as a proposed party and [was] not a signatory to the [agreement]"); cf. Redman v. Allen, No. 05 C 6818, 2006 U.S. Dist. LEXIS 81497, at *6-7 (N.D. Ill. Nov. 3, 2006) (rejecting inverted agency theory espoused by Decision).[5]

Respectfully, the record shows that FIFA expressly refused to bind ChampionsWorld to the FIFA License by the language of the MARs. ChampionsWorld should not be held indirectly bound to the MARs by operation of inapplicable agency law.

### 2. The Decision's Conclusion That ChampionsWorld Was A "Match Agent" Within The Scope Of Article 22 Is Erroneous

Article 22 of the MARs only refers to disputes "between a match agent and a national association, a club and/or another match agent" to FIFA arbitration. (Fike Decl. Ex. B: Art. 22.) There is no contention that ChampionsWorld was a "national association" or a "club." Moreover, the record does not support the Decision's finding that ChampionsWorld, which could never possess or use in its own name a match agent license, could nonetheless "act as a match agent" for purposes of Article 22. (Decision at 16-17.) The case of Washburn v. Rabun, 755 F.2d 1404 (11th Cir. 1985), relied upon by the Decision for this point, does not support a contrary conclusion. (Decision at 17.)

---

[5] For the reasons discussed in Point II.A, infra, the Decision's alternative conclusion of "estoppel" and finding of "direct benefit" are also erroneous. (Decision at 8-9.)

Although <u>Washburn</u> considered an Alabama statute which similarly provided that insurance agents must be natural persons, that statute was being read in conjunction with a second statute, which the Decision overlooks, that provided "all premiums received by an agent 'shall be trust funds.'" <u>Id.</u> at 1405-06. It was the <u>second</u>, "trust fund" statute that offered grounds to attribute funds collected by the natural agent to his corporation. <u>Id.</u> The MARs contain no similar "trust" provision regarding match agent licenses and, again, specifically prohibit "companies" from applying for or being transferees of such licenses. Moreover, <u>Washburn</u> never decided whether an agent's receipt of funds could be attributed to his company, but only certified the question to the Alabama Supreme Court. <u>Id.</u> at 1406.

By contrast, ChampionsWorld's authority of <u>Banque</u>, which the Decision does not mention, demonstrates why ChampionsWorld could not be covered by MAR Article 22. In <u>Banque</u>, plaintiffs were not bound to arbitrate under the Chicago Board of Options' membership arbitration provision that purported to bind "associated persons," where "persuasive" authority indicated that "only natural persons, not entities, can be 'associated persons,'" and where there was no evidence that the plaintiffs had "an express and mutual understanding that arbitration will resolve any conflicts" where the plaintiffs had signed a separate agreement with one of the defendants that did <u>not</u> contain an arbitration provision. 1993 WL 96453, at *3-4; <u>see also</u> <u>Maj v. National Secs. Network, Inc.</u>, 702 F. Supp. 184, 185 (N.D. Ill. 1988) ("The operative language of the arbitration provision clearly provides that '… any controversy which may arise *between [Maj] and [SSC] whether or not it involves [NSN]*, … shall be submitted to and be settled by arbitration….' This language does not require disputes solely between Maj and NSN to be resolved by arbitration, …. [W]e cannot create an arbitration clause where none exists").

Accordingly, the Decision should be vacated and Defendants' motions to stay denied.

## II. THREE CONTROLLING LEGAL ARGUMENTS THAT WERE ALSO MISAPPREHENDED BY THE COURT SHOULD BE RECONSIDERED OR, ALTERNATIVELY, CERTIFIED FOR INTERLOCUTORY REVIEW

"There are four statutory criteria for the grant of a section 1292(b) petition to guide the district court: there must be a question of *law*, it must be *controlling*, it must be *contestable*, and its resolution must promise to *speed up* the litigation." <u>In re Ocwen Fed. Bank FSB Mortgage Servicing Litig.</u>, No. 04 C 2714, 2006 U.S. Dist. LEXIS 34647, at *6 (N.D. Ill. May 16, 2006).

