# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHAMPIONSWORLD, LLC, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 06-CV-5724** |
| **v.** | ) | |
| | ) | **Hon. Harry D. Leinenweber** |
| UNITED STATES SOCCER FEDERATION, INC., | ) | |
| MAJOR LEAGUE SOCCER, L.L.C., and | ) | |
| DOES 1 through 10, inclusive, | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT UNITED STATES SOCCER FEDERATION INC.'S
## MOTION FOR JUDGMENT ON THE PLEADINGS
## <u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(c)</u>

Dated:  April 21, 2010

Russell F. Sauer, Jr. (admitted *pro hac vice*)
Casandra L. Thomson
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071
(213) 485-1234

Timothy B. Hardwicke
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois  60606
(312) 876-7700

# **TABLE OF CONTENTS**

Introduction ........................................................................................................................1

Summary Of Allegations And Procedural History ........................................................2

Legal Standard ..................................................................................................................5

Argument ............................................................................................................................6

I.   Plaintiff's First And Second Claims For Relief Should Be Dismissed Because The
     USSF's Actions, As Alleged, Are Immune From Antitrust Liability ................................6

     A.   Implied Antitrust Immunity Is Designed To Protect Defendants From
          Being Subjected To Conflicting Statutory Obligations ..........................................7

     B.   The USSF Is Legally Obligated To Exercise Control Over The Promotion
          Of International Professional Soccer Matches In The United States ......................7

          1.   The Olympic Movement ..........................................................................8

               a.   FIFA is the international federation recognized by the IOC
                    for the sport of soccer. .................................................................9

               b.   The United States Olympic Committee is the national
                    Olympic committee recognized by the IOC for the United
                    States. ..........................................................................................9

          2.   The Olympic And Amateur Sports Act ....................................................10

          3.   The USSF's Obligations As An NGB And Member Of FIFA .................12

     C.   Subjecting The USSF To Liability Under The Antitrust Laws For
          Exercising Authority Over The Promotion Of International Professional
          Soccer Matches Is "Plainly Repugnant" To The Olympic And Amateur
          Sports Act ...............................................................................................................14

II.  Plaintiff's Fifth Claim For Relief Should Be Dismissed Because Plaintiff Has Not
     And Cannot Plead The Necessary Elements Of A RICO Claim ......................................16

     A.   Plaintiff Fails To Sufficiently Plead The Existence Of An Association-In-
          Fact Enterprise .......................................................................................................16

     B.   Plaintiff Also Fails To Sufficiently Plead A Pattern Of Racketeering
          Activity ...................................................................................................................18

          1.   Plaintiff Cannot Establish That The USSF Made A False Statement
               - A Required Element For Mail Or Wire Fraud ......................................19

          2.   Plaintiff Has Failed To Allege Actionable Extortionate Conduct ...........20

III.     Plaintiff's State Law Claims Should Also Be Dismissed .................................................22

Conclusion ...........................................................................................................................25

Diagram And Summary Of Governance Structure For Soccer ....................................Appendix A

The Definition Of "Amateur Athlete" Under The
Ted Stevens Olympic And Amateur Sports Act ...........................................................Appendix B

## TABLE OF AUTHORITIES

### CASES

*Abrams v. Van Kampen Funds, Inc.*,
  2002 WL 1160171 (N.D. Ill. May 30, 2002)............................................................. 6

*Bachman v. Bear, Stearns & Co.*,
  178 F.3d 930 (7th Cir. 1999) ...................................................................... 18

*Basselen v. General Motors Corp.*,
  792 N.E.2d 498 (Ill. App. Ct. 2003) .............................................................. 24

*Behagen v. Amateur Basketball Ass'n*,
  884 F.2d 524 (10th Cir. 1989) .............................................................. passim

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................... 5

*Buchanan-Moore v. County of Milwaukee*,
  570 F.3d 824 (7th Cir. 2009) ........................................................................ 5

*Cobbs v. Sheahan*,
  319 F. Supp. 2d 865 (N.D. Ill. 2004).............................................................. 16

*Corley v. Rosewood Care Ctr.*,
  388 F.3d 990 (7th Cir. 2004) ..................................................................... 19

*Credit Suisse Sec. (USA), LLC v. Billing*,
  551 U.S. 264 (2007) ............................................................................... 7, 15

*Crichton v. Golden Rule Ins.*,
  576 F.3d 392 (7th Cir. 2009) ...................................................................... 17

*De Frantz v. U.S.O.C.*,
  492 F. Supp. 1181 (D.D.C. 1980)............................................................ 9, 10, 12

*Eleven Line v. N. Texas State Soccer Ass'n, Inc.*,
  213 F.3d 198 (5th Cir. 2000) .................................................................. 14, 15

*Evans v. United States*,
  504 U.S. 255 (1992) ................................................................................. 21

*FDIC v. Metz*,
  1986 U.S. Dist. LEXIS 15730 (N.D. Ill. Dec. 31, 1986)........................................ 23

*GE Capital Corp. v. Lease Resolution Corp.*,
  128 F.3d 1074 (7th Cir. 1997) ....................................................................... 5

*Gordon v. New York Stock Exch.*,
  422 U.S. 659 (1975) .......................................................................................... 7

*Hume v. United States*,
  132 U.S. 406 (1889) ........................................................................................ 24

*Inco Securities Corp. v. Legg*,
  1996 U.S. Dist. LEXIS 11932 (N.D. Ill. Aug. 16, 1996) ...................................... 23

*J.D. Pavlak, Ltd. v. William Davies Co.*,
  351 N.E.2d 243 (Ill. App. Ct. 1976) .................................................................. 24

*Jazbec v. Hirsch*,
  2009 U.S. Dist. LEXIS 96551 (N.D. Ill. Oct. 14, 2009) ...................................... 16

*Jennings* v. *Auto Meter Prods, Inc.*,
  495 F.3d 466 (7th Cir. 2007) ....................................................................... 16, 18

*Jepson, Inc. v. Makita Corp.*,
  34 F.3d 1321 (7th Cir. 1994) ............................................................................ 20

*JES Props., Inc. v. USA Equestrian, Inc.*,
  458 F.3d 1224 (11th Cir. 2006) ..................................................................... 7, 15

*Jones v. Bock*,
  549 U.S. 199 (2007) .......................................................................................... 5

*Limestone Dev. Corp. v. Vill. of Lemont*,
  520 F.3d 797 (7th Cir. 2008) .................................................................. 16, 17, 18

*McBaldwin Financial Co. v Dimaggio, Rosario & Veraja, LLC*,
  845 N.E. 2d 22 (Ill. App. Ct. 2006) .................................................................. 23

*Michels v. United States Olympic Comm.*,
  741 F.2d 155 (7th Cir. 1984) .................................................................. 7, 8, 9, 10

*Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*,
  163 F.3d 449 (7th Cir. 1998) .............................................................................. 5

*Northern Trust Co. v. Merrill Lynch & Co.*,
  2006 U.S. Dist. LEXIS 11037 (N.D. Ill. Mar. 15, 2006) ...................................... 23

*Oldfield v. Athletic Congress*,
  779 F.2d 505 (9th Cir. 1985) ............................................................................ 11

*Perlman v. Zell*,
  185 F.3d 850 (7th Cir. 1999) ............................................................................ 19

*PS&E West Inc. v. Essex Group, Inc.*,
  1987 U.S. Dist. LEXIS 6725 (N.D. Ill. July 16, 1987) ........................................... 23

*Resolution Trust Corp. v. Ruggiero*,
  977 F.2d 309 (7th Cir. 1992) ........................................................... 25

*Richmond v. Nationwide Cassel L.P.*,
  52 F.3d 640 (7th Cir. 1995) ...................................................... 16, 17

*Safeco Ins. Co. v. Siciliano*,
  2009 U.S. Dist. LEXIS 6364 (C.D. Ill. Jan. 29, 2009) ........................... 25

