IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHAMPIONSWORLD LLC,

          Plaintiff,

    v.

UNITED STATES SOCCER
FEDERATION, INC., MAJOR LEAGUE
SOCCER, L.L.C. and DOES 1
through 10, Inclusive,

          Defendants.

Case No. 06 C 5724

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Motions for Judgment on the Pleadings
under Federal Rule of Civil Procedure 12(c) by Defendants United
States Soccer Federation (the "USSF") and Major League Soccer
("MLS"). For the reasons stated below, the motions are granted in
part and denied in part.

Also before the Court are USSF's Request for Judicial Notice
and its Motion entitled "Objections and Request to Strike Portions
of Plaintiff's Declaration." For the reasons stated below, the
Request for Judicial Notice is granted. The motion "Objections and
Request to Strike Portions of Plaintiff's Declaration" is denied.

## I.  BACKGROUND

Plaintiff ChampionsWorld, LLC is a now-defunct business entity
which, from 2001 to 2005, sponsored professional, first-division

soccer exhibitions in the United States involving international teams. Although ChampionsWorld filed for bankruptcy and ceased operations in 2005, its reorganization plan provides for the commencement and prosecution of this lawsuit as its only remaining material asset, to be liquidated and distributed among its creditors.

Defendant United States Soccer Federation ("USSF") is the National Governing Body for amateur soccer in the United States. Defendant Major League Soccer ("MLS") is a first-division professional soccer league in the United States.

At the heart of the controversy is the question of whether the USSF has the authority to oversee professional, as well as amateur, soccer in the United States. The USSF claims that it has this power. ChampionsWorld argues that USSF improperly arrogated this power to itself and used it to unreasonably restrain trade and to extract over $3 million in arbitrary and "back-breaking" fees from ChampionsWorld and to cause it many millions more in damages, substantially contributing to ChampionsWorld's demise.

ChampionsWorld alleges that USSF's actions were part of an anticompetitive scheme to create a window of exclusivity for MLS by preventing other soccer entities or leagues from applying for first-division status in the United States. ChampionsWorld claims that USSF saw ChampionsWorld as a competitor to MLS because ChampionsWorld's matches between 2003 and 2005 had triple the

attendance of MLS's matches. ChampionsWorld alleges that USSF organized MLS and underwrote its operations with $5 million in seed money, which was never repaid. ChampionsWorld alleges that USSF and MLS have significant overlapping officers and board members and that the two entities have a "historically close and anticompetitive association."

Plaintiff's claims against Defendants sound in antitrust (Counts 1 through 3), the Racketeering Influenced and Corrupt Organizations Act ("RICO") (Counts 4 and 5), and contract (Counts 6 through 10). Defendants move for judgment on the pleadings on all counts.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." A court reviews the motion by using the same standard that applies when reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). The Court views the facts in the complaint in the light most favorable to the nonmoving party and will grant the motion "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Id*. But the Court need not ignore facts set forth in the complaint that

undermine the plaintiff's claim nor give weight to unsupported conclusions of law. *Id*

### III. <u>DISCUSSION</u>

### A. Judicial Notice

As a preliminary matter, USSF asks the Court to take judicial notice of certain public documents, such as excerpts of the Olympic Charter; statutes and regulations of the Fédération Internationale de Football Association ("FIFA"); Constitution and Bylaws of the U.S. Olympic Committee ("USOC"); and a decision by the Bureau of the Players' Status Committee of FIFA. Because these are public documents whose accuracy is easily verifiable and not subject to reasonable dispute, the request is granted. *See,* FED. R. EVID. 201(b); *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

Also, before the Court are USSF's objections and motion to strike portions of the declaration and exhibits attached to ChampionsWorld's brief in opposition to USSF's motion on the pleadings. USSF's objections and motion do not appear to have been properly noticed under Local Rule 5.3(b) and are therefore denied. The Court notes, however, that none of the materials that USSF has asked to strike had any bearing on the decision the Court issues today.

