# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHAMPIONSWORLD, LLC,

                Plaintiff,

      v.

UNITED STATES SOCCER
FEDERATION, *et al.*,

                Defendant.

Case No. 06 C 5724

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

The parties have filed a number of pretrial motions, primarily seeking sanctions against one another for various alleged misdeeds. The Court will resolve all the motions by way of this order. For the reasons that follow: (1) Defendants' Joint Motion for Sanctions for Plaintiff's Wholesale Destruction of Evidence [246] is granted in part; (2) ChampionsWorld's Motion for Sanctions Against Defendant United States Soccer Federation, Inc. [277] is denied; (3) Non-Party John Collins' Motion to Quash Discovery Subpoena [265] and Defendant USSF's Motion to Quash Discovery Subpoena Issued to Non-Party John P. Collins [268] are granted; (4) ChampionsWorld's Motion for Sanctions Against: (A) the Law Firms of Proskauer Rose LLP and Latham & Watkins LLP and (B) Defendants MLS and USSF [278] is denied; and ChampionsWorld's Motion to Compel the Production of Documents [306] is denied.

Defendants, in various pending motions, seek to recover their fees and costs in responding to these motions. Because none of the motions brought by Plaintiff are frivolous, the Court declines to impose fees or costs.

## I. <u>OVERVIEW OF LITIGATION</u>

Plaintiff ChampionsWorld, LLC ("ChampionsWorld") is a defunct sports marketing company that, from 2001 to 2005, sponsored professional soccer exhibitions in the United States involving international club teams. ChampionsWorld filed for bankruptcy and ceased operations in 2005.

Defendant United States Soccer Federation, Inc. (the "USSF") is the governing body for amateur soccer in the United States. Defendant Major League Soccer, LLC ("MLS") is a professional first-division soccer league in the United States. ChampionsWorld claims that USSF improperly assumed the power to oversee professional, as well as amateur, soccer in the United States. USSF then used this power to unreasonably restrain trade and to extract millions of dollars in sanctioning fees from ChampionsWorld, which caused the company to fail. ChampionsWorld alleges that USSF's actions were part of an anticompetitive scheme to protect MLS by preventing other soccer entities from applying for first-division status in the United States. Defendants deny any wrongdoing and argue that ChampionsWorld is trying to make them scapegoats for the company's poor business

strategy and eventual demise.  Given the contentious nature of the litigation, it is perhaps not surprising that the parties have become embroiled in various discovery disputes and seek sanctions against one another on several grounds.

## II.  **ALLEGED DESTRUCTION OF EVIDENCE**

First, Defendants seek sanctions against ChampionsWorld on the ground that Plaintiff lost or destroyed evidence, including: (1) virtually every email on its servers dated after September 1, 2004; (2) all of its accounting files dated after April 2004; and (3) virtually all of its accountant's records relating to ChampionsWorld.  Defendants seek a number of possible sanctions, including precluding Plaintiff from arguing that it is entitled to recover future lost profits or the lost value of its business and precluding Plaintiff from relying on testimony regarding events that occurred post-September 2004.  It also seeks fees and costs in bringing this motion.

ChampionsWorld responds that it took reasonable steps to preserve its data.  It acknowledges that it cannot find data from the end of 2004 and 2005, but points the finger at Lino DiCuollo ("DiCuollo"), who had been a Senior Vice President for Legal and Finance at ChampionsWorld.  DiCuollo now works for MLS, having been hired by that company shortly after the demise of ChampionsWorld.

## A.  Background

Deposition testimony paints a muddy picture as to who was minding the store in the last months of ChampionsWorld's existence.  DiCuollo, asked if he recalled being in charge of document retention for ChampionsWorld, replied, "I don't recall that," but acknowledged providing documents to Plaintiff's counsel, Pryor Cashman LLP, in connection with this case.  DiCuollo testified that he did not destroy any ChampionsWorld documents and was not aware of anyone else doing so.  DiCuollo's job duties while serving as Senior Vice President for Legal/Business Affairs for ChampionsWorld included "filing and maintenance of corporate documents."

Charlie Stillitano ("Stillitano"), ChampionsWorld's CEO, testified at his deposition that from 2002 on, the company had a verbal policy of retaining all documents.  It was Stillitano's understanding that all of the company's data would be saved on the company's on-site computer server.  Stillitano testified that he did not know why so few documents were produced from the period after September 2004.  Employees of the company were instructed to give documents to DiCuollo toward the end of the company's existence because such documents might be needed in the company's bankruptcy proceeding, he said.  DiCuollo's brother, Mario De Paola, who was the company's information technology director, has since died.  Stillitano further testified that he

did not instruct the company's accountants, Traphagen & Traphagen, to retain documents. Defendants did receive hard copies of at least some of the 2004 QuickBooks data kept by Traphagen, but they contend this is mostly financial projection data which is not helpful in determining the cause of ChampionsWorld's failure.