The Decision contains three questions of controlling and contestable law, which ChampionsWorld respectfully submits the Decision erroneously analyzed and should thus be reconsidered, or, alternatively, certified for interlocutory appeal. These include:

(i) Does the Seventh Circuit's "estoppel" doctrine, through which a non-signatory can be bound to arbitrate, require the non-signatory to be capable of directly receiving consideration under, or being directly bound by, the contract containing the arbitration provision. If the answer to this question is "yes," then the Decision should be reversed.

(ii) For a non-signatory to be able to compel arbitration, does the Seventh Circuit require the claims at issue to be "intimately founded in and intertwined with the underlying contract" that contains the arbitration provision. If the answer is "yes," the Decision should be reversed.

(iii) Does the Seventh Circuit require a "touch matters" test under the FAA to bind non-signatories to an arbitration clause, which the Decision does not address. If "yes," then the Decision should be reversed.

Reversal of the Decision would materially advance this litigation, because the action would no longer have to be stayed indefinitely pending overseas arbitration.

### A. The Decision Misconstrues The "Estoppel" Doctrine Under Which Non-Signatories May Be Compelled Against Their Will To Arbitrate

The Decision finds that ChampionsWorld is estopped, under Zurich Am. Ins. Co. v. Watts Indus., 417 F.3d 682 (7th Cir. 2005), "from now repudiating Stillitano's license application [sic] after having so directly benefited from it." (Decision at 8.) As an initial matter, Stillitano's letter application was not the contract that contains the FIFA arbitration provision. Under Zurich, "[a] nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause…. But case law consistently requires a *direct* benefit under *the contract containing an arbitration clause* before a reluctant party can be forced into arbitration." 417 F.3d at 688 (citing Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995)) (italics in original).

Regardless, the Decision incorrectly construes the Seventh Circuit's requirement for showing a "direct benefit" to a non-signatory. A non-signatory can only "directly benefit" from a contract under which it can directly receive consideration, or can directly be bound. This conclusion is compelled by the relevant authorities that have all been previously cited, including:

<u>Zurich</u>, 417 F.3d at 688 (finding no direct benefit to non-signatory insured whose parent company signed deductible agreements that permitted insured to pay lower premiums under its policy, because there were "no benefits to [the insured, *per se*] under [the deductible] agreements," and the ability to "pay[] lower insurance premiums based on the deductibles ... is too attenuated and indirect to force arbitration under and estoppel theory").

<u>Thomson-CSF</u>, 64 F.3d at 775, 778-79 (relied upon by <u>Zurich</u>, finding that third party who purchased company to exploit its exclusive dealing agreement with third party's competitor so as to shut the competitor out of the market, derived its anticompetitive benefit "directly from" its purchase of the signatory company, and not from the exclusive dealing agreement "itself").

<u>MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC</u>, 268 F.3d 58, 61-62 (2d Cir. 2001) ("[T]he benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself"; close affiliation between a non-signatory and a signing party alone "may not estop a nonsignatory from avoiding arbitration.") (citing <u>Thomson-CSF</u>, 64 F.3d at 778-79).

<u>Masefield AG v. Colonial Oil Indus.</u>, No. 05 Civ. 2231 (PKL), 2005 WL 911770, at *4 (S.D.N.Y. Apr. 18, 2005) ("[T]he Contract only addresses defendant's purchase of fuel oil from [the signatory] and makes no mention of [the non-signatory] .... Though [the non-signatory] may be taking advantage of [the signatory's] agreement with defendant to secure repayment of [the signatory's] prior obligations, any benefit derived from it is indirect."); see also <u>Grundstad v. Ritt</u>, 106 F.3d 201, 205 (7th Cir. 1997) ("The guaranty simply states that [the guarantors] 'hereby guarantee' the Agreement. It does not state that they agree to be bound personally by the Agreement"); <u>Industrial Elecs. Corp. v. iPower Distrib. Group, Inc.</u>, 215 F.3d 677, 681 (7th Cir. 2000) ("[The plaintiff] was not a party to the franchise agreement and does not have standing directly to enforce its terms").