*San Francisco Arts & Ath. v. U.S.O.C.*,
  483 U.S. 522 (1987) ...................................................... 8, 10, 22

*Silver v. New York Stock Exch.*,
  373 U.S. 341 (1963) ............................................................. 7

*Slaney v. Int'l Amateur Ath. Fed'n*,
  244 F.3d 580 (7th Cir. 2001) ........................................................ 9, 12

*Stachon v. United Consumers Club, Inc.*,
  229 F.3d 673 (7th Cir. 2000) .............................................. 16, 17, 18

*Streams Sports Club, Ltd. v. Richmond*,
  457 N.E.2d 1226 (Ill. App. Ct. 1983) ........................................... 24

*United States v. Davuluri*,
  239 F.3d 902 (7th Cir. 2001) ................................................... 19

*United States v. Turkette*,
  452 U.S. 576 (1981) ............................................................ 17

*Vulcan Golf, LLC v. Google Inc.*,
  552 F. Supp. 2d 752 (N.D. Ill. 2008) ........................................... 17

*Wagner v. Magellan Health Svcs., Inc.*,
  125 F. Supp. 2d 302 (N.D. Ill. 2000) ........................................... 20

*We Care Hair Dev. v. Engen*,
  180 F.3d 838 (7th Cir. 1999) .................................................. 24

*Williams v. Aztar Indiana Gaming Corp.*,
  351 F.3d 294 (7th Cir. 2003) ............................................. 19, 20

# STATUTES

18 U.S.C. § 1951 ........................................................................................................... 21

18 U.S.C. § 1951(b)(2) ................................................................................................. 21

18 U.S.C. § 1961 ........................................................................................................... 18

18 U.S.C. § 1961(4) ...................................................................................................... 16

18 U.S.C. § 1962(c) ...................................................................................... 4, 16, 17, 18

28 U.S.C. § 1404(a) ........................................................................................................ 4

36 U.S.C. § 220501 ......................................................................................................... 2

36 U.S.C. § 220501(b)(1) ............................................................................................. 10

36 U.S.C. § 220505(c)(4) ............................................................................................. 11

36 U.S.C. § 220522(a)(14) ........................................................................................... 11

36 U.S.C. § 220522(a)(6) ............................................................................................. 11

36 U.S.C. § 220523(a)(1) ............................................................................................. 11

36 U.S.C. § 220523(a)(1-5) .......................................................................................... 11

36 U.S.C. § 220523(a)(7) ............................................................................................. 11

36 U.S.C. § 220524(1) .................................................................................................... 2

36 U.S.C. § 220524(1-2) .............................................................................................. 11

36 U.S.C. § 220525(b)(4)(C) ....................................................................................... 11

36 U.S.C. § 220527-28 ................................................................................................. 11

Fed. R. Civ. Proc. 10(c) ................................................................................................. 5

Fed. R. Civ. Proc. 12(b)(6) ............................................................................................ 5

Fed. R. Civ. Proc. 12(c) .............................................................................................. 1, 5

Fed. R. Evid. 201(b) ....................................................................................................... 6

## OTHER AUTHORITIES

124 CONG. REC. 12855 (1978) .................................................................... 11

S. Rep. No. 105-325 (1998) ...................................................................... 10

## RULES

FIFA Statutes, Art. 13, para. 1(a), (f) ...................................................... 13

FIFA Statutes, Art. 13, para. 2 ................................................................. 13

FIFA Statutes, Art. 55 ............................................................................... 13

FIFA Statutes, Art. 76, para. 3 ................................................................. 13

IOC Principle 3 ............................................................................................ 8

IOC Principle 6 ............................................................................................ 9

IOC Rule 1(2) ............................................................................................... 9

IOC Rule 3(1-2) ........................................................................................... 9

IOC Rule 26 .................................................................................................. 9

IOC Rule 27(1.1-2, 1.5) ............................................................................... 9

IOC Rules 28 and 29, Bylaw 1.2 .............................................................. 11

IOC Rule 28(3) ............................................................................................. 9

IOC Rule 28(6) ............................................................................................. 9

IOC Rule 29(1.2) ........................................................................................ 10

IOC Rule 30 ........................................................................................... 10, 12

IOC Rule 41, Bylaw 1 .............................................................................. 9, 10

IOC Rule 45(2) ............................................................................................. 9

IOC Rule 46 .................................................................................................. 9

## TABLE OF ACRONYMS

FIFA            Fédération Internationale de Football Association

IF              International Federation

IOC             International Olympic Committee

MLS             Major League Soccer, LLC

NGB             National Governing Body

NOC             National Olympic Committee

USOC            United States Olympic Committee

USSF            United States Soccer Federation, Inc.

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendant United States Soccer Federation, Inc. ("USSF"), by its attorneys, hereby moves for judgment on the pleadings on each of Plaintiff ChampionsWorld, LLC's ("Plaintiff") First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Claims for Relief:

### INTRODUCTION

Plaintiff ChampionsWorld, LLC's ("Plaintiff") Complaint is principally constructed on a fundamentally flawed foundation - that Defendant United States Soccer Federation, Inc. ("USSF") did not and does not have the authority to regulate the promotion of exhibition soccer matches played among foreign professional teams in the United States.  Contrary to Plaintiff's assertion, the USSF not only has the authority to regulate such soccer matches, it is *legally obligated* to do so by virtue of its role in the Olympic movement, its status as the national governing body for the sport of soccer as recognized by the United States Olympic Committee ("USOC"), and as the national association representing the United States in the Fédération Internationale de Football Association ("FIFA").  As a member of FIFA – a membership that is mandated by the International Olympic Committee ("IOC") and the Olympic and Amateur Sports Act – the USSF is duty-bound to comply with FIFA's rules and regulations, *including the requirement that all soccer matches involving foreign teams to be played in the United States be regulated and sanctioned by the USSF.*

Notwithstanding the foregoing, Plaintiff seeks to hold the USSF liable for violating antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state laws simply for fulfilling the obligations imposed on it by the IOC, FIFA, the USOC and the Olympic and Amateur Sports Act.  By this motion, the USSF seeks dismissal of each of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that:

- The USSF's actions in regulating the promotion of exhibition soccer matches involving foreign professional teams played in the United States are immune from the application of the antitrust laws.

- Plaintiff has not and cannot allege facts sufficient to establish an "association in fact" enterprise or the predicate acts necessary to state a RICO claim.

- Plaintiff's state law claims either suffer from the same flaws as their federal counterparts, or are legally insufficient on their face.

When stripped of the erroneous allegations that the USSF exercised authority it did not have or otherwise misrepresented its authority over the promotion of exhibition soccer matches involving foreign professional teams, it becomes clear that Plaintiff's Complaint is nothing more than a naked attempt to place blame for Plaintiff's financial collapse and recover losses caused, not by the actions of the Defendants, but by Plaintiff's own poor business practices.

## SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY

Pursuant to the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. §§ 220501, *et seq.* (the "Act"), the USSF is a non-profit corporation recognized by the United States Olympic Committee as the National Governing Body for the sport of soccer in the United States. (Complaint ("Cmplt") ¶¶ 26-27.)  As such, the basic mission of the USSF is to develop interest and participation in the sport of soccer in this country.  *See* 36 U.S.C. § 220524(1).

Defendant Major League Soccer, LLC ("MLS") is the premier professional soccer league in the United States and a member of the USSF.  (Cmplt. ¶¶ 32-33.)  MLS was formed in or about 1993 and was selected by the USSF to be the initial First-Division professional soccer league in this country.  (*Id.* at ¶¶ 33-34.)

According to the Complaint, Plaintiff was in the business of promoting exhibition soccer matches involving foreign teams.  (Cmplt. ¶¶ 12, 18.)  From 2001 to 2005, Plaintiff promoted a number of soccer matches in the United States between foreign national teams and foreign club

teams (the "Matches").  (*Id.* at ¶¶ 14, 18.)  For each Match it promoted, Plaintiff entered into a contract with the USSF in which the USSF, *inter alia*, authorized Plaintiff to stage the Match and required that Plaintiff pay the USSF specified sanctioning fees and post a performance bond to secure Plaintiff's obligations under the contract (the "Match Contracts").  (*Id.* at ¶¶ 84, 86.)