**B. United States Soccer Federation's Authority to Govern Professional Soccer in the United States**

Because the issue of USSF's authority, or lack thereof, to govern professional soccer in the United States, is central to most of the claims and defenses in this case, the Court will address this issue before dealing with the motions for judgment on the pleadings on ChampionsWorld's separate claims.

*1. Olympic and Amateur Sports Act*

It is undisputed that USSF has the authority to govern *amateur*, though not necessarily professional, soccer in the United States. This authority over amateur sports derives from the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. §§ 220501 *et seq.* (the "ASA"). Congress enacted the ASA in 1978 to create a vertical structure for the management of certain amateur sports in the United States and to "rectify the factional nature of amateur sports organizations in this country at that time." *Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524, 527 (10th Cir. 1988). Congress placed the U.S. Olympic Committee (the "USOC") at the head of this vertical structure as a coordinating body for amateur sports in which Americans compete internationally. *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 203 (5th Cir. 2000). Immediately below the USOC in the chain of command are National Governing Bodies (the "NGBs") for each sport included in the Olympic Games or Pan-American Games. *Id.* The USOC recognizes

one, and only one, amateur sports organization to act as NGB for each sport.  36 U.S.C. § 220521(a); *Behagen*, 884 F.2d at 528.

USSF is the NGB for soccer in the United States.  As such, the USSF establishes national goals for soccer, is the coordinating body for amateur soccer in the United States, and represents the United States in the international soccer federation known as the "Fédération Internationale de Football Association" ("FIFA").  *See,* 36 U.S.C. § 220523(a).  USSF has been a member of FIFA since 1913. In its role as NGB, USSF sets standards for eligibility and exercises jurisdiction over amateur soccer activities in the United States and American soccer teams in the Olympic, Paralympic, and Pan-American Games.  *See id.*

In 1998, the ASA was amended to reflect changes in the conduct of Olympic events.  The statute was revised to prohibit NGBs from having "eligibility criteria related to amateur status or to participation in the Olympic Games, the Paralympic Games, or the Pan-American Games that are more restrictive than those of the appropriate international sports federation."  36 U.S.C. § 220522(a)(14).  Senator Ted Stevens, for whom the act is named, said, "The addition of the word 'Olympic' to the popularly used title 'Amateur Sports Act' is meant to take into account the participation of professional and quasi-amateur athletes in some of the sports of the Olympic Games and Pan-American Games, but at the same time continue to reflect the unique role the USOC and national

governing bodies have in the national framework of truly amateur sports activities." 144 Cong. Rec. S5434-02, 1998 WL 259708, at *S5450.

The ASA gives NGBs what has been called "monolithic control" over the amateur sports that they govern. *Behagen*, 884 F.2d at 529. This type of control would normally violate the antitrust laws. *See,* Sherman Act, 15 U.S.C. §§ 1 and 2. Congress may, however, explicitly exempt an organization from the antitrust laws. *See, e.g.*, 15 U.S.C. § 1291 (exempting certain sports telecasts from antitrust laws). The ASA does not expressly state that NGBs have such an exemption in the governing of amateur sports, but courts have consistently found that Congress implicitly exempted NGBs, in the oversight of *amateur* sports, from the antitrust laws. *See, Behagen*, 884 F.2d at 529-30; *Eleven Line*, 213 F.3d at 203-04; *JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1230-31 (11th Cir. 2006).

### 2. Defining "Amateur" and "Professional"

USSF claims, however, that it also has monolithic control over *professional* soccer in the United States. USSF argues that it derives this power from, surprisingly, the very same ASA that gives it power over amateur sports. At first glance, this argument seems counterintuitive, as the ASA (known as the "Olympic *and Amateur* Sports Act") repeatedly uses the word "amateur" to qualify such terms as "athlete," "competition," and "sports organization." *See,*

*e.g.*, 36 U.S.C. § 220501(b). The entire statute is, in fact, peppered with the word "amateur," while the word "professional" hardly, if ever, appears. *See, e.g.*, 36 U.S.C. §§ 220523 and 220524 (defining authority and duties of NGBs).