Stillitano provided an affidavit explaining that in the early fall of 2004, after ChampionsWorld retained Pryor Cashman, he, DiCuollo, and the company's outside general counsel had lunch with attorneys from the firm and were instructed to preserve all documents related to the lawsuit. Stillitano told outside counsel that the company had a 100 percent document retention policy in place and nothing would be destroyed.

ChampionsWorld contends that at the time outside counsel was retained to bring the instant lawsuit, there was no reason to doubt that DiCuollo was adequately performing his job of maintaining the company's records, with the assistance of his brother. Defendants argue that it was actually Senior Vice President of Operations Tim Kassel ("Kassel") who was in charge of document retention. Kassel testified that he preserved data up until the company's bankruptcy filing in January 2005, but did not know if anyone did so following the bankruptcy.

## B.  Legal Standard

Courts have the inherent power to sanction a party for failure to preserve evidence that it controls when it could have reasonably foreseen that evidence to be material in a potential lawsuit. *Jones v. Bremen High School*, 08 C 3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25, 2010). Sanctions "must be proportionate to the circumstance surrounding the failure to comply with discovery." *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993).

To find sanctions appropriate, the Court must determine: (1) that there was a duty to preserve the evidence; (2) that the duty was breached; (3) that the other party was harmed by the breach; and (4) that the breach was caused by the breaching party's willfulness, bad faith, or fault. *Jones*, 2010 WL 2106640, at *5. If the court finds sanctions appropriate, it must impose the least severe sanction necessary to ameliorate the prejudice that arose from the breach. *Id.*

## C.  Analysis

### 1.  *Duty to Preserve the Evidence*

There is no real dispute between the parties that ChampionsWorld had a duty to preserve evidence by early to mid-2004. Even prior to that date, the company had investigated

possible claims against USSF.  In August 2004, ChampionsWorld retained Pryor Cashman, its counsel of record in this proceeding.

## 2.  *Breach of Duty to Preserve*

The next question, then, is whether ChampionsWorld breached its duty to preserve the evidence.  On the record presented, the Court cannot find that ChampionsWorld (or anyone else) intentionally destroyed any documents.  However, it does not appear that Stillitano took any affirmative steps to carry out Pryor Cashman's directive that all documents be preserved. Stillitano apparently assumed either that DiCuollo handled this process or that the company's verbal document retention policy would suffice.  It did not.  Plainly put, Stillitano and ChampionsWorld's outside counsel should have done more to ensure that relevant evidence was preserved, particularly given the importance of ChampionsWorld's financial condition to its case and the fact that ChampionsWorld had been contemplating some sort of legal action against USSF well prior to its demise.  *See Jones*, 2010 WL 2106640, at *6 (noting that an intention to preserve evidence must be "followed up with concrete actions reasonably calculated to ensure that relevant materials will be preserved.").  So Plaintiff breached its duty to preserve certain emails and accounting records.

Nonetheless, in discussing spoliation sanctions, the Seventh Circuit has held that "the crucial element is not that evidence

was destroyed but rather the reasons for the destruction." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (internal citations omitted). Here, neither DiCuollo nor anyone else seems to be able to explain why certain data was not preserved. DiCuollo's brother, who might have been able to offer an explanation, has died. As such, the circumstances make it difficult for the Court both to understand what happened to the information and to assign responsibility.

### 3. Prejudice to Defendants

Nonetheless, the Court finds that Defendants have been prejudiced by ChampionsWorld's failure to preserve certain documents from 2004 and early 2005. In arguing against a finding of prejudice, ChampionsWorld notes that in October 2004, Defendant MLS approached ChampionsWorld about buying the company, and ChampionsWorld turned over some financial information to MLS. The parties dispute how much information was disclosed, but Defendants note that because the information was submitted in October, it did not include ChampionsWorld's fourth-quarter results, which would have been important in understanding why the company subsequently filed bankruptcy. Defendants also argue that almost all of the information regarding ChampionsWorld's efforts to find potential investors in late 2004 and early 2005 is missing, as are documents concerning the company's decision to file bankruptcy. This information is clearly important to

defending against ChampionsWorld's claims that USSF's sanctioning fees forced it into bankruptcy. However, the Court notes that that prejudice is ameliorated somewhat by the data provided by ChampionsWorld to MLS during the sale discussions, as well as information provided to Defendants through third-party subpoenas.

### *4. Fault*

As noted above, apportioning fault in this case is difficult given the messy relationship between DiCuollo and the parties. Nonetheless, the Court cannot find that ChampionsWorld acted willfully or in bad faith because there is nothing to indicate the company destroyed records to hide adverse information. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008).