<u>Veera v. Janssen</u>, No. 05 Civ. 2145 (SHS), 2005 WL 1606054, at *4-5 (S.D.N.Y. July 5, 2005) (directors signed agreements containing arbitration clauses on behalf of companies; agreements also contained "limitation on liability" clauses, which defendants argued directly benefited directors personally such that they were estopped from avoiding arbitration; court disagreed, and found that liability provisions were "aimed directly at limiting the Investment Companies' liability; .... Any application of that provision to [the directors] is incidental to their

agency relationship with the Investment Companies…. [Moreover, the managing directors] were not asked to adopt and approve the agreement.").

     Zimring v. Coinmach Corp., No. 00 Civ. 8111 (LMM), 2000 WL 1855115, at *4 (S.D.N.Y. Dec. 19, 2000) (finding no direct benefit to non-signatory who signed asset purchase agreement expressly on behalf of his company alone and not in his own name, even though "it [was] undisputed that [the non-signatory] received a substantial benefit by selling [his company] pursuant to the APA," because the non-signatory was "an *intentional* non-signatory").[6]

     Where ChampionsWorld was "not permitted" by FIFA to be a "match agent" and is not named anywhere on the license, there is no question that ChampionsWorld is an "intentional non-signatory" of the FIFA License. ChampionsWorld was not asked to adopt the FIFA License, nor could it have done so. ChampionsWorld also could not assume the FIFA License or have standing to directly enforce its terms. Even if ChampionsWorld obtained some relatively minimal benefit as a result of Stillitano becoming a match agent by the time most of Defendants' damage had been done – and, again, even that point is arguable since the record does not support a finding that ChampionsWorld ever needed Stillitano to be licensed – such supposed benefit to ChampionsWorld was <u>necessarily</u> and as a matter of law indirect. Therefore, the Decision's finding of "direct benefit" and conclusion of "estoppel" are erroneous as a matter of law.

### B.    The Decision Misconstrues The Requirements For Non-Signatories To Be Able To Compel Arbitration

#### 1.    The "Intertwined With" Test Controls Non-Signatory Standing

     The Decision finds that USSF, a non-signatory to the FIFA License, is empowered to compel parties thereto – or, to be more precise, another non-signatory to that agreement – to arbitrate. (Decision at 9-12.) In this regard, the Court misconstrued the significance of the rule stated in Hughes Masonry Co. v. Greater Clark County School Bldg. Corp., 659 F.2d 836, 841 n.9 (7th Cir. 1981), that a signatory's claims must be "intimately founded in and intertwined with the underlying contract" that contains the arbitration clause. See also Allied Van Lines, Inc. v. Orth Van and Storage, Inc., No. 04 C 6004, 2005 U.S. Dist. LEXIS 13616, at *5 (N.D. Ill. June 3, 2005) (finding that signatory may be compelled by non-signatory to arbitrate "where claims against the non-signatory are 'intimately founded in and intertwined with the underlying contract

---

[6] Defendants previously agreed that relevant "Seventh Circuit precedent is entirely consistent with the Second Circuit precedent." (USSF Supp. Br. at 4; MLS Supp. Br. at 2.)

obligations'") (citing <u>Hughes</u>); <u>Shipp v. XA, Inc.</u>, No. 06 C 1193, 2006 U.S. Dist. LEXIS 67094, at *14 (N.D. Ill. Aug. 31, 2006) (reciting rule that non-signatory may compel arbitration if claim by signatory "is rooted in and dependent on rights and conditions defined in the Agreement").[7]

The Decision distinguishes <u>Hughes</u> because it "never addressed the general question of whether a nonsignatory can enforce an arbitration agreement – it merely held that a signatory cannot seek to avoid arbitration where it would be inequitable to do so." (Decision at 11.) However, the Decision does not consider <u>Shipp</u> and <u>Allied Van</u>, which did specifically address a non-signatory's right to compel, and overlooks that non-signatory standing to compel has necessarily derived from an analysis of signatory rights. <u>See</u> <u>Denney v. BDO Seidman, L.L.P.</u>, 412 F.3d 58, 70-71 (2d Cir. 2005) (explaining how to apply traditional "signatory/non-signatory" tests in rare cases when one non-signatory seeks to compel another non-signatory to arbitrate).