Plaintiff alleges the USSF did not have jurisdiction over the Matches Plaintiff promoted and therefore misrepresented to Plaintiff its authority to regulate the Matches, charge sanctioning fees for those Matches, and require the posting of performance bonds to secure compliance with the Match Contracts.  (Cmplt. ¶¶ 62-64, 106-107.)  Plaintiff further claims the USSF fraudulently induced or coerced Plaintiff to enter into the Match Contracts by threatening to report a promoter who did not enter into a match contract to FIFA as a promoter in "bad standing" – the result of which would be to "deny such a promoter access to teams within their spheres of control, thereby effectively ruining that promoter's business."  (*Id.* at ¶¶ 81-82.)  Plaintiff also alleges that the USSF illegally conspired with MLS to engage in these activities and provide preferential fee-based treatment to MLS, all in an effort to eventually allow MLS to control the "market" for first division international exhibition soccer matches played in the United States.  (*Id.* at ¶¶ 92-100.)

Plaintiff filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on or about January 13, 2005, and ceased its business operations on or about May 6, 2005.  (Cmplt. ¶¶ 22, 23.)  Plaintiff claims that it was the sanctioning fees charged by the USSF and its alleged conspiracy with the MLS that caused Plaintiff's financial collapse.  (*Id.* at ¶ 22.)  On March 7, 2006, the Bankruptcy Court confirmed Plaintiff's plan of liquidation, which provides, *inter alia*, for the prosecution of this action.  (*Id.* at ¶ 24.)

Plaintiff initiated this action on May 2, 2006 by filing a Complaint in the United States District Court for the Southern District of New York against the USSF and MLS alleging that the

USSF's and MLS's actions as described herein violated the federal antitrust laws, RICO, and state common law principles.  Specifically, Plaintiff alleges the following claims:  (1) Vertical conspiracy to restrain competition in violation of Section 1 of the Sherman Act against USSF and MLS; (2) Conspiracy to monopolize the market in violation of Section 2 of the Sherman Act against USSF and MLS; (3) Attempted monopolization in violation of Section 2 of the Sherman Act against MLS; (4) Racketeering activities by MLS in violation of 18 U.S.C. § 1962(c); (5) Racketeering activities by USSF and MLS in violation of 18 U.S.C. § 1962(c); (6) Fraudulent inducement against USSF; (7) Unjust enrichment against USSF and MLS; (8) Restitution against USSF for invalidity of contract; (9) Restitution against USSF for unconscionability of contract; and (10) Restitution against USSF for unenforceability of contracts due to duress

On October 11, 2006, the District Court for the Southern District of New York granted the USSF's motion to transfer the action to the Northern District of Illinois pursuant to the forum selection clause contained in the Match Contracts and in the interests of justice pursuant to 28 U.S.C. § 1404(a).  On May 4, 2007, this Court granted the USSF's motion to stay this matter pending the arbitration before FIFA of certain issues underlying each of Plaintiff's claims.

The parties proceeded to arbitrate those issues before FIFA, and on March 4, 2010, FIFA forwarded its decision issued on February 10, 2010, finding as follows:

1. The USSF has the authority under FIFA's statutes and regulations to require that a football match to be played between foreign national teams and/or foreign clubs within the United States first be sanctioned by the USSF.

2. As part of its authority to sanction football matches played in the United States between foreign national teams and/or foreign clubs, the USSF has the right under FIFA's statutes and regulations to charge sanctioning fees and require the posting of a bond securing those fees.

3. The USSF has the right under FIFA's statutes and regulations to notify FIFA in the event that a FIFA licensed match agent refuses to pay the sanctioning fees or post the performance bonds that the USSF requires in connection with matches played in the United States between foreign national teams and/or foreign clubs.

4.      The above mentioned principles have applied at least since 2001, when ChampionsWorld, the licensed match agent Charles Stillitano serving as its CEO, took up its business of promoting international, first division professional men's soccer exhibitions in the United States.

*See* USSF's Request for Judicial Notice ("RJN"), Ex. P at 3.  The Court lifted the stay on February 5, 2010, and USSF filed its Answer and Affirmative Defenses on March 29, 2010.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed - but early enough not to delay trial."[1]  The Court "review[s] Rule 12(c) motions by employing the same standard that applies when reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6)."  *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).  Thus, like a motion to dismiss, a motion for judgment on the pleadings tests the sufficiency of a plaintiff's complaint.  *See id.*  A complaint is sufficient only to the extent it "contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory," and although the requirements of notice pleading are minimal, "[a] complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show that plaintiff is not entitled to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007); *Jones v. Bock*, 549 U.S. 199, 215 (2007).

Additionally, in deciding a motion brought under Rule 12(c), "[a] court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (quoting Fed.

---

[1] For purposes of a Rule 12(c) motion, the "pleadings" include the complaint, answer, and any written instruments attached as exhibits.  *See* Fed. R. Civ. Proc. 10(c); *see also Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

R. Evid. 201(b)).  The Court may consider historical documents, documents contained in the

public record, and reports, decisions, and regulations of administrative bodies without converting

the motion to one for summary judgment.  *See, e.g., Abrams v. Van Kampen Funds, Inc.*, 2002

WL 1160171, at *2 (N.D. Ill. May 30, 2002).

<u>**ARGUMENT**</u>

I. **PLAINTIFF'S FIRST AND SECOND CLAIMS FOR RELIEF SHOULD BE
DISMISSED BECAUSE THE USSF'S ACTIONS, AS ALLEGED, ARE IMMUNE
FROM ANTITRUST LIABILITY**

At the foundation of Plaintiff's First and Second Claims for Relief is the allegation that

the USSF violated the antitrust laws by exercising its authority to regulate the promotion of

exhibition soccer matches involving foreign professional teams played in the United States.

However, as explained in further detail below, the USSF not only has the right to exercise this

authority, it is required to do so.  By seeking to subject the USSF to antitrust liability for taking

actions that the USSF is legally obligated to take by virtue of its status as the national governing

body recognized by the USOC and the national association recognized by FIFA for soccer in the

United States, Plaintiff attempts to place the USSF "between a rock and a hard place" – the

USSF can either choose to exercise authority over the promotion of such soccer matches, thereby

subjecting itself to liability under the antitrust laws, or it can refuse to exercise that authority,

thereby subjecting itself to discipline or expulsion from FIFA and resulting in the exclusion of

the United States from participating in soccer in all international tournaments including the Pan-

American Games, the Olympic Games and the FIFA Men's and Women's World Cup events.

This is precisely the type of situation where the courts recognize implied antitrust

immunity.  Because the USSF's allegedly unlawful actions were necessary to implement

Congress's intent with regard to the governance of soccer in the United States, and application of

the antitrust laws to the facts alleged in Plaintiff's Complaint would unduly interfere with the

operation of the Olympic and Amateur Sports Act, the USSF's actions, as alleged by Plaintiff, should be deemed exempt from the application of the antitrust laws.

**A.      Implied Antitrust Immunity Is Designed To Protect Defendants From Being Subjected To Conflicting Statutory Obligations**

"A defendant is entitled to implied immunity when its actions are necessary for the effective operation of a law enacted by Congress.  No party is able to establish an injury to competition under such circumstances because implied repeal of the antitrust laws represents a policy decision by Congress to tolerate that level of threat to competition."  *JES Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1230-31 (11th Cir. 2006) (citing *Silver v. New York Stock Exch.*, 373 U.S. 341, 357-359 (1963)).  Thus, courts will immunize certain conduct from antitrust scrutiny when Congress either expressly directs the complained-of conduct through statute or enacts a regulatory scheme that is "plainly repugnant" to the antitrust laws.  *See, e.g., Gordon v. New York Stock Exch.*, 422 U.S. 659, 688-89 (1975) (distinguishing implied immunity based on a "specific [statutory] provision" from implied immunity premised on a "pervasive regulatory scheme").  Moreover, the applicability of implied immunity is a pure question of law that the Supreme Court has found is properly decided on a motion to dismiss.  *See id.* at 688 (implied antitrust immunity question of law); *Credit Suisse Sec. (USA), LLC v. Billing*, 551 U.S. 264, 285 (2007) (rejecting proposal to remand to district court for additional proceedings and determining immunity as a matter of law on a motion to dismiss).