USSF argues that "amateur" is a term of art and must not be read in its ordinary sense. *Cf. Behagen*, 884 F.2d at 526 n.1. USSF reaches the conclusion that it has authority over professional U.S. Soccer through the following line of reasoning:

(1) The International Olympic Committee ("IOC") rules provide that the international federation for each sport has responsibility for determining eligibility requirements for its sport in the Olympic games.

(2) FIFA, the international federation for soccer, has allowed paid professionals to participate in Olympic soccer teams since 1984.

(3) Under the ASA, an "amateur athlete" is one who meets the eligibility standards of his or her sport's NGB. 36 U.S.C. § 220501(b)(1).

(4) As the NGB for soccer in the U.S., USSF must establish the eligibility criteria for amateur athletes.

(5) But USSF may not maintain eligibility standards more restrictive than FIFA's. *See,* 36 U.S.C. § 220522(a)(14).

(6) Since FIFA permits paid professional players to participate in the Olympics and related competitions, so must USSF.

(7) Since paid professional soccer players are eligible to participate in the Olympics, paid professional soccer players are amateur athletes under the ASA.

The Court cannot accept USSF's reasoning in the last step. Just because FIFA allows professionals to play in the Olympics, it does not necessarily follow that all professional soccer players are now "amateur" players *for all purposes*; nor that USSF has authority over all professional soccer players and, by extension, all professional soccer matches because they are now "amateur" events.

If USSF's reasoning were correct, then it would also follow that because the Fédération Internationale de Basketball Amateur ("FIBA"), the international association for amateur basketball, allows professional players in the Olympics, then the Amateur Basketball Association of the United States of America ("ABA/USA"), the NGB for amateur basketball in the United States, would have monolithic control over all professional basketball in the United States, including the National Basketball Association. It is extremely difficult to conclude from a reading of the plain text of the ASA or its legislative history that Congress intended such a result.

Indeed, the legislative summary of the amended Section 220522(a)(14) explains that this provision "would prohibit NGBs from having eligibility criteria that [are] more restrictive than its international sports federation for participation in events at the Olympic Games, Paralympic Games, and Pan-American Games." 144 Cong. Rec. S5434-02, 1998 WL 259708, at *S5451.

Congress's intent in revising the ASA therefore appears to be to make a limited exception for the Olympics and related competitions (*i.e.*, Pan-American Games, Paralympics) that would recognize the entry of professional players into these events and still allow the USOC and its NGBs to maintain control over this narrow class of competitions.

Moreover, FIFA does not classify all professional soccer players as amateurs, so there is no requirement, even under FIFA's rules, for USSF to do so. FIFA's rules provide that a "professional" is "a player who has a written contract with a club and is paid more for his footballing activity than the expenses he effectively incurs. All other players are considered to be amateurs." FIFA's Regulations on the Status and Transfer of Players, § 2, art. 2. USSF's rules define a "professional player" as "a person who receives or has received payment for playing or who signs a professional form of this Federation. . . . An amateur player is any person other than a professional player." USSF Policy Manual, § 601-1. Thus, both FIFA and USSF define amateurs and professionals as separate, mutually exclusive categories.

USSF argues that these definitions are irrelevant because all that matters is how Congress defined "amateur," not how USSF and FIFA define it. But where Congress defines "amateur athlete" as an athlete who meets the NGB's eligibility standards, § 220501(b)(1), and insists that the NGB's standards may not be more restrictive

than those of its international federation, § 220522(a)(14), USSF's
and FIFA's definitions are highly relevant.  USSF claims that the
cited definitions are inapplicable because they relate to athlete
registration requirements, not eligibility standards. Yet USSF
cites no FIFA or USSF rule that provides "eligibility standards"
that are different from the above definitions, except to say that
FIFA and USSF allow professionals to participate in the Olympics.