But bad faith is not a prerequisite to the imposition of sanctions. *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). Fault is enough, and Stillitano and ChampionsWorld's outside counsel should have done more to ensure the documents were preserved, rather than relying on what was apparently a verbal "100 percent document retention policy." *See*, *Danis v. USN Communs., Inc.*, No. 98 C 7482, 2000 WL 1694325, at *32 (N.D. Ill. Oct. 20, 2000) ("The duty to preserve documents in the face of pending litigation is not a passive obligation."). So a sanction of some sort is appropriate, although not so harsh as

limiting ChampionsWorld's damages to recovery of the sanctioning fees alone or precluding Plaintiff from presenting testimony about events after September 2004. Nor should Defendants be allowed to draw an adverse inference from the absence of the emails and accounting records without any evidence that they were destroyed in bad faith. *See Wiginton v. CB Richard Ellis*, 02 C 6832, 2003 WL 22439865, at *7 n.6 (N.D. Ill. Oct. 24, 2003). That leaves the remedy of instructing the jury that ChampionsWorld failed to take appropriate steps to preserve information relevant to the litigation, and that as a result, most its emails dated after September 1, 2004, its Quickbooks files dated after April 2004, and most of its outside accounting firm's records were destroyed. The Court agrees to so instruct the jury, but declines to impose any further sanctions, monetary or otherwise, on ChampionsWorld.

### III.  ALLEGED MISCONDUCT OF USSF BEFORE FIFA

ChampionsWorld seeks sanctions against USSF, arguing that USSF tampered with arbitration proceedings before the Federation Internationale de Football Association ("FIFA") by engaging in inappropriate *ex parte* communications with FIFA officials. ChampionsWorld argues that USSF needed a favorable ruling from FIFA after this court rejected its argument that the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, gave it authority to charge sanctioning fees for professional soccer

matches in the United States. *ChampionsWorld LLC v. U.S. Soccer Fed'n, Inc.*, 726 F.Supp.2d 961, 970 (N.D. Ill. 2010).

ChampionsWorld requests either a default judgment against USSF or a finding that USSF is barred from asserting that FIFA's regulations gave it authority to sanction international professional soccer matches. USSF contends any *ex parte* communications with FIFA officials concerned only scheduling matters, and the motion is frivolous. Because the Motion to Quash filed by Collins (and joined by USSF) is intertwined with this motion, the court will address them jointly.

## A. Background

Some background on the FIFA arbitration is necessary for the Court to resolve this motion. In 2007, this Court ordered this case stayed pending arbitration before FIFA pursuant to an arbitration clause in Stillitano's application for a FIFA match agent license. ChampionsWorld subsequently filed a request before FIFA's Players' Status Committee (the "PSC") seeking a resolution of its dispute with USSF, but FIFA declined to intervene in the matter because only individuals may proceed before FIFA's decision-making bodies. ChampionsWorld, as a company, was barred. FIFA also stated that it could not hear RICO or antitrust claims, two of the issues ChampionsWorld had asked it to decide. After receiving letters from FIFA to that

effect, ChampionsWorld requested that this Court lift the stay. USSF objected on the ground that they had not been informed of ChampionsWorld's efforts before FIFA and wanted the opportunity to present its own case for arbitration. This Court continued the stay to give the parties a chance to get the PSC to accept the case.

On September 4, 2008, USSF submitted a petition to the PSC asserting that Stillitano, and not ChampionsWorld, was the real party in interest because he held the match agent license. USSF did not request an adjudication of ChampionsWorld's racketeering or antitrust claims, but rather requested that the PSC answer four questions related to USSF's authority to charge sanctioning fees for matches between foreign national teams or foreign clubs. Specifically, USSF asked FIFA to decide whether: (1) USSF has the authority to require matches between foreign national teams first to be sanctioned by USSF; (2) USSF has the authority to impose sanctioning fees; (3) USSF was required to return the sanctioning fees previously paid to it; and (4) USSF has the right to notify FIFA if a match agent refuses to pay sanctioning fees. (The phrasing of these questions in the present tense, rather than as of the time the sanctioning fee dispute arose, would become a problem, as we shall see.)

Stillitano objected to that petition. One day after Stillitano filed his objection, on October 31, 2008, USSF's

General Counsel, Timothy Pinto ("Pinto"), sent an email to FIFA's Director of Legal Affairs, Marco Villiger ("Villiger"). Pinto, writing on behalf of himself and USSF's President, Sunil Gulati ("Gulati"), requested a meeting with FIFA Secretary General Jerome Valcke ("Valcke") about the ChampionsWorld lawsuit and indicated that Pinto and Gulati were willing to travel to Zurich for the meeting. Villiger's response was copied to Omar Ongaro ("Ongaro"), the head of player status and governance for FIFA. Villiger wrote that the Players' Status Department was awaiting Stillitano's position, so "there is not much we can say." He added, "once we have the position, things are surely getting interesting. If you agree, I propose that we will inform you once we got [sic] the position in order to discuss the next steps." There is no evidence showing that any in-person meeting took place as a result of this exchange. Villiger and Ongaro are part of the administrative staff of the PSC.