The Decision acknowledges, *sub silentio*, that ChampionsWorld's claims have nothing to do with the MARs. Indeed, the MARs say nothing about whether USSF had any authority to "sanction" ChampionsWorld's events and, consequently, are not mentioned anywhere in the Complaint.[8] Therefore, the Decision's finding that USSF has standing to compel arbitration is erroneous as a matter of law.

## 2. "Intended Third Party Beneficiaries" Of "Association Rules" Still Must Demonstrate That A Dispute Is Related To *Those Rules*

The Decision relies upon a series of securities exchange, "association rules" cases to find an "intended third party beneficiary" right for USSF to compel arbitration. (Decision at 9-11.)

---

[7] Seventh Circuit precedent on this point is once again entirely consistent with the Second Circuit. <u>Denney v. Jenkens & Gilchrist</u>, 412 F. Supp. 2d 293, 297-300 (S.D.N.Y. 2005) ("A nonsignatory may compel arbitration on an estoppel theory, where (i) there is a close relationship between the parties and controversies involved and (ii) the signatory's claims against the nonsignatory are '"intimately founded in and intertwined with the underlying"' agreement containing the arbitration clause"; "[t]he plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel"; "Plaintiffs are not estopped from avoiding arbitration with [the non-signatory defendants] because [plaintiffs] do not allege that the [agreements containing arbitration clauses] were integral to the fraudulent scheme. It is not sufficient that the dispute between plaintiffs and [the non-signatory defendants] is related to [] services provided by [the signatory] to the [agreements with arbitration clauses]").

[8] All that the MARs say about national associations authorizing foreign competitions is that the individual teams must "obtain authorization from <u>their</u> national associations." (Fike Decl. Ex. B: Art. 14.)

These cases hold that when a plaintiff who is a member of an exchange – and who has agreed to submit to arbitration as part of the exchange rules – tries to avoid arbitration, that plaintiff can be compelled to arbitrate an "exchange-related dispute" as part of its "association" agreement. E.g., Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21, 26 (2d Cir. 1996); Patten Secs. Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400 (3d Cir. 1987); R.J. O'Brien & Assocs., Inc. v. Pipkin, 64 F.3d 257, 259-60 (7th Cir. 1995). Certain exchanges permit non-members, as intended third party beneficiaries of the exchange rules, to rely on the arbitration provision and to demand that plaintiff-members honor their promise to the exchange (and thus to the intended beneficiaries of the exchange) to arbitrate "exchange-related disputes." Spear, 85 F.3d at 26; IDS Life Ins. Co. v. SunAmerica, Inc., 103 F.3d 524 (7th Cir. 1996).

To make these cases applicable, the Decision finds that "[a]lthough ChampionsWorld is not a member of FIFA *per se*, ChampionsWorld agreed to adhere to FIFA's arbitration framework [within the MARs], just the same as the association members in cases like *R.J. O'Brien* and *Geldermann* agreed to their respective associations' arbitration frameworks." (Decision at 10.) Again, this finding is unwarranted because ChampionsWorld was never a "match agent" and never a party to the FIFA License/MARs. To further make the "association rules" cases applicable, the Decision disregards the fact that USSF is a member of FIFA, and instead analyzes USSF merely as an intended non-party beneficiary of the MARs. (Id. at 10-11.)

Notwithstanding the forced reasoning, even intended non-signatory beneficiaries to "association rules" must be able to demonstrate that an "association member's" dispute is related to those rules. The securities exchange cases cited by the Decision did not involve outsiders trying to compel members to arbitrate non-securities disputes. E.g., Spear, 85 F.3d at 26 ("the arbitration rules of an exchange are sufficient to compel arbitration of exchange-related disputes ….") (citations omitted) (emphasis supplied); R.J. O'Brien, 64 F.3d at 261 ("associated person" required to arbitrate "commodities trading dispute" as member of futures association under Commodities Exchange Act).