**B.      The USSF Is Legally Obligated To Exercise Control Over The Promotion Of International Professional Soccer Matches In The United States**

The USSF is part of a hierarchy of organizations responsible for the organizing of competition under the auspices of the International Olympic Committee ("IOC").  The IOC possesses the rights to, and governs the operation of the Olympic Games under the Olympic Charter.  *See, e.g., Michels v. United States Olympic Comm.*, 741 F.2d 155, 156 (7th Cir. 1984).

Each nation must be represented by a national Olympic committee ("NOC") that is recognized

by the IOC, and the NOCs in turn recognize a national governing body for each Olympic sport.

The national governing body recognized by its NOC must be affiliated with the international

federation recognized by the IOC for its sport, and must be governed by and comply in all

aspects with both the Olympic Charter and the rules of its international federation.

As the national governing body for the sport of soccer in the United States, the USSF is

required to be a member of and comply with all of the rules of its international federation, FIFA,

including the requirement that the USSF sanction any match played in the United States by any

foreign team.  Thus, the USSF is required to exercise authority and control over the promotion of

exhibition soccer matches involving foreign professional teams played in the United States.

**[Although the relationship between the various national and international entities that govern soccer is explained in the following sections, reference to the Diagram And Summary Of Governance Structure For Soccer found at Appendix A will make the explanation easier to follow and understand.]**

### 1.   The Olympic Movement

The Olympic Games and the principles of Olympism are conducted and administered by

the Olympic Movement, which is the "concerted, organised, universal and permanent action,

carried out under the supreme authority of the IOC . . . ."  RJN, Ex. E at 9 (IOC Principle 3); [2]

*see also San Francisco Arts & Ath. v. U.S.O.C.*, 483 U.S. 522, 533 (1987) (describing origin and

goals of the Olympic Movement).  In existence since 1894, the IOC governs the Olympic

Movement under the Olympic Charter, a system of "elaborate rules and procedures."  *San*

*Francisco Arts*, 483 U.S. at 533; *Michels,* 741 F.2d at 156.  "Belonging to the Olympic

---

[2] Throughout this motion, the USSF cites rules of the IOC and FIFA that were in force as of September 1, 2004.  *See* RJN, Ex. E (Olympic Charter); *Id.*, Ex. I (FIFA Statutes).  To show these rules have not changed substantively from 2000 through the present, the USSF also submitted earlier versions of these rules as well as the versions currently in effect.  *Id.,* Exs. A-F (Olympic Charter), G-J (FIFA Statutes).

Movement requires compliance with the Olympic Charter and recognition by the IOC." RJN,

Ex. E at 9 (IOC Principle 6).

          a.        <u>FIFA is the international federation recognized by the IOC for the sport of soccer</u>.

The IOC recognizes international federations ("IF") which administer the sport at the

international level.  In turn, IFs administer the sport at the national level through affiliated

national associations.  RJN, Ex. E at 58 (IOC Rule 26); *Michels*, 741 F.2d at 156.  IFs establish

and enforce rules "concerning the practice of their respective sports," ensure the application of

those rules internationally, "ensure the development of their sports throughout the world," and

establish eligibility criteria for participation in the Olympic Games.  RJN, Ex. E at 58 (IOC Rule

27(1.1-2, 1.5)), 80 (Rule 41, Bylaw 1).   The Fédération Internationale de Football Association

("FIFA") is the IF recognized by the IOC for the sport of football (soccer).  *Id.* at 87 (Rule 46).

          b.        <u>The United States Olympic Committee is the national Olympic committee recognized by the IOC for the United States</u>.

National Olympic committees ("NOC") represent their country in the Olympic

Movement pursuant to recognition by the IOC and continued compliance with the Olympic

Charter.  RJN, Ex. E at 10 (IOC Rule 1(2)), 13 (Rule 3(1-2)), 61 (Rule 28(6)); *Slaney v. Int'l*

*Amateur Ath. Fed'n*, 244 F.3d 580, 586 n.1 (7th Cir. 2001).  The IOC recognizes only one NOC

per country which has exclusive authority over the Olympic Games and related competitions in

that country.  RJN, Ex. E at 60 (IOC Rule 28(3)); *De Frantz v. U.S.O.C.*, 492 F. Supp. 1181,

1183 (D.D.C. 1980) (NOCs are "sole authorities responsible for the representation of the

respective countries at the Olympic Games as long as each NOC's rules and regulations are

approved by the IOC").  Only NOCs recognized by the IOC may send participants to the

Olympic Games.  RJN, Ex. E at 83 (IOC Rule 45(2)).

To be recognized by the IOC, NOCs must observe IOC Rules and must recognize and include as members all national associations or federations that serve as representatives of their country in the IF of any Olympic sport, as long as those national federations comply with the Olympic Charter and the rules of their IF. RJN, Ex. E at 63 (IOC Rule 29(1.2)), 64 (Rule 30); *see also Michels*, 741 F.2d at 156. The United States Olympic Committee ("USOC") serves as the NOC for the United States. *San Francisco Arts*, 483 U.S. at 533-534.

## 2.    The Olympic And Amateur Sports Act

In 1978, Congress passed the Amateur Sports Act, later renamed the Olympic and Amateur Sports Act.[3] Concerned with "numerous and frequent jurisdictional squabbles" between schools, athletic groups and national sport federations, *De Frantz*, 492 F. Supp. at 1187 n.13, Congress passed the Act to "rectify the factional nature" of these organizations by reestablishing and enhancing the USOC's supervisory authority over the numerous United States national sport federations. *See Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524, 527 (10th

---

[3] Essential to the proper interpretation of the Olympic and Amateur Sports Act is an understanding that the term "amateur" as used in the Act is not defined in its customary sense, but is a term of art. Under the Act, "professional" players can be included within the definition of "amateur." *See Behagen*, 884 F.2d at 526 (noting potential for confusion and instructing that "it is best to treat 'amateur' and 'professional' in this case as merely technical terms"). The Act simply defines an "amateur athlete" as any "athlete who meets the eligibility standards established by the [national governing body ("NGB")]." 36 U.S.C. § 220501(b)(1). NGBs, in turn, maintain eligibility standards mandated by their respective IF. RJN, Ex. E at 67 (IOC Rule 30 (requiring NGBs to comply with all IF rules)); 36 U.S.C. § 220522(a)(14) (NGB may not use eligibility criteria more restrictive than the sport's IF); *see also* RJN, Ex. E at 80 (IOC Rule 41, Bylaw 1 ("[e]ach IF establishes its sport's own eligibility criteria")). Hence, the definition of "amateur" for the sport of soccer is determined by FIFA's eligibility rules, and FIFA has permitted paid professionals to participate on the men's and women's Olympic teams since 1984. Indeed, it was this potential for confusion that led Congress to change the title of the Act in 1998. *See* S. Rep. No. 105-325, at 2 (1998) ("the 1978 Act needs to be updated due to several significant changes which have occurred in [that] . . . sports have begun to allow professional athletes to compete in some Olympic events" and that "even sports still considered 'amateur' have athletes with greater financial opportunities and professional responsibilities than were ever considered in 1978"). **For a diagram of the foregoing analysis, see Appendix B.**

10

Cir. 1989); *Oldfield v. Athletic Congress*, 779 F.2d 505, 506 (9th Cir. 1985) (the Act "was

enacted in response to years of rivalry, warfare, and confusion among amateur athletic

organizations").  The Act grants the USOC exclusive authority to recognize a national governing

body ("NGB") for each sport and specifies procedures for the USOC's on-going review of each

NGB's compliance with the Act.[4]  36 U.S.C. §§ 220505(c)(4), 220527-28; s*ee also Behagen*, 884

F.2d at 528 ("[I]f the USOC finds that the NGB is not complying adequately with the statutory

requirements," the USOC can "seek to compel an NGB to comply with the requirements of the

Act, and for penalties of probation, revocation of recognition, or replacement of the NGB.").