### 3.  USSF's Authority Under FIFA Rules

But USSF has still another argument.  USSF claims that FIFA
requires all games played in the U.S. by foreign teams to be
approved by USSF.  USSF argues, therefore, that it is legally
obligated to exercise authority over professional soccer matches or
risk discipline or expulsion from FIFA, which could result in the
exclusion of U.S. teams from the Olympics and other international
events.  For this reason, USSF claims implied immunity from the
antitrust laws regarding its oversight of professional soccer.
*See, Behagen*, 884 F.2d at 529-30 (holding NGB's seemingly
anticompetitive conduct regarding amateur basketball exempt from
antitrust laws because it was necessary to implement clear intent
of Congress).

In support of its argument, USSF cites the recent arbitration
decision by the FIFA Players' Status Committee regarding this
controversy, which finds that

> (1)  FIFA's statutes give USSF authority to sanction
> professional soccer matches in the United States;

(2) Under this authority, USSF has the right to charge sanctioning fees and require the posting of a bond securing those fees; and

(3) USSF has the right to notify FIFA in the event that a FIFA-licensed match agent refuses to pay a sanctioning fee or post a performance bond.

The exercise of the above-named rights would arguably constitute unreasonable restraints of trade under the Sherman Act. *See*, *Silver v. N.Y. Stock Exchange*, 373 U.S. 341, 359-60 (1963) (holding antitrust laws serve to protect freedom to compete unhindered by group actions of others), which is why USSF claims the antitrust exemption. But the FIFA arbitration rulings are of limited help to USSF because the Court of Arbitration for Sport ("CAS") has held that the FIFA Players' Status Committee "may consider disputes only to the extent that they implicate FIFA's statutes and regulations." *Stillitano v. USSF & FIFA*, CAS 2009/A/1812, at 10.9. Indeed, it is clear that FIFA has no power to grant USSF an exemption, either express or implied, from the antitrust laws. Only Congress may do this. Similarly, FIFA does not have, or claim to have, authority to interpret acts of Congress. Furthermore, it seems far-fetched to believe that FIFA would discipline USSF for obeying the antitrust laws of the United States.

### 4. *Antitrust Exemption*

USSF argues that, in enacting the ASA, Congress gave great deference to the Olympic movement as it already existed and

expected international federations ("IFs") and NGBs to behave much as they were already doing. "Congress was not only aware," argues USSF, "but expected that the NGBs appointed under the Act would be subject to the rules and regulations of their respective IFs, and yet Congress chose not to limit or interfere with those obligations." Thus, argues USSF, Congress can be assumed to have approved USSF's authority over professional soccer, absent an express statement to the contrary.

This is turning the presumption upside down. Antitrust exemptions are the exception, not the rule. Surely, Congress expected NGBs generally to follow the rules of their international federations. But that does not mean that Congress intended for IFs to be able to unilaterally authorize their NGBs to violate the antitrust laws of the United States without Congressional approval of any kind. Furthermore, USSF offers no reason why Congress would have known of (and therefore tacitly approved) USSF's practice of sanctioning professional soccer matches at the time it passed or amended the ASA. It seems unlikely that this practice could have been apparent to Congress when it is only this year, after a lengthy arbitration process, that FIFA has clarified that it condones such a practice.

The fundamental issue before the Court is whether the ASA has so clearly granted monolithic control to NGBs over their respective *professional* sports that the ASA acts as an implied repealer of the

antitrust laws, thereby exempting NGBs from liability under those laws. *Cf. Silver*, 373 U.S. at 347. It is, however, "a cardinal principle of construction that repeals by implication are not favored." *Id.* at 357. Repeal by implication will be found only to the extent that there is a "plain repugnancy" between the ASA and the antitrust laws; therefore, repeal by implication will be found only as necessary to make the ASA work, and even then only to the minimum extent necessary. *See, Gordon v. N.Y. Stock Exchange, Inc.*, 422 U.S. 659, 682-83 (1975).

The Court finds that repeal by implication is necessary to make the ASA work only to the extent that it applies to amateur sports and to the Olympics and related events. To the extent that the Olympics allow professional athletes to participate, the ASA cannot work unless its antitrust exemption is extended to the NGBs' authority over those athletes, *but only as it pertains to their participation in the Olympics and related events*. To say that the ASA authorizes an NGB to exercise authority over the whole of a sport's professional activities is to read far more into the statute than its text and history can bear.