ChampionsWorld views these communications as an attempt to manipulate the proceedings before FIFA, but USSF offers a less nefarious explanation. USSF contends that ChampionsWorld kept it in the dark about its initial communications with FIFA. When it learned of those discussions, USSF contends, it contacted FIFA to determine what the procedure would be after USSF submitted its own petition. After receiving no response to these inquires, Pinto sent the October 21, 2008, email to Villiger. USSF

contends there were no further communications between Pinto and Villiger prior to FIFA's decision to accept jurisdiction over the USSF petition.  In deposition testimony, Pinto said he did not expect a meeting in Zurich to occur, but was merely trying to "step up the pressure" to get a response from FIFA.

On November 5, 2008, FIFA provided each side with copies of correspondence from the other side, but did not provide copies of the email exchange between Villiger and Pinto.  About a month later, on December 2, 2008, the PSC decided that it had jurisdiction over USSF's petition.  It did not initially provide an explanation for its ruling.

ChampionsWorld contends that USSF again had improper contact with FIFA on the eve of a March 10, 2009, status hearing before this Court in which the Court to was decide whether to continue the stay.  Gulati emailed Villiger and told him an update on the ChampionsWorld matter was needed because of an "important court filing date."  Villiger replied that the decision would be released the day before the status hearing.  On March 9, 2009, the PSC did issue the grounds for its decision that it had jurisdiction over the USSF petition.  Gulati, in deposition testimony, said the email was no different from a call to a clerk to see when an order would be issued.

Stillitano appealed the PSC's decision that it had jurisdiction to the Court of Arbitration for Sport (the "CAS").

On July 15, 2009, the CAS found the PSC was competent to answer questions as to whether FIFA's statutes and regulations give USSF the right to sanction foreign matches, charge sanctioning fees, and report non-paying match agents to FIFA. But the CAS found that the PSC could not rule on the issue of whether USSF was required to return sanctioning fees previously paid by Stillitano for international matches played in the United States. Again, the questions as framed by the CAS were in the present tense and did not specifically refer to the period when the sanctioning fee dispute arose.

With the case again set to be heard by the PSC, ChampionsWorld alleges that USSF had improper contact with FIFA. On August 26, 2009, Gulati wrote to Villiger to propose a meeting to introduce USSF's new general counsel, Lisa Levine ("Levine"), and to address various issues "that we have been discussing over the last several months with you." The ChampionsWorld litigation was on the agenda for the meeting, which was held via conference call on September 24, 2009.

Levine's notes from that meeting indicate that during the conference call, FIFA officials said they would soon be inviting Stillitano to file a brief, to which USSF could file a reply. A hearing would then be set. USSF contends that Levine's notes show that the discussion of the ChampionsWorld matter was limited to questions of timing and procedure. Testimony from Levine,

Gulati, and John P. Collins ("Collins"), counsel for FIFA, during the most recent CAS hearing supports this interpretation.  Levine testified that during the conference call there was no discussion about the substance of the dispute, and that no one from USSF tried to influence the PSC.  Collins agreed that the conversation solely concerned the status and timing of the dispute.

Nonetheless, ChampionsWorld notes that shortly after this meeting, FIFA again sided with USSF in a dispute.  Stillitano had attempted to moot the need for arbitration by stipulating that FIFA's *current* statutes and regulations may be read to authorize USSF to sanction professional international soccer matches played in the United States.  ChampionsWorld argued that although the current regulations do give USSF that power, the regulations in existence during the genesis of this dispute did not.  USSF, on the other hand, argued that the PSC should decide not only whether it currently has sanctioning authority under FIFA statutes and regulations, but whether it had that authority during Stillitano's tenure at ChampionsWorld.  The PSC agreed, rejecting ChampionsWorld's arguments that the CAS's questions were framed in the present tense and did not speak to that issue.

On February 10, 2010, the PSC decided the questions in favor of USSF, finding that under FIFA regulations USSF has sanctioning authority over soccer matches played by foreign national teams or foreign clubs in the United States, has the right to charge

sanctioning fees, and has the right to notify FIFA if a licensed match agent refuses to pay those fees. Further, the PSC found that USSF has had those rights since at least 2001, when Stillitano and ChampionsWorld began promoting international, first-division professional men's soccer exhibitions in the United States. ChampionsWorld appealed that decision to the CAS.

A ruling by the CAS was issued on July 12, 2011. The CAS affirmed the PSC's ruling. Relevant to the instant motion, it found insufficient evidence in the record to establish that USSF and FIFA had engaged in improper communications or conspired to rephrase the questions at issue to suit their own purposes.