It would be unreasonable, for example, to imagine the NASD being called upon to arbitrate a personal injury dispute, simply because one side was an "associated person" of the NASD and the other was a third party beneficiary of the NASD's rules. In the same vein, ChampionsWorld's claims have nothing to do with the MARs.

13

**C.     The Decision Overlooks The Requirement Of The "Touch Matters" Test**

The "touch matters" test, which was argued by both sides but is not discussed in the Decision, is defined as follows:

> Where the scope of an arbitration agreement is broad, "there arises a presumption of arbitrability; if, however, the dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the presumption by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it…. Claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement." In determining whether a particular claim falls within the scope of the parties' arbitration agreement, this Court "focuses on the factual allegations in the complaint rather than the legal causes of action asserted." If those allegations "touch matters" covered by the [relevant] license agreement, plaintiffs' claims must be arbitrated.

Specht v. Netscape Comm'ns Corp., 306 F.3d 17, 36 (2d Cir. 2002) (citations omitted); accord Sarantakis v. Gruttadauria, No. 02 C 1609, 2003 U.S. Dist. LEXIS 4002, at *17-18 (N.D. Ill. Mar. 14, 2003) ("claims that do not implicate the contract are litigable. In deciding whether a particular claim implicates the agreement, and thus is subject to arbitration, courts focus on the factual allegations of the complaint," and finding that plaintiffs' claim did not "implicate[] the account agreement even tangentially" and had "nothing to do with the account agreement") (citations omitted); Shipp, 2006 U.S. Dist. LEXIS 67094, at *11 (allegations "touch matters" covered by a contract containing an arbitration clause if "it would be virtually impossible for [a plaintiff] to allege a factual basis for [its claims] without invoking the Agreement …."); Industrial Elecs., 215 F.3d at 681; AlliedSignal, Inc. v. B.F. Goodrich Co., 183 F.3d 568, 573 (7th Cir. 1999) ("Therefore, [defendant] could fully comply with the [agreement containing an arbitration clause] and still cause [plaintiff] antitrust injury by charging uncompetitive prices. [Plaintiff's] antitrust claims do not arise under [that agreement] and hence are not subject to arbitration"); Stechler v. Sidley Austin Brown & Wood, L.L.P., 382 F. Supp. 2d 580, 591-92 & n.86 (S.D.N.Y. 2005) ("Here, no term in the Agreements *directly* gives rise to the [non-signatories'] injuries. The [non-signatories'] injuries arise indirectly from the purposes for which the Agreements were entered into, rather than from the terms of the Agreements themselves…. Their claims 'can hardly be characterized as arising out of or being integrally related to' the Agreements …. 'Were this Court to find the Agreement[s] void, invalid, or

14

unenforceable, Plaintiffs would still have valid causes of action against the [] Defendants'")
(citations omitted).

Once again, ChampionsWorld's allegations have nothing to do with, and make no
mention of the FIFA License or MARs. As a result, the allegations do not "touch matters"
within the FIFA License or MARs, and should not be deemed arbitrable as a matter of law. The
Decision's failure to address this issue is erroneous.

## CONCLUSION

For the foregoing reasons, Plaintiff ChampionsWorld respectfully requests that the Court
grant reconsideration of the Decision, then thereupon vacate the Decision and deny Defendants'
respective motions to stay and/or dismiss this action pursuant to the Federal Arbitration Act. In
the alternative, Plaintiff respectfully requests that the Court certify the three controlling and
contestable legal questions described above for interlocutory review by the United States Court
of Appeals for the Seventh Circuit, and that the Court award ChampionsWorld such other and
further relief as it deems just and proper.

Dated: Chicago, Illinois
      May 18, 2007

PRYOR CASHMAN LLP
410 Park Avenue
New York, New York 10022
(212) 421-4100

- and -

MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, Illinois 60601-6710
(312) 222-0800

By: *s/ Jamie M. Brickell*
One of the Attorneys for Plaintiff
ChampionsWorld LLC
Jamie M. Brickell (admitted *pro hac vice*)
William L. Charron (admitted *pro hac vice*)
Ronald H. Balson
Carrie A. Hall