The Act also codifies the powers and duties of United States NGBs.  Indeed, through the

Act, Congress granted NGBs "monolithic control" over their sport.  *Behagen*, 884 F.2d at 529.

Specifically, NGBs serve as the coordinating body for their sport, exercise jurisdiction over and

sanction activities and competitions of their sport in the United States, establish procedures for

determining eligibility standards for competitions, and establish national goals for their sport.  36

U.S.C. § 220523(a)(1-5).  NGBs are charged with developing interest and participation in their

sport and minimizing conflicts in the scheduling of *all* practices and competitions in their sport.

*Id*. § 220524(1-2).  The Act also addresses an NGB's relationship with its respective IF.  An

NGB must "demonstrate[] that it is a member of no more than one international sports federation

that governs a sport," must maintain eligibility criteria that are no "more restrictive than those of

the appropriate international sports federation," and, in several functions, must follow

"applicable international rules" and "requirements."  *Id.* §§ 220522(a)(6), (14), 220523(a)(7),

220525(b)(4)(C).  Consistent with the IOC Rules, under the Act NGBs are intended to represent

the United States as a member of their sport's IF.  *Id.* § 220523(a)(1); *see also* 124 CONG. REC.

---

[4] Pursuant to the IOC Bylaws, an NOC may not recognize more than one national association per
sport.  RJN, Ex. E at 64 (IOC Rules 28 and 29, Bylaw 1.2).

12855 (1978) (statement of Sen. Stevens) ("It is the intent of this provision that [an NGB] should be able to establish that it is able to perform the functions of the U.S. representative for the sport in this country to the international amateur sports federation recognized by the [IOC].").

Importantly, the Act is *not* the source of the USOC's authority or the authority of individual NGBs; these powers flow from the IOC.  *See De Frantz*, 492 F. Supp. at 1188 ("In writing this legislation, Congress did not create a new relationship between the USOC and the IOC.").  The Act does not alter the powers and duties of the USOC or NGBs that are ascribed to each in their role in the larger Olympic Movement.  *Id.* (Congress intended a "compatibility and not a conflict" between the Act and the Olympic Movement and did not intend "to limit or deny to the USOC powers it already enjoyed as a National Olympic Committee"); *see also Slaney*, 244 F.3d at 586 n.3 ("*In addition to its Olympic duties*, the USOC has been designated as the coordinating body for all amateur sports in this nation by the Ted Stevens Olympic and Amateur Sports Act.") (emphasis added).  The Olympic and Amateur Sports Act simply "legitimized" the "already long-existing relationship" between the IOC, USOC, United States NGBs and their respective IFs.[5]  *See id.*

### 3.     The USSF's Obligations As An NGB And Member Of FIFA

NGBs for each sport also have duties under the Olympic Charter.  *See* RJN, Ex. E at 67 (IOC Rule 30).  Each national association *must* (1) "exercise a specific, real and on-going sports activity," (2) be affiliated to their sport's IF, and (3) "be governed by and comply in all aspects with both the Olympic Charter *and the rules of its IF*."  *Id.*  (emphasis added).  As the national association representing the United States in FIFA, the USSF is, therefore, bound to comply with all of FIFA's Statutes.

---

[5] Indeed, the USSF did not become a member of FIFA by virtue of the Olympic and Amateur Sports Act.  The USSF has been a member of FIFA since 1913.

FIFA's Statues provide that the USSF is obligated, among other things, "to comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time" and "to comply fully with all other duties arising from these Statutes and other regulations."  RJN, Ex. I at 11 (FIFA Statutes, Art. 13, para. 1(a), (f)).  The FIFA Statute implicated by this action that the USSF must adhere to provides that "Members and their clubs may not play on the territory of another Member without the latter's approval."  *See id.* at 47 (Art. 76, para. 3) .  In other words, the sanction of the USSF is required by FIFA for any soccer match played in the United States by any foreign team regardless of whether the team is a national team or club team.

Violation of the foregoing obligation could result in FIFA imposing disciplinary sanctions on the USSF, up to and including suspension or expulsion from FIFA.  *Id.* at 11 (Art. 13, para. 2  ("Violation of the . . . obligations by any Member may lead to sanctions provided for in these Statutes.")), 36 (Art. 55 (listing disciplinary measures)).  Expulsion from FIFA would have a crippling effect on the sport of soccer in the United States because, among other things, teams from other countries would be prohibited from playing teams from the United States, effectively excluding the United States from the world of soccer and precluding the United States from sending soccer teams to events such as the Olympic Games and the FIFA Men's and Women's World Cup Competitions.  Moreover, expulsion from FIFA would not only violate the IOC Rule that the USSF be a member of FIFA and abide by FIFA's rules, it would frustrate the intent of Congress as expressed in the Olympic and Amateur Sports Act that the USSF, as the NGB for soccer, represent the United States as a member of FIFA.  Thus, the USSF is legally obligated to regulate the promotion of exhibition soccer matches among foreign "professional" teams played in the United States.

C.   **Subjecting The USSF To Liability Under The Antitrust Laws For Exercising Authority Over The Promotion Of International Professional Soccer Matches Is "Plainly Repugnant" To The Olympic And Amateur Sports Act**

As set forth in the preceding section, under the Act, the USSF is expected to represent the United States as a member of FIFA.  The Olympic Charter obligates the USSF to be affiliated with FIFA, and further requires the USSF to comply with FIFA's Statutes, which dictate that the USSF must approve matches between foreign teams played in the United States.  Consistent with that obligation, the USSF requires a promoter seeking to stage a match between foreign national teams or foreign club teams in the United States first seek sanction from the USSF.  It is the exercise of this authority that Plaintiff claims violates the antitrust laws.

Plaintiff is not the first to complain that an NGB's enforcement of an IF rule violates the antitrust laws.  In *Behagen*, the United States NGB for basketball (the ABA/USA) reported to its IF (FIBA) that a United States basketball player, Behagen, signed several professional and "amateur" contracts without complying with ABA/USA and FIBA regulations.  *Behagen*, 884 F.2d at 526 (in order to play overseas, United States player was required to apply for NGB permit and IF license).  Upon ABA/USA's report, FIBA ruled the player ineligible and caused the team employing Behagen to rescind his contract.  *Id.*  Behagen then sued the ABA/USA and FIBA for violation of antitrust laws.  After surveying the powers and duties of an NGB recognized in the Act, the *Behagen* court found that the Act "makes clear that Congress intended an NGB to exercise ***monolithic control*** over its particular amateur sport."  *Id.* at 529 (emphasis added); *Eleven Line v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 204 (5th Cir. 2000) (*Behagen* court correct in "extrapolat[ing] from the [Act's] purpose and structure that Congress intended that action taken under its direction be exempt from the federal antitrust laws.").  Relying on the "relationship between an NGB and the international organization governing a particular amateur sport," the *Behagen* court held that the Act intended the monolithic control of

14

an amateur sport by the NGB for that sport *and by the appropriate international sports federation* of which the NGB is a member." *Behagen*, 884 F.2d at 529 (emphasis added).  Thus, because the NGB was carrying out its duties as a member of its IF, the NGB's "actions were necessary to implement the clear intent of Congress, and therefore are exempt from the federal antitrust laws." *Id*. at 527.