USSF does not cite any court decision that has held that an NGB has authority to govern an entire *professional* sport. In fact, it is well established that baseball is the only professional sport that is exempt from antitrust laws and that "[o]ther professional sports operating interstate . . . are not so exempt." *Flood v.*

*Kuhn*, 407 U.S. 258, 282-83 (1972).  The Supreme Court has expressed its view that the cases that led to baseball's exemption were an "aberration."  *Id.* at 282.  *See also, American Needle, Inc. v. National Football League*, 130 S.Ct. 2201 (2010) (applying antitrust law to National Football League).  It would seem unwise for this Court or any other to establish a new aberration.

The Court therefore holds that, as a matter of law, the ASA does not give USSF authority to govern professional soccer in the United States, except to the extent necessary for USSF to govern the participation of professional players in the Olympics and related events.  USSF is not entitled to an exemption from the antitrust laws regarding professional soccer, except to the extent necessary for USSF to oversee Olympic and related events.  USSF has no clear mandate from Congress to govern the whole of professional soccer in the U.S.

## C. ChampionsWorld's Antitrust Claims (Counts 1 through 3)

In Counts 1 through 3 of its Complaint, ChampionsWorld makes claims against USSF and MLS for (1) vertical conspiracy to restrain competition under the Sherman Act, 15 U.S.C. § 1, (2) conspiracy to monopolize under the Sherman Act, 15 U.S.C. § 2, and (3) attempt to monopolize, also under Section 2.

ChampionsWorld alleges that USSF and MLS conspired together to damage ChampionsWorld's ability to compete by charging excessive sanctioning fees and requiring unreasonable performance bonds, all

under color of an authority to govern professional soccer that USSF did not possess. ChampionsWorld alleges that USSF and MLS conspired to bring ChampionsWorld down in order to enhance MLS's position as the premier professional soccer league in the United States. The Court finds that these allegations sufficiently state causes of action under the Sherman Act for conspiracy to restrain trade (§ 1) and conspiracy and attempt to monopolize (§ 2). USSF, of course, counters that it had the authority to impose its fees and bonds based on its power under the ASA and its antitrust exemption. The Court has rejected this argument, as explained above. The Motions for Judgment on the Pleadings regarding Counts 1 through 3 are therefore denied.

### D. ChampionsWorld's RICO Claims (Counts 4 and 5)

#### 1. Count 4

MLS, but not USSF, is named as a Defendant in Count 4, which alleges RICO violations under 18 U.S.C. § 1962(c). ChampionsWorld alleges that under RICO, MLS is the "person" that used the "enterprise" of USSF to engage in racketeering activities. *See,* 18 U.S.C. §§ 1961(3) and 1961(4). ChampionsWorld alleges that since about 1993, MLS has exerted control over USSF and sought to perpetuate the false premise that USSF has legal authority to govern U.S. professional soccer.

MLS officials allegedly drafted the USSF policy of charging sanctioning fees and performance bonds of MLS's competitors, such

as ChampionsWorld. ChampionsWorld alleges that MLS committed extortion under the Hobbs Act, 18 U.S.C. § 1951, obtaining money from ChampionsWorld on at least two dozen occasions by the wrongful use of fear through economic threats and the color of official right. *See, Evans v. United States*, 504 U.S. 255, 261 (1992) (holding that Congress has expanded common-law definition of extortion to include acts by private individuals). ChampionsWorld also alleges mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The Complaint specifies numerous instances of extortionate acts by USSF, too numerous to repeat in detail, allegedly done at the behest of MLS, which used interstate communications to wring money from ChampionsWorld, all based on USSF's purported power to govern professional soccer.

USSF allegedly threatened, for example, to report ChampionsWorld to FIFA as a "promoter in bad standing," thereby damaging ChampionsWorld's standing in the international soccer community, if ChampionsWorld declined to pay its sanctioning fees. ChampionsWorld's allegations state the identity of persons falsely misrepresenting USSF's authority and, in many cases, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to ChampionsWorld. *See, Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990).