## B. Analysis

The Court notes, as it has before, that FIFA's interpretation of its own statutes is of limited use in this proceeding because FIFA does not have the authority to interpret U.S. law or to grant USSF an exemption from this country's antitrust laws. *ChampionsWorld,* 726 F.Supp.2d at 969. Nonetheless, ChampionsWorld argues that USSF manipulated the outcome of the FIFA proceedings and should not be permitted to offer the CAS's ruling "as insulation against its prior misconduct." A district court may dismiss a case for egregious litigation misconduct under either FED. R. CIV. P. 37 or its inherent authority. *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F.Supp.2d 974, 981 (N.D. Ill. 2011).

However, while ChampionsWorld can show some communications between USSF and FIFA's administrative staff of which it perhaps should have been informed, nothing in ChampionsWorld's motion rises to the level of "tampering" with the tribunal. There is no evidence to show that USSF communicated with the PSC tribunal that decided the arbitration, and USSF's explanation that its communications with FIFA officials involved scheduling matters appears well-taken. While ChampionsWorld ascribes a great deal of meaning to FIFA's unwillingness to accept his stipulation that FIFA's current regulations allow USSF to charge sanctioning fees, the Court cannot do the same. The questions in USSF's petition inartfully framed the issue of USSF's authority to charge sanctioning fees as implicating only FIFA's current regulations. But it has always been clear that the dispute in this case stems from the USSF's authority to charge sanctioning fees during the time of ChampionsWorld's existence.

In an attempt to show wrongdoing by USSF, ChampionsWorld supplemented its motion with emails between counsel for USSF and Collins. Collins, who now serves as outside counsel to FIFA, was formerly general counsel to USSF. Collins turned over these emails in response to a subpoena from ChampionsWorld that seeks information related to his communications with Defendants' counsel regarding ChampionsWorld or Stillitano. Although Collins turned over these emails, he and USSF seek to quash the subpoena.

In one of the emails to Collins, one of the attorneys for USSF, Russell Sauer ("Sauer"), attached a letter that USSF faxed to FIFA (which also had been submitted to ChampionsWorld's counsel), with the comment "I understand you may be advising the FIFA Player's Status Committee in connection with the [the ChampionsWorld matter]." Sauer added, "If you wish to discuss this matter further, please do not hesitate to call." Collins replied, "Your understanding is correct." In a later email exchange, Sauer requested that Collins provide contact information for an individual at FIFA, unconnected with the PSC, who could help locate historical information.

The Court cannot ascribe to these emails the nefarious motives urged by ChampionsWorld. ChampionsWorld complains that it did not have an opportunity to submit copies of anticipated submissions to the PSC for Collins' "consideration and *ex parte* 'discussion.'" However, there is no evidence of further discussions of that letter, or that Collins took any actions that compromised the integrity of the FIFA arbitration proceedings. Collins has submitted an affidavit in which he states that he was not present at the PSC hearing, did not know who was on the bureau of the PSC that decided the matter, and did not learn of the PSC's decision until after the fact. In light of these representations, and the lack of evidence of any discussions between USSF officials and FIFA officials that went to the

substance of the dispute, ChampionsWorld cannot establish any tampering with the FIFA proceedings on the part of USSF.

There remains the question of whether Collins should have to turn over additional documents in response to ChampionsWorld's subpoena regarding his communications with Defendants' law firms about Stillitano or ChampionsWorld. USSF and Collins note that fact discovery in this case closed on January 31, 2011. Because there is nothing to show improper conduct on Collins' part, the Court finds that good cause does not exist to extend the discovery deadline and allow the subpoena of Collins. As such, it is quashed, and ChampionsWorld's Motion for Sanctions against USSF for FIFA Tribunal Tampering is denied. Collins' request that he be awarded fees and costs incurred in filing the motion to quash is likewise denied.

### IV. Motion to Disqualify Defense Counsel

ChampionsWorld asks this Court to disqualify counsel for both Defendants, and to strike their affirmative defenses, on the basis of a June 2006 interview with DiCuollo conducted by attorneys for MLS from the law firm of Proskauer Rose LLP. DiCuollo, as noted above, is the former executive for ChampionsWorld who went to work for MLS after leaving ChampionsWorld's employ. DiCuollo, a lawyer, served as in-house counsel at ChampionsWorld, although he and Defendants contend his role at the company was primarily a business one.

In March, this Court directed Proskauer to turn over its notes from the meeting over its objection. The interview of DiCuollo by Proskauer attorneys is documented in an 11-page internal memorandum dated June 29, 2006 (the "Proskauer Memorandum"). ChampionsWorld contends the memorandum shows that Proskauer deliberately elicited privileged information from DiCuollo, and that both Proskauer and counsel for USSF, Latham & Watkins LLP, must be disqualified because this information has tainted the proceedings. Specifically, ChampionsWorld contends that DiCuollo was the source of Defendants' theory that misguided business strategies, and not the USSF sanctioning fees, drove ChampionsWorld into bankruptcy.