The *Behagen* court's reasoning has been accepted by every court which has considered the issue.  The "monolithic control" of a sport intended by Congress immunized an NGB rule prohibiting professional promoters from staging equestrian competitions on certain dates and in certain locations without the NGB's sanction, *JES Properties*, 458 F.3d at 1231, and would have immunized an NGB rule prohibiting players from competing in a league or tournament not sanctioned by the NGB.  *Eleven Line*, 213 F.3d at 204-05.  Notably, all of these contested rules involved regulation of *professional* match promoters, *professional* players, or *professional* league and facility management.

The analysis applied by the court in *Behagen* and *JES Properties* is equally applicable here.  The USSF's actions in complying with FIFA's Statutes are directly within the activity required of NGBs under the Act.  The USSF should not be forced to choose between incurring antitrust liability or complying with its obligations as intended by the Act.  *Credit Suisse*, 551 U.S. at 282-83 (conflicting rules would have "chilling effect" on lawful activity desired by Congress).

Accordingly, the USSF's actions, as alleged by Plaintiff, are immune from antitrust liability warranting dismissal of Plaintiff's First and Second Claims for Relief.

II.   **PLAINTIFF'S FIFTH CLAIM FOR RELIEF SHOULD BE DISMISSED
BECAUSE PLAINTIFF HAS NOT AND CANNOT PLEAD THE NECESSARY
ELEMENTS OF A RICO CLAIM**

In order to properly state a claim for a violation of 18 U.S.C. Section 1962(c), Plaintiff

must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

*Jennings* v. *Auto Meter Prods, Inc.,* 495 F.3d 466, 472 (7th Cir. 2007).  "A RICO plaintiff is

required to allege sufficient facts to support each element of its RICO claim; '[i]t is not enough

for plaintiff to simply allege these elements in boilerplate language.'"  *Jazbec v. Hirsch*, 2009

U.S. Dist. LEXIS 96551 at *7 (N.D. Ill. Oct. 14, 2009) (quoting *Cobbs v. Sheahan*, 319 F. Supp.

2d 865, 869 (N.D. Ill. 2004)).  Plaintiff's RICO claim fails because Plaintiff has not and cannot

plead facts sufficient to establish the existence of an enterprise or a pattern of racketeering

activity.

A.   **Plaintiff Fails To Sufficiently Plead The Existence Of An Association-In-Fact
Enterprise**

An "association-in-fact" enterprise is defined as "any union or group of individuals

associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *Jennings*, 495 F.3d at 1440.

To constitute an enterprise for purposes of the RICO statute, the union or group must be

something "more than a group of people who get together to commit a pattern of racketeering

activity." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995); *see also*

*Jennings*, 495 F.3d at 1441 ("an enterprise is distinct, separate, and apart from a pattern of

racketeering activity.").  "[S]ome type of organizational structure is required."  *Stachon v. United*

*Consumers Club, Inc.,* 229 F.3d 673 (7th Cir. 2000).

Indeed, the "hallmark of an enterprise is 'structure.'"  *Richmond*, 52 F.3d at 644.  It

"requires proof of 'an ongoing structure of persons associated through time, joined in purpose,

and organized in a manner amenable to hierarchical or consensual decision-making.'"  *Limestone*

16

*Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 805 (7th Cir. 2008) (quoting *Richmond*, 52 F.3d at 644); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) ("An enterprise is not a pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages.").

Importantly, "an association-in-fact enterprise must be meaningfully distinct from the entities that comprise it such that the entity sought to be held liable can be said to have controlled and conducted the enterprise rather than merely its own affairs." *Crichton v. Golden Rule Ins.*, 576 F.3d 392, 399 (7th Cir. 2009). "Thus, in order to adequately plead a claim under § 1962(c), the complaint must identify an 'association in fact' that is meaningfully different in the RICO context from the units that go to make it up." *Vulcan Golf, LLC v. Google Inc.,* 552 F. Supp. 2d 752, 784 (N.D. Ill. 2008) (citation omitted).

Plaintiff's allegations fall far short of meeting the requisite pleading standard. Apart from conclusory statements alleging that USSF, MLS, and certain unnamed entities "formed an association-in-fact enterprise and have operated as a single unit" (*see* Cmplt. ¶ 198), the Complaint asserts no structure, hierarchy, or consensual decision making by the purported enterprise. *See Limestone*, 520 F.3d at 805; *Richmond*, 52 F.3d at 644. Instead, Plaintiff attempts to define the "enterprise" solely through the purported acts of its participants, which the Seventh Circuit plainly prohibits. *See Stachon*, 229 F.3d at 676 ("RICO plaintiffs cannot establish structure by defining the enterprise through what it supposedly does."). Specifically, Plaintiff describes the "organization" of the enterprise simply as an alleged agreement between USSF and MLS: USSF allegedly allows MLS to dictate the sanctioning fees that USSF charges to MLS's competitors in exchange for a payoff from MLS. (Cmplt. ¶ 200.) Thus, Plaintiff fails to allege any facts indicating that an enterprise exists with a structure that is independent of MLS

17

and USSF, let alone facts indicating that the purported association-in-fact enterprise has a

"system of governance, an administrative hierarchy, a joint planning committee, a board, a

manager, a staff, headquarters, personnel having differentiated functions, a budget, records, or

any other indicator of a legal or illegal enterprise." *Limestone*, 520 F.3d at 804.

At most, Plaintiff has alleged a conspiracy between MLS and USSF.  However, "a

conspiracy is not a RICO enterprise unless it has some enterprise-like structure, such as that of a

cartel exempt from antitrust law (OPEC, for example--the international oil cartel)."  *Limestone*,

520 F.3d at 804.  As the Seventh Circuit instructs:

> To withstand Appellees' motion to dismiss, however, Appellants
> must present something more than [allegations describing the
> alleged pattern of racketeering]; otherwise, 'every conspiracy to
> commit fraud that requires more than one person to commit is a
> RICO organization and consequently every fraud that requires
> more than one person to commit is a RICO violation.'

*Stachon*, 229 F.3d at 676 (quoting *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir.

1999)).  While "the hallmark of conspiracy is agreement, the central element of an enterprise is

structure." *Jennings*, 910 F.2d at 1441 (citation omitted); s*ee also Limestone*, 520 F.3d at 805

(rejecting notion that a RICO enterprise need not have structure and noting that "[w]ithout a

requirement of structure, 'enterprise' collapses to 'conspiracy'").

Because Plaintiff fails to plead facts sufficient to establish a RICO enterprise with any

form of structure, Plaintiff's Fifth Claim for Relief should be dismissed.

### B.      Plaintiff Also Fails To Sufficiently Plead A Pattern Of Racketeering Activity

To state a claim under Section 1962(c), a plaintiff must allege a pattern of racketeering

activity, which "consists, at the very least, of two predicate acts of racketeering." *Jennings*, 495

F.2d at 472; 18 U.S.C. § 1961 (defining racketeering activities).  In this case, Plaintiff alleges

that the USSF engaged in the predicate acts of mail and wire fraud and extortion.  Each of these

alleged predicate acts is founded upon the claim that the USSF fraudulently misrepresented its authority over the promotion of exhibition soccer matches involving foreign professional teams in the United States and then used that misrepresented authority to extract sanctioning fees and performance bonds from Plaintiff.

However, as described in Section I.B., *supra*, the USSF is required to exercise jurisdiction over the promotion of such soccer matches in the United States.  Moreover, in its February 10, 2010 arbitration decision, FIFA expressly found that the USSF has the authority to charge sanctioning fees and require the posting of a performance bond securing those fees.  RJN, Ex. P at 3.  In the absence of any misrepresentation by the USSF, Plaintiff has failed to allege a single actionable predicate act, and its RICO claim must be dismissed.