MLS objects on the grounds that the alleged acts of wrongdoing emanated from USSF, not MLS. MLS also argues that the acts of mail

and wire fraud are not pled with the specificity required by Rule 9(b). But ChampionsWorld alleges that certain fraudulent actions that emanated from USSF's office bore the signatures of MLS personnel who expressly signed in such capacities. Sunil Gulati, President of USSF and a board member of both USSF and MLS, was the alleged architect of USSF's sanctioning fee policy. ChampionsWorld specifically names at least five overlapping board members or officers of USSF and MLS who are alleged to have been operating USSF for MLS's benefit by using USSF sanctioning fees to drive MLS's competitors out of business.

The Court finds that ChampionsWorld has sufficiently alleged a pattern of racketeering activities by MLS for Count 4 to survive a motion to dismiss under Rules 12(c) and 9(b). The cases that MLS cites to support its Rule 9(b) argument involve far less detailed allegations than ChampionsWorld provides. *See, Photofile, Inc. v. Graphicomp Sys.*, 1993 WL 375769, *4 (N.D. Ill. 1993); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248-49 (2d Cir. 1987). Furthermore, MLS's argument that ChampionsWorld has suggested no rational motive for MLS's alleged racketeering activities does not stand up. Surely, the demise of a business competitor would be beneficial to MLS. The Motion for Judgment on the Pleadings regarding Count 4 is denied.

## *2. Count 5*

In Count 5, ChampionsWorld sets forth an alternative RICO claim that USSF and MLS and "DOES 1 through 10" (as-yet-unknown defendants) formed an "association-in-fact" and operated as a single unit to carry out the extortionate and fraudulent scheme described in Count 4, using their managers and employees. Under this theory, the association-in-fact was the "person" and the employees were the "enterprise" used to carry out the pattern of racketeering activities on ChampionsWorld and other victims. ChampionsWorld alleges, plausibly, that if not restrained by this Court, Defendants will continue this pattern of extortionate and fraudulent behavior against other competitors.

USSF argues that this claim fails because ChampionsWorld has not pled sufficient facts to establish the existence of an association-in-fact or a pattern of racketeering activity. The Court has already found in its analysis of Count 4 that ChampionsWorld has sufficiently pled a pattern of racketeering activity.

As to whether ChampionsWorld has pled an association-in-fact, an "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). ChampionsWorld alleges that USSF and MLS had legitimate purposes of promoting soccer in the U.S., but that the two had an additional, nefarious purpose to monopolize all professional U.S.

soccer matches.  ChampionsWorld alleges that the two organizations
had a common purpose, with overlapping officers and an
organizational structure that provided for continuity with
differentiated roles between the two entities.  USSF allegedly
founded MLS with $5 million in seed money, which MLS never paid
back.  DOES 1 through 10 allegedly dictated USSF's sanctioning fees
with the purpose of harming MLS's competitors.  These allegations
sufficiently plead an "association-in-fact."  The Motion for
Judgment on the Pleadings regarding Count 5 is denied.

### E.  ChampionsWorld's Contract Claims (Counts 6 through 10)

#### 1. Fraudulent Inducement Against USSF Only (Count 6)

ChampionsWorld alleges that USSF induced ChampionsWorld to pay
unreasonable fees by falsely stating that USSF had the authority to
govern U.S. professional soccer.  ChampionsWorld alleges that USSF
knew this claim was false and intended for ChampionsWorld to rely
on it, that ChampionsWorld reasonably relied on the claim, and that
this reliance proximately caused monetary loss to ChampionsWorld.
This sufficiently states a claim under Illinois law.  *See,
Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166 (Ill. App. Ct. 2009).