Defendants contend that it was legally permissible for attorneys for MLS to interview a former employee of its adversary and that DiCuollo was warned not to reveal privileged information. Further, they argue that DiCullo's role within ChampionsWorld was largely business, not legal, circumscribing the scope of Plaintiff's privilege claim.

## A. Background

As noted above, DiCuollo's job description with ChampionsWorld was "Senior Vice President — Legal/Business Affairs." DiCuollo told the Proskauer attorneys that he was not really "practicing law" at ChampionsWorld, but was Stillitano's right-hand man and the day-to-day "financing guy." DiCuollo said

he worked for ChampionsWorld until May 2005, then did some work on a *per diem* basis as the company's bankruptcy administrator until October or November 2005.  By late November 2005, he was offered a position with MLS as director of player personnel.

DiCuollo outlined for the Proskauer attorneys the staffing of ChampionsWorld, its financial position, the attempted sale of the company prior to its bankruptcy, and its bankruptcy. Proskauer attorneys also questioned DiCuollo about the background of the instant lawsuit.  On this point, DiCuollo disclosed:

- He was asked to do research on the suit by the ChampionsWorld Board.

- In his opinion, MLS was not a potential target of the suit until the lawyers got involved.

- The names of certain ChampionsWorld investors that DiCuollo said were "leading the charge" on the lawsuit.

Relevant to the issue of USSF sanctioning fees, DiCuollo told the Proskauer attorneys that:

- Certain international teams required that the promoter be sanctioned by the home federation. For example, Manchester United, an English team, told ChampionsWorld that it would not play in matches sponsored by it if ChampionsWorld did not either pay the USSF sanctioning fees or sue over them.

- In 2002 or 2003, ChampionsWorld had an expert look at the Ted Stevens Act to determine if USSF had authority to charge sanctioning fees, and the expert concluded that it did not.

- DiCuollo himself looked into the issue in 2004, reviewing FIFA rules, USSF bylaws, and other

documents. He also researched whether other federations were charging similar fees. DiCuollo concluded that USSF did not have authority to charge sanctioning fees.

- DiCuollo spoke with Sheila Kronert Moore at FIFA, who told him that club team games were outside of FIFA's purview, so ChampionsWorld would have to look to the governing law in the United States.

- DiCuollo also recounted conversations with officials at USSF seeking clarification for its authority for charging the sanctioning fees. DiCuollo told the Proskauer attorneys that his research on the sanctioning fee issue was not done from a "legal perspective," but rather as a negotiating tool to get lower fees.

DiCuollo also discussed with Proskauer attorneys details of ChampionsWorld's perception of the interrelationship between MLS and USSF, including the fact that there was a perception by some at ChampionsWorld that because MLS and USSF had overlapping board members, MLS received benefits from USSF. Finally, DiCuollo provided the names of two of ChampionsWorld's main competitors.

## B. Legal Standard

Here, the Court is called upon to determine whether DiCuollo revealed any privileged information. ChampionsWorld's principal claims (RICO and antitrust violations) are brought under federal law, so this Court will apply attorney-client privilege law as determined by the federal courts. *Mem'l Hosp. for McHenry Co. v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981). As a preliminary point, Defendants argue that Proskauer's conduct in interviewing DiCuollo should be judged by the standards applied in New York

federal courts because this action was transferred pursuant to 28 U.S.C. § 1404(a), and in such a case the transferee court applies the law of the forum in which the case was originally filed. ChampionsWorld contends that this Court should apply the law of this circuit as to the appropriate boundaries of interviews of a former employee of an adversary. Given that this interview occurred in New York while the case was pending there, this Court will look to the interpretation of New York federal courts on this issue. Regardless, it appears that federal courts sitting both here and in New York (and indeed throughout the country) have applied similar reasoning to disputes such as this.

Federal courts have inherent authority to discipline attorneys who appear before them for conduct inconsistent with ethical standards. *MMR/Wallace Power & Indus., Inc. v. Thames Assoc., et al.*, 764 F.Supp. 712, 717 (D. Conn. 1991). Generally speaking, counsel may conduct *ex parte* interviews of former employees of a corporate adversary. *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 443 (S.D.N.Y. 1995). However, counsel may not inquire about privileged or confidential communications, and must conform to all ethical standards. *Siebert & Co., Inc. v. Intuit*, 868 N.E.2d 208, 210 (N.Y. 2007). Where privileged information was revealed, the Court must determine whether the attorney's conduct is so questionable as to

taint the litigation before the Court, thus requiring disqualification of counsel. *MMR/Wallace*, 764 F.Supp. at 718.