### 1.    Plaintiff Cannot Establish That The USSF Made A False Statement - A Required Element For Mail Or Wire Fraud

In order to establish that the USSF engaged in the predicate act of mail or wire fraud, Plaintiff must allege the USSF's (1) participation in a scheme to defraud, (2) intent to defraud, and (3) use of the mail or wires in furtherance of the scheme.  *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001).  A fundamental and "necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact."  *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 298-99 (7th Cir. 2003).  Indeed, as the Seventh Circuit has explained, "[t]he word 'fraud' in the mail fraud statute means deliberate, material misrepresentation. . . . ***No fraud, no mail fraud***."  *Perlman v. Zell*, 185 F.3d 850, 854 (7th Cir. 1999) (emphasis added).

To prevent RICO from criminalizing generic fraud claims, the requirement of an actual falsehood is strictly enforced.  *See Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1008 (7th Cir. 2004).  If the alleged falsehood turns out to be a true statement, as apparent from either judicially

noticeable facts and records or from the face of the allegedly misleading documents, no mail or wire fraud can be shown and the RICO claim should be dismissed.  *See Williams*, 351 F.3d at 299 (affirming dismissal where mailings contained nothing that "could be considered 'false' or 'misrepresentations'"); *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) (affirming dismissal where court did "not see what is false or misleading about such a statement" and where "there is nothing obviously false about these particular statements"); *Wagner v. Magellan Health Svcs., Inc.*, 125 F. Supp. 2d 302, 307 (N.D. Ill. 2000) (dismissing RICO claim where "no scheme to defraud alleged" because statements in question "were not in fact false").

Plaintiff alleges the USSF affirmatively "misrepresented" its "legal authority" to regulate the promotion of exhibition soccer matches involving foreign professional teams, charge sanctioning fees for the promotion of those matches, and require that a promoter secure its obligations with a bond.  (*See* Cmplt. ¶ 205.)  But, as discussed above, the statements made by the USSF that Plaintiff claims were misrepresentations are, in fact, true statements.  *See* Section I.B., *supra.*  Indeed, the parties submitted the precise question regarding the truth of these representations to FIFA for determination, and in its February 10, 2010 arbitral decision, FIFA expressly found that the USSF has the authority under FIFA's statutes and regulations to (1) require that a football match to be played between foreign national teams and/or foreign clubs within the United States first be sanctioned by the USSF, and (2) charge sanctioning fees and require the posting of a bond securing those fees.  In the absence of a false statement, Plaintiff has failed to allege and cannot establish the predicate acts of mail or wire fraud.

### 2. Plaintiff Has Failed To Allege Actionable Extortionate Conduct

In addition to mail or wire fraud, Plaintiff claims that an association-in-fact enterprise comprised of the USSF and MLS committed predicate acts of extortion under the Hobbs Act, 18

U.S.C. § 1951.  The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  Parroting the language of the statute, Plaintiff alleges that this nebulous enterprise "obtained property from Plaintiff on at least two dozen occasions from 2001 through 2005, with consent from Plaintiff that was induced by the wrongful use of fear through economic threats and by the color of official right."  (Cmplt. ¶ 201.)  Plaintiff's reliance on alleged violations of the Hobbs Act as predicate acts fails because Plaintiff cannot, as a matter of law, establish that the purported enterprise obtained property (sanctioning fees) through wrongful use of fear or under color of official right.

Plaintiff claims that it was subjected to a wrongful "economic threat" by the purported enterprise because it was allegedly advised that it would be reported to FIFA as a "promoter in bad standing" if it failed to accede to the USSF's jurisdiction and pay sanctioning fees to the USSF.  However, as explained in detail above, not only is the USSF is obligated by the IOC, FIFA, and the Act to regulate Matches, FIFA expressly held in its February 10, 2010 arbitral decision that the "USSF has the right under FIFA's statutes and regulations to notify FIFA in the event that a FIFA licensed match agent refuses to pay the sanctioning fees or post the performance bonds that the USSF requires in connection with matches played in the United States between foreign national teams and/or foreign clubs."  RJN, Ex. P at 3.  Thus, the conduct of the purported enterprise was not "wrongful."

In order to properly allege that the purported enterprise obtained sanctioning fees from Plaintiff "under color of official right" through the USSF's exercise of its mandated jurisdiction, Plaintiff must "show that a ***public official*** has obtained a payment ***to which he was not entitled***, knowing that the payment was made in return for official acts."  *Evans v. United States*, 504 U.S.

255, 268 (1992) (emphasis added).  As an initial matter, Plaintiff cannot establish, as a matter of

law, that the USSF (and, by extension, the purported enterprise) is a "public official."  In *San*

*Francisco Arts*, the United States Supreme Court held that the USOC is a private citizen and that

its conduct does <u>not</u> constitute "governmental action."  483 U.S. at 542-547.  The logic of this

decision was then extended to NGBs in the *Behagen* case.  884 F.2d at 530-532 (in rejecting the

plaintiff's claim that the NGB for basketball was a governmental actor, the court noted that the

acts of an NGB are "further removed from congressional action under the Amateur Sports Act

than is the USOC . . . Our analysis here is simplified by the pronouncements of the Supreme

Court in *San Francisco Arts & Athletics*. . . .").  Moreover, even if the purported enterprise

qualified as a "public official" under the Hobbs Act, in light of the USSF's obligation to regulate

the Matches and FIFA's express finding in its arbitral decision that the USSF has and had the

authority under FIFA's statutes and regulations to exercise jurisdiction over the Matches, charge

sanctioning fees, and require the posting of a bond securing those fees, Plaintiff cannot establish

that the purported enterprise obtained money to which it was not entitled.

Because Plaintiff cannot establish the necessary elements of the predicate acts of

extortion under the Hobbs Act, or mail or wire fraud, Plaintiff has failed to allege a pattern of

racketeering activity and its RICO claim against the USSF should be dismissed.

## III.    PLAINTIFF'S STATE LAW CLAIMS SHOULD ALSO BE DISMISSED

In addition to the federal antitrust and RICO claims, Plaintiff also asserts five state

common law claims for relief.  These common law claims fare no better than their federal

statutory counterparts and should be dismissed.

Plaintiffs sixth, seventh and eighth claims for relief (for fraudulent inducement, unjust

enrichment and restitution for lack of consideration, respectively) are each premised on the

assertion that the USSF misrepresented its authority to sanction and regulate the exhibition international soccer matches which the Plaintiff promoted.  Since the USSF, in fact, not only had the authority to sanction and regulate such matches, but was obligated to exercise that authority, each of these claims fails as a matter of law.

Unlike its other claims, Plaintiff's Ninth and Tenth Claims for Relief for restitution based on allegations of "unconscionability" and "duress" assume, correctly, that the USSF had jurisdiction to sanction the Matches at issue.  Nevertheless, these claims are equally flawed in numerous respects.

First, under Illinois law[6] "an action for restitution generally requires rescission and disaffirmance of the contract . . . ."  *McBaldwin Financial Co. v Dimaggio, Rosario & Veraja, LLC*, 845 N.E. 2d 22, 33 (Ill. App. Ct. 2006).  Rescission requires returning the other party, here the USSF, to its original position – the *status quo ante.  Northern Trust Co. v. Merrill Lynch & Co.*, 2006 U.S. Dist. LEXIS 11037 (N.D. Ill. Mar. 15, 2006) (and cases cited therein).  In the instant matter, however, this is impossible.  The USSF granted the approvals sought by Plaintiff, and Plaintiff promoted the Matches and spent the proceeds generated between 2001 and 2005.  The Match Contracts were fully performed and, as a consequence, cannot be unwound.