#### 2. Unjust Enrichment against USSF and MLS (Count 7)

Unjust enrichment is a "quasi-contract" theory that allows a
court to infer the existence of a contract where none exists in
order to prevent unjust results.  To state a claim for unjust
enrichment, a plaintiff must allege "that the defendant retained a

benefit to the plaintiff's detriment, and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience." *Wooley v. Jackson Hewitt, Inc.*, 540 F.Supp.2d 964, 978 (N.D. Ill. 2008). When the parties' relationship is governed by a valid contract, a plaintiff may not bring a claim of unjust enrichment unless the claim falls outside the contract or the plaintiff challenges the validity of the contract. *Id.*

ChampionsWorld alleges that USSF and MLS were unjustly enriched by the fees illegally imposed on it by USSF. Because ChampionsWorld also challenges the validity of the contracts under which these fees were imposed, it may plead unjust enrichment. Its claim is sufficiently pled against USSF.

MLS argues that there can be no claim of unjust enrichment against MLS because USSF alone is alleged to have received the fees. But ChampionsWorld alleges that USSF's sanctioning fee scheme also allowed MLS to demand fees from ChampionsWorld when the two groups put on doubleheader soccer matches. For example, in July 2003, USSF allegedly gave ChampionsWorld a discount for sponsoring a doubleheader match with MLS. ChampionsWorld was then compelled to pay a $50,000 fee to MLS on the basis that MLS had conferred a benefit on ChampionsWorld by deigning to be a co-sponsor. This sufficiently states an unjust enrichment claim against MLS.

### 3. Restitution for Invalidity of Contracts Due to Lack of Consideration Against USSF Only (Count 8)

ChampionsWorld alleges that, in exchange for the sanctioning fees it paid to USSF, it received no goods or services of any kind – nothing except USSF's promise to sanction ChampionsWorld's events. Since USSF had no authority to sanction professional events, that promise was illusory. Therefore, argues ChampionsWorld, the contracts were invalid due to lack of consideration.

An illusory promise is one that, on closer examination, reveals that the promisor has not promised to do anything. An illusory promise is not sufficient consideration to support a contract. *W.E. Erickson Const., Inc. v. Chicago Title Ins.* Co., 641 N.E.2d 861, 864 (Ill. App. Ct. 1994). ChampionsWorld has therefore sufficiently stated a claim for restitution based on lack of consideration.

### 4. Restitution for Unconscionability of Contracts (Count 9) and for Unenforceability Due to Economic Duress (Count 10) Against USSF Only

#### a. Timeliness (Counts 9 and 10)

USSF argues that ChampionsWorld may not seek restitution because (1) this action usually calls for rescission of the contract and (2) a party who seeks rescission due to unconscionability or duress must do so promptly. *See, McBaldwin Fin. Co. v. DiMaggio, Rosario & Veraja*, LLC, 845 N.E.2d 22, 33

(Ill. App. Ct. 2006); *P.S. & E. West, Inc. v. Essex Group, Inc.*, 1987 WL 14609, *7 (N.D. Ill. 1987).

Whether a rescission is timely, depends on the facts of the case. *Brandt v. Phipps*, 75 N.E.2d 757, 767 (Ill. 1947). ChampionsWorld's pleadings state that it paid the exorbitant fees demanded by USSF from 2001 to 2004, then found out around fall 2004 that USSF did not have the authority to charge sanctioning fees. ChampionsWorld prepared to commence a lawsuit at that time seeking injunctive relief, but its financial situation had deteriorated to the point that it was unable to do so. ChampionsWorld filed for bankruptcy in January 2005 and ceased operations in May 2005. In March 2006, the Bankruptcy Court confirmed the plan under which this lawsuit was authorized. The Complaint was filed May 2, 2006. These circumstances raise an issue for the trier of fact as to whether ChampionsWorld's restitution claims are timely. *See id.* (finding five year delay reasonable under facts of the case).

It could be argued that if ChampionsWorld had consulted an attorney regarding USSF's authority in 2001, it would have discovered USSF's fraud at that time and demanded rescission then. ChampionsWorld argues that it reasonably believed USSF's claims of authority. Whether its belief was reasonable and any delay therefore excusable is, in this case, a question for the trier of fact. The reasonableness of ChampionsWorld's reliance will depend on the precise facts giving rise to the reliance. *See,* Rest. 2d

Torts § 545 (misrepresentation of law). Therefore, the restitution claims will not be dismissed for untimeliness.