## C. Analysis

DiCuollo's role in this case is thorny for many reasons, not the least of which is that he worked in both a business and legal capacity for ChampionsWorld. The attorney-client privilege protects confidential communications by a client to an attorney, acting in his or her role as an attorney, for the purpose of obtaining legal advice. *Sandra T.E. v. South Berwyn School Dist. 100,* 600 F.3d 612, 618 (7th Cir. 2010). Because the privilege only applies when a lawyer acts as a lawyer, communications regarding business strategy are not governed by the attorney-client privilege. *Weeks v. Samsung Heavy Ind. Co., Ltd.*, 93 C 4899, 1996 WL 341537, *3 (N.D. Ill. June 20, 1996). Further, the "attorney-client privilege protects *communications* between a client and its lawyer, not the facts which the client communicates to the attorney." *Standard Chartered Bank PLC v. Ayala Int'l Holdings, Inc.*, 111 F.R.D. 76, 80 (S.D.N.Y. 1986). And the privilege does not protect facts that an attorney obtains from independent sources and conveys to his client. *Id.*

Much of the information revealed by DiCuollo during the Proskauer Rose interview was factual information about the circumstances of the sanctioning-fee dispute. Further, a portion

of ChampionsWorld's Complaint centers on communications between DiCuollo and USSF over the sanctioning fees, so those communications cannot be considered privileged. The Court also notes ChampionsWorld itself inquired of DiCuollo during his deposition in January 2011 (before disclosure of the Proskauer Memorandum) about many of the same subjects touched upon during the Proskauer Rose interview. Specifically, ChampionsWorld's counsel asked DiCuollo about his position with the company, who its investors were, his communications with USSF over the sanctioning fees, and his own investigation into the validity of the fees. ChampionsWorld's counsel apparently was not concerned that DiCuollo would reveal privileged information in response to these inquiries. But counsel did instruct DiCuollo not to reveal privileged information in regard to his conversations with Martin O'Connor, who served as outside counsel for the company. This is a strong indicator that, despite its arguments to the contrary, ChampionsWorld did not view DiCuollo's work as "innately privileged." Further, while it is undisputed that DiCuollo identified documents for ChampionsWorld to use in preparing its RICO and fraud claims, there is no evidence that Proskauer attorneys broached this subject with him.

The instant case is similar to *Siebert*, 868 N.E.2d at 210-11, where the Court of Appeals of New York held that disqualification was not warranted merely because defense

attorneys interviewed a former executive for the plaintiff who had been privy to plaintiff's privileged and confidential information.  In *Siebert*, the executive, Nicholas Dermingy, was involved in negotiating a contract between the parties to create an Internet brokerage service.  *Id.* at 209.  After the agreement fell apart, Dermingy also was a member of the litigation team for the plaintiff and was privy to its litigation strategy.  *Id.* After he was fired from the plaintiff company, attorneys for the defendant interviewed Dermingy, but warned him not to reveal confidential or privileged information.  *Id.* Because the record showed that no such information had been disclosed, the court found the interview was proper.  *Id.* at 212.

There are numerous parallels between the instant case and *Siebert*.  Like the executive in that case, DiCuollo played a role in the underlying transaction by negotiating with USSF over the sanctioning fees, and he later played a role in developing ChampionsWorld's litigation strategy.  And as in *Siebert*, the interview in this case focused on the facts underlying the dispute, not ChampionsWorld's litigation strategy.  As such, the Court cannot find that the Proskauer interview was improper.

Even if the Court were to find some impropriety, ChampionsWorld has not shown that the interview tainted these proceedings or provided Defendants with an unfair advantage so as

to require the extreme sanction of disqualification.  The vast
majority of the information obtained from DiCuollo was publicly
available elsewhere, primarily through information disclosed
during the bankruptcy proceeding and by disclosures
ChampionsWorld itself made to third parties.  It is clear that
DiCuollo was not the only possible source of Defendants' theory
that a flawed business model, and not the USSF sanctioning fees,
was the cause of the company's demise.  There abundant
information that pointed in this direction, including testimony
by both Stillitano and DiCuollo during ChampionsWorld's
bankruptcy proceedings, as well as a valuation of ChampionsWorld
prepared by Bederson & Company, LLP, a firm retained by
Plaintiff's bankruptcy counsel, which showed the financial losses
suffered by ChampionsWorld throughout its history.   The fact
that DiCuollo did not disclose secret information and was not the
only source of the defense theory in this case distinguishes this
case from the principal case relied upon by ChampionsWorld,
*Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F.Supp. 510 (S.D.N.Y.
1993).  In *Ackerman*, a former in-house counsel for the defendants
provided "inside and obviously secret information" to the
plaintiffs' counsel and helped them develop their theory of
fraud.  *Id.* at 517–18.  That information was used as the primary
source of information for plaintiff's complaint.  *Id.*  The same
is not true here.