Second, a party seeking to rescind a contract due to duress or unconscionability must do so promptly.  A party who fails to seek rescission promptly and "accepts the benefits of the disputed contract" waives the right to rescind.  *Inco Securities Corp. v. Legg*, 1996 U.S. Dist. LEXIS 11932 (N.D. Ill. Aug. 16, 1996); *PS&E West Inc. v. Essex Group, Inc.*, 1987 U.S. Dist. LEXIS 6725 (N.D. Ill. July 16, 1987); *FDIC v. Metz*, 1986 U.S. Dist. LEXIS 15730 (N.D. Ill. Dec. 31, 1986).  Here, Plaintiff failed to seek rescission in a timely fashion.  Instead, Plaintiff

---

[6] Pursuant to the choice of law provisions contained in the Match Contracts about which Plaintiff complains, these common law claims for relief are governed by Illinois law.

admittedly entered into a series of Match Contracts over a four year period and promoted numerous soccer Matches.  Rather than challenge these contracts through a legal proceeding when first confronted with the terms imposed by the USSF, Plaintiff and its principals instead continued for over four years to execute successive agreements, promote Matches and reap the benefits of the agreements.  Under these circumstances, no Illinois court has ever permitted the remedy of rescission.

Third, neither claim is substantively viable.  A plaintiff claiming that a contract should be avoided on grounds of unconscionability must plead and prove both procedural and substantive unconscionability.  "On the procedural side, the question is, how did the provision make its way into the contract?  Considerations such as unfair surprise and the relative bargaining strength of the parties are relevant here. . . On the substantive side, the question is whether the terms of the contract are grossly one-sided."  *Basselen v. General Motors Corp.*, 792 N.E.2d 498, 507 (Ill. App. Ct. 2003) (quoting *J.D. Pavlak, Ltd. v. William Davies Co.*, 351 N.E.2d 243 (Ill. App. Ct. 1976) and *Streams Sports Club, Ltd. v. Richmond*, 457 N.E.2d 1226 (Ill. App. Ct. 1983)).  "An unconscionable bargain has been defined as one 'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other."  *Hume v. United States*, 132 U.S. 406, 410 (1889); *We Care Hair Dev. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999).

Plaintiff's bases for alleging that the match agreements were unconscionable are the claimed unequal bargaining power and the purportedly unreasonable fee and bond requirements. (Cmplt. ¶¶ 230-231.)   On the procedural side, Plaintiff cannot rely on the USSF's unique bargaining position.  Allowing the Plaintiff to do so would penalize the USSF for exercising its statutorily granted rights and fulfilling its obligations as an NGB.  On the substantive side, the

fee and bond provisions about which Plaintiff complains do not, as a matter of law, constitute the types of provisions "which no man in his senses" would agree to.  Indeed, Plaintiff agreed to these same terms over and over again while admitting that it could have promoted the same matches in Europe *at no charge.*  (Cmplt. ¶ 232.)

Plaintiff's claim of "duress" is also legally insufficient.  In order to rescind a contract on the grounds of duress under Illinois law, a Plaintiff must allege that it "was *induced by a wrongful act of another to make a contract* under circumstances which deprive him of the exercise of free will . . . ."  *Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 313 (7th Cir. 1992); *Safeco Ins. Co. v. Siciliano*, 2009 U.S. Dist. LEXIS 6364 (C.D. Ill. Jan. 29, 2009) (same). While Plaintiff alleges that the USSF failed to comply with its own internal policies of imposing "reasonable non-discriminatory sanctioning fees," (Cmplt. ¶ 239), Plaintiff does not, and cannot, allege that it was compelled to enter into the Match Contracts *due* to the fees imposed.  Rather, Plaintiff alleges that it entered into the agreements knowingly and in spite of the fees. And, Plaintiff did so with the admitted knowledge that it could have promoted soccer matches in other countries without having to pay any such fees.  (Cmplt. ¶ 232.)  Simply put, Plaintiff does not allege the type of duress sufficient to support rescission of the Match Contracts (assuming the remedy of rescission was even available).

## CONCLUSION

For all of the foregoing reasons, the USSF respectfully requests that the Court dismiss Plaintiff's First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Claims for Relief, the only claims alleged against the USSF, and enter judgment in the USSF's favor.

Dated:  April 21, 2010

Respectfully submitted,
By: */s/ Casandra L. Thomson*
One of the Attorneys for Defendant
United States Soccer Federation, Inc.

# APPENDIX A

# Diagram And Summary Of Governance Structure For Soccer



## International Olympic Committee ["IOC"]

1. The IOC recognizes international federations (IFs) which administer the sport at the international level. IFs encompass national associations which administer the sport at the national level. IOC Rule 26.
2. The IF is responsible for developing its sport throughout the world, establishing control and direction for the sport and determining eligibility criteria for participation in the Olympic Games. IOC Rules 27(1); IOC Rule 41, Bylaw 1.
3. FIFA is the IF recognized by the IOC for the sport of football (soccer). IOC Rule 46.

## Fédération Internationale de Football Association ["FIFA"]

1. FIFA recognizes only one national association per country. FIFA Statutes, Art. 10, ¶ 1.
2. Each national association must comply fully with FIFA statutes, regulations and directives and all duties arising there from, and a failure to comply can lead to suspension or expulsion. FIFA Statutes, Art. 13 ¶ 1(a), (i); Art. 14-15.
3. Teams and clubs governed by a national association may not play in the territory of another country without the authorization of the host country's national association. FIFA Statutes, Art. 76, ¶ 1.
4. The USSF is the national association recognized by FIFA in the US. Complaint ¶ 27.

## United States Olympic Committee ["USOC"]

1. The USOC recognizes only one national olympic committee (NOC) per country which has exclusive authority over the Olympic Games and related competitions in that country. IOC Rule 28(3).
2. Only NOCs recognized by the IOC may send participants to the Olympic Games. IOC Rule 45(2).
3. The USOC is the NOC recognized by the IOC for the US. RJN, Ex. N ("USOC Bylaws") at Article I, Section 1.4; RJN, U.S.C. § 220505(c)(2).
4. The NOC must recognize all national association members of recognized IFs. IOC Rule 29(1.2).
5. The NOC may not recognize more than one national association per sport. IOC Rules 28 and 29, Bylaw 1.2.
6. To be recognized, a national association must be a member of the recognized IF and must comply with the rules of the IF. IOC Rule 30; "USOC Bylaws Article XVII, Section 17.1.M.

## United States Soccer Federation ["USSF"]

1. The USOC has exclusive jurisdiction over participation in Olympic Games in the US. 36 U.S.C. § 220503(3).
2. The USOC may recognize only one national governing body (NGB") per Olympic sport. 36 USC § 220521(a).
3. An NGB must be a member of no more than one IF. 36 USC § 220522(a)(6).
4. The NGB is responsible for establishing goals and serves as coordinating body for the sport in the US. 36 USC § 220523(a)(2)-(3).
5. The NGB shall develop interest and participation in its sport throughout the US. 36 USC § 220524(1).
6. The USSF is the NGB recognized by the USOC for the sport of soccer. Complaint ¶ 27.

\*An NGB is the equivalent of a national association.

# APPENDIX B

**THE DEFINTION OF "AMATEUR ATHLETE" UNDER THE TED STEVENS OLYMPIC AND AMATEUR SPORTS ACT**

Per International Olympic Committee Rules, each recognized international federation is responsible for determining eligibility criteria for its sport for participation in the Olympic Games.  IOC Rule 27(1.5); IOC Rule 41, Bylaw 1.



FIFA, the international federation for soccer, has permitted paid professionals to participate on the men's and women's Olympic teams beginning in 1984.  *See* RJN, Ex. K at Art. 8 Rules 2-3 (2008 FIFA Regulations of the Olympic Tournaments).



Under the Act, an "amateur athlete" means an athlete who meets the eligibility standards established by the national governing body.  36 USC § 220501(b)(1).



As the national governing body for the sport of soccer in the US, the USSF must establish the eligibility criteria.



But, the USSF is not permitted to maintain eligibility standards more restrictive than those established by FIFA.  36 USC § 20522(a)(14).



Since FIFA permits paid professional to participate in Olympic and related competitions, so must the USSF.



Since paid professional players are eligible to participate in Olympic and related competitions:



**Paid Professional Soccer Players = Amateur Athletes under the Act.**