### b. Unconscionability (Count 9)

Under Illinois law, a finding of unconscionablilty may be based on either procedural or substantive unconscionability or a combination of the two. *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006). "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Id.* at 264. Here, where USSF is alleged to have misrepresented its authority over professional soccer and used its artificially enhanced bargaining power to compel ChampionsWorld to pay exorbitant fees, Plaintiff has sufficiently stated a claim for procedural unconscionability. *See, Levey v. CitiMortgage*, Inc., 2009 WL 2475222, *4 (N.D. Ill. 2009) (finding procedural unconscionability could turn on acts of bad faith such as misrepresentation).

The issue of substantive unconscionability concerns whether the terms themselves are commercially reasonable. *Frank's Maint. & Eng'g, Inc v. C.A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. Ct. 1980). ChampionsWorld alleges that USSF charged sanctioning fees between 9% and 20% of ChampionsWorld's gross (not net) receipts. ChampionsWorld alleges that FIFA, for example, charges at most a 2% sanctioning fee, while some European federations charge a nominal fee or none at all. ChampionsWorld alleges that

the exorbitant fees largely contributed to its demise.  This is adequate to state a claim for substantive unconscionability. USSF's Motion for Judgment on the Pleadings for Count 9 is denied.

### c. Economic Duress (Count 10)

Economic duress is not generally treated as a cause of action in tort, but rather as a defense to the enforceability of a contract or a basis for restitution or rescission.  *Lawless v. Central Prod. Credit Ass'n*, 592 N.E.2d 1210, 1217 (Ill. App. Ct. 1992).  Here, ChampionsWorld pleads economic duress as a basis for restitution.  "Economic duress occurs where undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement." *Rubin v. Laser*, 703 N.E.2d 453, 459 (Ill. App. Ct. 1998).  There is no economic duress unless the defendant applies wrongful or unlawful pressure. *Hurd v. Wildman, Harrold, Allen & Dixon*, 707 N.E.2d 609, 614 (Ill. App. Ct. 1999).

ChampionsWorld alleges that, even if USSF does have the authority to sanction professional U.S. soccer events, USSF took oppressive and undue advantage of its authority from the very beginning in negotiating sanctioning fees with ChampionsWorld.  But it is difficult for a party to claim that its will was overborne by economic duress when it has had time for "inquiry, examination, and reflection."  *J.D. Alexander v. Standard Oil Co.*, 423 N.E.2d 578, 583 (Ill. App. Ct. 1981).  ChampionsWorld alleges that it

contracted with USSF from 2001 to 2004 to put on soccer matches under USSF's auspices. Thus, ChampionsWorld was in a position from the beginning to reject USSF's terms and do business elsewhere. This is inconsistent with the idea that ChampionsWorld was in economic distress and that USSF took advantage of it. ChampionsWorld's allegations are insufficient to support its economic duress claim. USSF's Motion for Judgment on the Pleadings as to Count 10 is granted.

## IV.  **CONCLUSION**

For the reasons stated herein, the Court rules as follows:

1.  The United States Soccer Federation's and Major League Soccer's Motions for Judgment on the pleadings are denied as to Counts 1 through 9 of the Complaint.

2.  USSF's Motion to Dismiss Count 10 is granted; Count 10 is dismissed without prejudice.

3.  The Court holds that, as a matter of law, the Olympic and Amateur Sports Act, 36 U.S.C. §§ 220501 *et seq.,* does not give the United States Soccer Federation authority to govern professional soccer in the United States, except to the extent necessary for USSF to govern the participation of professional players in the Olympic Games and related events, such as Paralympics and Pan-American Games.  USSF is not entitled to an exemption from the antitrust laws regarding professional soccer, except to the extent necessary for USSF to oversee Olympic and related events.

4.    USSF's Motion for Judicial Notice is granted.

5.    USSF's Motion to Strike certain portions of ChampionsWorld's declaration and exhibits accompanying its brief is denied.

**IT IS SO ORDERED.**

_____
          Harry D. Leinenweber, Judge
          United States District Court

**DATE:** July 21, 2010