Further, counsel for USSF argues that it did not know the substance of the DiCuollo interview until after this Court ordered co-defendant MLS to produce it, so it could not have used information from DiCuollo to shape its litigation strategy. ChampionsWorld has given this Court no reason to doubt this assertion. For these reasons, ChampionsWorld's Motion for Sanctions Against: (A) the Law Firms of Proskauer Rose LLP and Latham & Watkins LLP and (B) Defendants MLS and USSF is denied.

## V.  ChampionsWorld's Motion to Compel Production of Documents from MLS

Finally, ChampionsWorld seeks to compel MLS to produce documents relating to its decision to partner with Creative Artists Agency ("CAA") to promote international, professional soccer matches in 2010 and 2011. For the reasons that follow, the motion is denied.

### A.  Background

CAA is a talent and entertainment agency that, among other things, promotes exhibition soccer matches and is the current employer of both Stillitano and Jon Sheiman, a former ChampionsWorld executive. In 2010 and 2011, MLS, through its marketing arm, Soccer United Marketing ("SUM"), partnered with CAA to promote these exhibitions, some of which involved international teams. ChampionsWorld's document requests, issued in 2010, sought documents that showed MLS' revenues and expenses

in connection with the promotion of international games. MLS objected to the unlimited date range of the requests. After some back and forth, MLS agreed in a June 11, 2011, letter to produce such documents through the end of 2009. The CAA-promoted games did not fall within this category, and, until recently, there was no further discussion of the matter.

However, Championsworld argues that the CAA documents are important in light of recently exchanged expert valuation reports. ChampionsWorld's expert contends that but for USSF's unlawful sanctioning fees, it would have stayed in business and become profitable. Defendants' expert, on the other hand, opines that ChampionsWorld could not have reasonably expected to turn a profit.

ChampionsWorld contends that during recent deposition testimony, Stillitano shed new light on the issue when, under questioning from USSF's counsel, he testified that lessons he learned from running ChampionsWorld allowed the CAA-MLS promoted matches to be profitable. Although Stillitano is its former CEO, ChampionsWorld characterizes this revelation as surprising. In fact, during Stillitano's initial deposition in this matter, counsel for ChampionsWorld instructed Stillitano not to answer questions about whether certain CAA-promoted games made a profit because that would result in the disclosure of CAA's confidential information. Further, when counsel for Defendants sought to

question Sheiman about the CAA games, counsel for ChampionsWorld objected because CAA is not represented in this matter and "it's irrelevant to this action anyway." MLS argues, in essence, that ChampionsWorld has waived any right to the CAA documents.

## B. Analysis

Generally, parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense. FED. R. CIV. P. 26(b)(1). ChampionsWorld brings this motion to compel under FED. R. CIV. P. 37(a)(1). Courts have broad discretion in ruling on motions to compel. *Gile v. United Airlines, Inc.,* 95 F.3d 492, 495-96 (7th Cir. 1996). In ruling on a motion to compel, the Court must "independently determine the proper course of discovery based upon the arguments of the parties." *Id.* at 496. While FED. R. CIV. P. 37 does not set a time limit for motions to compel, they must be brought within a reasonable period of time. *Singletary v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi.*, No. 89 C 2821, 1992 WL 199827, at *2 (N.D. Ill. Aug. 10, 1992).

Here, ChampionsWorld has known since June 11, 2010, that MLS planned to produce documents to show its revenue and expenses in connection with the promotion of international games only through the end of 2009, but has not objected until now. The fact discovery cutoff in this case was January 31, 2011. It is too

late in the game, so to speak, for ChampionsWorld to object, particularly given that the "new" information that sparked this motion came from its own former CEO.  This is particularly true where attorneys for ChampionsWorld had previously objected during depositions when Defendants tried to pursue this line of inquiry.  As such, Plaintiff's motion to compel is denied.

## VI. <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

(1)  Defendants' Joint Motion for Sanctions for Plaintiff's Wholesale Destruction of Evidence [246] is granted in part;

(2)  ChampionsWorld's Motion for Sanctions Against Defendant United States Soccer Federation, Inc. [277] is denied;

(3)  Non-Party John Collins' Motion to Quash Discovery Subpoena [265] and Defendant USSF's Motion to Quash Discovery Subpoena Issued to Non-Party John P. Collins [268] are granted;

(4)  ChampionsWorld's Motion for Sanctions Against: (A) the Law Firms of Proskauer Rose LLP and Latham & Watkins LLP and (B) Defendants MLS and USSF [278] is denied; and

(5) ChampionsWorld's Motion to Compel the Production of Documents [306] is denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 8/17/2011