IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHAMPIONSWORLD, LLC, | Case No 06 C 5724 |
| Plaintiff, | |
| v. | Hon. Harry D. Leinenweber |
| UNITED STATES SOCCER FEDERATION, INC., MAJOR LEAGUE SOCCER, LLC and DOES 1 through 10, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Before the Court is Defendant U.S. Soccer Federation's Petition to Confirm an Arbitral Award; Plaintiff's Motion for Partial Summary Judgment; Defendants' Motion to Exclude the Expert Opinion of Rodney Fort; and Defendants' Motions for Summary Judgment on Plaintiff's Antitrust, RICO, and State Law Claims. For the reasons stated herein, the arbitral award is confirmed; Plaintiff's Motion for Partial Summary Judgment is denied; Defendants' Motions to Exclude and for Summary Judgment on the Antitrust claim are granted; and Defendants' Motion for Summary Judgment on the RICO and State Law Claims is granted in part and denied in part.

## II.  BACKGROUND

### A.  Parties and Related Entities

Due to the size and complexity of this case, the following background is necessarily incomplete.  Nonetheless, the Court provides a brief summary of the case, generally noting where there is a significant dispute (such a notation does not, however, constitute a ruling on what is or is not properly disputed under Local Rule 56.1).

Plaintiff ChampionsWorld was formed in 2000 by Carmelo "Charlie" Stillitano ("Stillitano"), its CEO throughout its existence.  From 2001 through 2005, ChampionsWorld organized and promoted soccer matches between prominent international men's professional soccer teams, played (with a few exceptions) on U.S. soil.

The Fédération Internationale de Football Association ("FIFA") is the international governing body for soccer, and is responsible for such international competitions as the World Cup.  FIFA is not a party to this litigation.

Defendant United States Soccer Federation, Inc. ("USSF") is a membership organization.  USSF is the FIFA National Association member for the United States, and claims to have held that role since the early 20th century.  It is a member of the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), and is the national governing body for soccer

recognized by the United States Olympic Committee ("USOC"). USSF is governed by a National Council comprised of elected representatives from USSF's constituent groups, and also has a Board of Directors, similarly comprised. USSF maintains that its sanction is required for any match played on U.S. soil involving foreign, FIFA-affiliated teams; it also charges substantial sanctioning fees.

Defendant Major League Soccer, LLC ("MLS") is the Division I professional men's soccer league based in the United States, and a member of USSF. It has an unusual structure for a sports league, with a joint Board of Governors and several investor-operators responsible for various teams (the parties sometimes refer to these as the MLS "owners.") For additional history, see *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 47-55 (1st Cir. 2002).

In 2002, a group consisting of most of the MLS investors formed Soccer United Marketing (SUM), a marketing and promotion entity which now, among others, represents MLS and USSF.

A few more introductions are in order. Sunil Gulati ("Gulati") is, since 2006, President of USSF. Before that, he was USSF Vice President, and is the President of Kraft Soccer, evidently the company through which the Kraft family became MLS investors and operators of the New England Revolution MLS team. Gulati frequently represented the Kraft family and/or Kraft Soccer at MLS and SUM proceedings.

- 3 -

Don Garber ("Garber") is the MLS Commissioner and CEO of SUM; he also sits on USSF's Board of Directors. Garber and Gulati communicated fairly often about soccer matters. Charles "Chuck" Blazer ("Blazer") is a FIFA Executive Committee member, and was at all relevant times CONCACAF General Secretary.

## B. Background

### 1. Historical Background

In 1975, Pres. Gerald Ford formed a Commission on Olympic Sports. The Commission's final report noted, among other things, that: (a) USSF became affiliated with FIFA in 1913; (b) unlike the other sport governing bodies, USSF's members included amateur and professional leagues; and (c) USSF derived income from fees relating to "Foreign Games/Tours." That report was delivered to Congress before the passage of the Amateur Sports Act of 1978. (The Act was amended in 1998 and renamed the Ted Stevens Olympic and Amateur Sports Act, and is now codified at 36 U.S.C. §§ 220501, *et seq.*)

As part of its successful bid to host the 1994 FIFA Men's World Cup, USSF agreed to facilitate the development of a Division I professional soccer league in the United States. USSF selected Major League Professional Soccer, Inc. ("MLPS") (later to become MLS) from among three applicants to become that league (and to become a USSF member). Alan Rothenberg ("Rothenberg"), then-President of USSF, was involved in developing and founding MLPS,

although Mark Abbott ("Abbott") (MLS's 30(b)(6) witness and current President) testified that Rothenberg did not participate substantively in selecting MLPS. Plaintiff contends that process was not genuinely competitive. MLS was formed in 1995, and played its inaugural season the following year.

It appears that the World Cup Organizing Committee lent $5 million to MLPS to get the league running (that loan was later assumed by MLS). After the World Cup, surplus funds, as well as the right to collect on that loan, were transferred to the newly-formed United States Soccer Foundation ("Foundation"). (The parties dispute how independent the Foundation is from USSF.) Instead of repaying the loan in cash, MLS entered into an arrangement whereby the Foundation incrementally forgave the loan in exchange for marketing benefits such as sponsorship placement on an MLS team's jersey and the right to use MLS's marks. *See* Abbott Dep. 77:11-80:23. Plaintiff disputes that the loan was ever truly repaid.

USSF has repeatedly stated its support for MLS (and the women's professional leagues), and that the leagues' success is important to the good of soccer in the United States. USSF has helped fund stadium development for certain MLS teams (though, Defendants contend, only in exchange for fair consideration). USSF also helped fund Project 40, which has been described in different

ways throughout the record, but appears to have been intended to support aspiring professional soccer players.

### 2. The Background of This Dispute

From 1996 to 2002, MLS promoted over 40 matches between FIFA-affiliated National or club teams, but the games were generally not as well attended as Plaintiff's, nor did they necessarily feature the same caliber teams. After its founding, SUM considered acquiring all or part of ChampionsWorld several times, but talks failed. SUM created SUM International to promote high-caliber international matches, noting in a memorandum that "leaving the field open to ChampionsWorld and other promoters will prove extremely damaging to SUM and MLS." Pl.'s Resp. to Defs.' Statement of RICO Facts, Ex. EE, at Bates No. MLS 044641-643.

For all or nearly all of ChampionsWorld's matches, Plaintiff entered into contracts or "match agreements" with USSF. The agreements set forth, among other things, Plaintiff's agreement to pay a fee and post a performance bond in return for USSF's agreement to sanction the match.

Although ChampionsWorld eventually went bankrupt, some of its games were successful in drawing large crowds and high gross gate receipts. In 2003, ChampionsWorld's average attendance at U.S. matches was 45,427, and it paid an average sanctioning fee of over $200,000 per match.

USSF claims that it has been sanctioning international games, and charging sanctioning fees, since the early 20th century; Plaintiff objects to USSF's historical evidence and argues that USSF's bylaws did not impose sanctioning fees on non-USSF members until 1999. In any event, USSF's general sanctioning fee is an amount calculated as follows:

- 5.25% of the gross gate receipts for matches involving one foreign club team;

- 9% of the gross gate receipts for matches involving two foreign club teams;

- 11.25% of the first $200,000, and then 15% of the remaining gross gate receipts for matches involving any country's national team ("a National Team").

*See, e.g.,* Pl.'s Resp. To Def.' Statement of Antitrust Facts, Ex. OOO. (The actual percentages appear to have varied over time.) Promoters are responsible for these fees, regardless of whether they are members of USSF. Throughout its existence, Plaintiff questioned whether USSF had authority to sanction its games and charge these fees.

Although the parties hotly dispute when the policy originated, at all relevant times USSF gave a "discount" to promoters of international matches who put on matches as a part of a doubleheader with an MLS game; that is, the sanctioning fee due for the international match was calculated based on 50% of the gross gate receipts of the doubleheader event (rather than the ordinary 100% of gross gate receipts). (The parties dispute whether the

- 7 -

discount applied only to MLS games.) Some of ChampionsWorld's games were doubleheaders.

Similarly, USSF claims that it has required promoters to put up "performance bonds" (to ensure payment of sanctioning fees) for decades. Again, Plaintiff contends that USSF rules did not require fees (and therefore, bonds) from non-members before 1999. USSF requires bonds in the greater of:

- $3,750 per foreign club team per game;

- $25,000 for any game involving a National Team; or

- an estimate of the anticipated percentage payments that will be due to USSF, CONCACAF and FIFA after the match. The estimate is in the sole discretion of the Federation.

*See id.* The bond amount could also vary depending on the number of games at issue.

Plaintiff disputes that all promoters have had to post such bonds. Plaintiff points out that MLS teams benefit from using a collective "blanket bond" of $50,000, and notes several other incidences of USSF issuing fee waivers (for example, to Nike as part of a Licensing Agent Agreement; the parties dispute whether that waiver was assigned later, with the rest of the Agreement, to SUM.) SUM undisputedly paid sanctioning fees to USSF.

USSF contends that its staff members made decisions regarding fee and bond amounts independent of anyone at MLS. Plaintiff disputes this, claiming that Defendants worked together to run it

out of business, and pointing to communications from or relating to individuals like Gulati, who have overlapping connections to SUM, MLS, and USSF.

At all relevant times, FIFA charged a fee of 2% of the gross receipts for any match between two National Teams of FIFA members (less a deduction for certain taxes and fees). Similarly, for matches played in its territory, CONCACAF has charged a fee of: 2% of the gross receipts (again, less a deduction) for matches between two National Teams, and 2% of the gross receipts for international club team matches. Under the ChampionsWorld-USSF match agreements, USSF was responsible for the fees payable to FIFA, CONCACAF, and any state associations.

In 2001 and 2002, USSF set the bond amounts for ChampionsWorld's matches at the base bond level. Plaintiff was late in "closing out" its financial obligations for every game in 2002 and 2003; Plaintiff does not dispute this, but contends that it is essentially irrelevant, pointing to testimony from USSF employees that late fees are generally not collected. In 2003, USSF set performance bonds for all but one of Plaintiff's matches higher than the base bond amount — most often, at $100,000. At Plaintiff's request, USSF significantly reduced the bond requirements for some of Plaintiff's 2003 games.

In 2003, in support of Stillitano's application to become a FIFA-licensed match agent, USSF Secretary General Dan Flynn wrote

a letter stating that ChampionsWorld had consistently submitted required paperwork and fees to USSF and to the participating teams, that USSF had never received any complaints regarding Stillitano, and calling his track record with USSF "impeccable." *See* Pl.'s Opp'n to Defs.' Mot for RICO Summ. J. Ex. N.

In 2004, USSF set ChampionsWorld's performance bonds above the base amount (evidently for every game) – generally, $75,000, and did not agree to reduce them. Plaintiff paid the 2004 bonds in a single $675,000 payment, which, it contends, was at USSF's insistence. Plaintiff contends that Chuck Blazer objected to Plaintiff not being allowed to meet that bond amount with a letter of credit, as USSF rules allegedly permit. ChampionsWorld did not pay the balance of the fees owed for its 2004 matches.

ChampionsWorld suffered substantial losses during its existence, filed for bankruptcy in January 2005, and ceased doing business in May 2005.

Plaintiff relies heavily on a series of e-mails and communications, mostly between, among others, Gulati, Garber, Abbott, and Kraft Soccer's Brian O'Donovan, to demonstrate that, *e.g.*, MLS and/or SUM improperly sought special breaks on sanctioning fees; MLS and/or SUM could use USSF's structure, contacts, and/or members to their benefit; MLS and/or SUM affiliates were improperly consulted regarding Plaintiff's sanctioning fee and bond amounts; or that they were gleefully

- 10 -

plotting Plaintiff's demise. Needless to say, Defendants contest many of these documents' admissibility, as well as the conclusions that Plaintiff draws from them regarding who spoke on behalf of whom, and whether or not the discussions were appropriate. The Court will discuss the admissibility of these various documents as necessary, below.

For some undisclosed period of time, USSF provided MLS and/or SUM with an international games report – that is, a report of upcoming international games promoted by other promoters. USSF's Tom King maintained, however, that the information was provided to any promoter that asked, and was given to other promoters verbally.

### 3. *Procedural Background*

Plaintiff's Complaint originally brought claims sounding in antitrust (Counts I through III), civil RICO (Counts IV and V), and contract, along with related doctrines (Count VI through Count X).

### a. *Arbitration Proceedings*

FIFA has a standing committee called the Players' Status Committee (the "PSC"), which acts as its dispute resolution body. *See* FIFA Statutes, § 34, 49 (2011). The PSC is the designated arbiter listed in the Match Agent Regulations ("MARs"), to which (as set out in this Court's May 2007, opinion) ChampionsWorld became bound when Stillitano applied to become a FIFA-licensed match agent. The Court of Arbitration for Sport ("CAS") is an arbitral court headquartered in Lausanne, Switzerland. When

arbitrating FIFA-related disputes, the CAS applies FIFA's statutes and regulations and, secondarily, Swiss law. PSC decisions are appealable to the CAS.

On May 4, 2007, this Court granted the Defendants' Motion to Stay this action pending arbitration before the PSC. That November, Plaintiff filed a claim for arbitration against Defendants, which included its antitrust and RICO claims. FIFA rebuffed the arbitration request, in part because only individuals (not corporations) may participate in FIFA's dispute resolution process.

In September 2008, USSF instituted an arbitration action against Stillitano, limited to whether FIFA's rules authorized USSF to: (1) sanction games such as Plaintiff's, (2) charge sanctioning fees and a performance bond, and (3) notify FIFA if a match agent refused to pay the fees or bonds. The original petition also asked (4) whether USSF, FIFA and/or CONCACAF had to return any sanctioning fees to Stillitano. Plaintiff objected to that arbitration, and the matter was submitted to the PSC for its determination of its own jurisdiction. The PSC determined that it had jurisdiction over USSF's petition.

Plaintiff appealed that conclusion to the CAS, which affirmed the PSC's conclusion with regard to first three questions (but not the fourth), and noted that the PSC's jurisdiction was limited to interpreting FIFA's Statutes and regulations. The case was

- 12 -

returned to the PSC for a ruling on the merits. The PSC subsequently found that under FIFA's statutes and regulations:

- USSF has the authority to require matches between foreign national or club teams on U.S. soil to be sanctioned by it;

- USSF has the right to charge sanctioning fees for such matches and require the posting of a bond securing those fees; and

- USSF has the right to notify FIFA if a FIFA-licensed match agent refuses to pay its sanctioning fees or post performance bonds in connection with such games.

The PSC concluded that all of these principles have applied at least since 2001, even though FIFA's statutes only *explicitly* recognized members' sanctioning authority over club games played on their territory since 2004.

Plaintiff appealed the merits decision to the CAS, which subsequently affirmed the PSC's ruling as a reasonable interpretation of FIFA's statutes and regulations. It held that USSF had the authority to sanction and charge sanctioning fees for foreign national team or club matches played on U.S. soil, and to notify FIFA regarding delinquent match agents. In a procedure uncommon in U.S. courts, Plaintiff had to name FIFA (as the entity of which the PSC is a part) as a respondent in its appeal; FIFA submitted briefs and arguments to the CAS panel. Plaintiff evidently did not appeal the CAS decision to the Swiss Supreme Court. USSF has now moved to confirm the arbitral award.

*b. Litigation Proceedings*

On July 21, 2010, the Court denied Defendants' Motion for Judgment on the Pleadings regarding Counts I through IX, and dismissed Count X without prejudice. In that ruling, the Court found as a matter of law that the Ted Stevens Act does not grant USSF authority to govern professional soccer in United States, "except to the extent necessary for USSF to govern the participation of professional players in the Olympic Games and related events. . . . USSF is not entitled to an exemption from the antitrust laws regarding professional soccer, except to [that extent]." *ChampionsWorld LLC v. U.S. Soccer Federation*, 726 F.Supp.2d 961, 975 (N.D. Ill. 2010).

On September 14, 2011, Plaintiff voluntarily dismissed Counts II, III, and IV (its Sherman Act Section 2 and USSF RICO Enterprise claims). Accordingly, the only remaining counts are Counts I, V, and VI-IX.

### III. **LEGAL STANDARD**

The bulk of this opinion is devoted to summary judgment; other applicable legal standards will be set out in the relevant sections. The Court applies the ordinary summary judgment standard. *See, e.g.,* FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court discusses the extent of the parties' compliance with Local Rule 56.1 below.

## IV.  DISCUSSION

### A.  Standing

Plaintiff consistently objects that Defendants use the term "FIFA Affiliate Exhibition Matches" to distort the issues, insisting that USSF's policies purported to govern a match involving *any* foreign soccer-playing entity, not merely those affiliated with FIFA members.  *See, e.g.,* Pl.'s Mem. in Opp'n to USSF's Pet. to Enforce CAS Ruling 7; Pl.'s Mem. in Opp'n to Defs.' Mot. For RICO Summ. J. 2.  Defendants note that all of Plaintiff's games did involve FIFA affiliates, and objects that Plaintiff lacks standing to challenge its policy as applied to other matches.  *See*, *e.g.*, USSF's Opp'n to Pl.'s Mot. For Partial Summ. J. 6-7 & n.5. (USSF raised the issue in a footnote, and Plaintiff does not appear to have directly responded.  Standing, however, is jurisdictional, and not waivable.)

### *1.  Contract Claims*

The Court agrees that, at least with regard to the contract claims, Plaintiff's claims are predicated on its relationship with USSF, and USSF's authority over Plaintiff's matches.  Plaintiff may well agree.  *See* Pl.'s Reply in Supp. of its Mot. For Partial Summ. J. 1 ("To prevail . . . USSF must show that it had authority to charge its own sanctioning fees upon professional soccer matches promoted by ChampionsWorld between 2001 and 2004.")

- 15 -

### 2. RICO Claim

Under RICO, a plaintiff has standing if it has suffered: "(1) an 'injur[y] in [its] business or property' (2) 'by reason of' (3) the defendants' 'violation of section 1962.'" *RWB Services, LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 685, 687 (7th Cir. 2008) (noting also that plaintiffs must be injured by at least one predicate act, but that courts should examine the injury in the context of the entire RICO violation to assess the requisite causation.). *See also* 18 U.S.C. § 1964(c).

Plaintiff's RICO liability theory is premised on the claim that USSF falsely claimed exclusive sanctioning authority over foreign professional soccer matches played in the United States, and then demanded fees and bonds in unjustifiable and discriminatory amounts calculated in part to drive Plaintiff out of business. To the extent that Plaintiff's business was injured by reason of this alleged racketeering activity, it is only in relation to games that Plaintiff promoted or tried to promote. *See* Pl.'s Opp'n to Defs.'s Mot. for RICO Summ. J. 26 (noting that Plaintiff suffered RICO harm: (1) in paying the sanctioning fees and bonds, and (2) because the alleged misconduct was intended to (and did) drive its investors away.) Plaintiff has conceded that all of its matches involved FIFA affiliates, and not argued that it has broader standing. Furthermore, Plaintiff has made little, if any, genuine effort to establish a violation of § 1962 beyond the

context of FIFA-affiliate matches - including whether such matches occur, of USSF actually sanctions them. Although this is a closer question, absent such an explanation, the Court concludes that Plaintiff can only establish standing to challenge USSF's conduct as it pertains to FIFA-affiliated matches.

### 3. Antitrust Claims

Antitrust standing is not jurisdictional, and need not be addressed at this juncture. *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994).

### B. USSF's Petition to Enforce the Arbitral Award

USSF has petitioned under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention") for recognition and enforcement of the arbitral decision in CAS 2010/A/2241 (*Charles Stillitano v. United States Soccer Federation (USSF) & Federation Internationale de Football Association (FIFA)*). Thomson Dec. Ex. A (hereinafter, "2011 CAS Ruling"). Plaintiff objects that: (a) the decision falls outside of the Convention; (b) venue in this Court is improper; and (c) several defenses to enforcement under the Convention apply.

The Convention is enacted into U.S. law as Chapter 2 of the Federal Arbitration Act ("FAA"). 9 U.S.C. § 201, *et seq.* Article 1 (1) of the Convention provides that it applies:

> to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where recognition and enforcement of such awards are

sought. . . .[and to] arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

Convention Art. I, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330. Its implementing legislation, however, limits the Convention's applicability. *Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 577 (7th Cir. 2007)(citing 9 U.S.C. § 202). Section 202 defines a Convention award as:

An . . . arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial. . . . An . . . award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

*Id.* Because the various entities' relationships are integral to this discussion, the Court pauses summarize them (as relevant here, and very generally) as follows:



Stillitano, USSF, and ChampionsWorld are or were U.S. citizens; FIFA is Swiss. As relevant here, only ChampionsWorld and USSF are parties to this litigation. The agreement under which this Court compelled arbitration (under Chapter 1 of the FAA) is Stillitano's match agent application to FIFA. (This Court ruled previously that ChampionsWorld was bound by that agreement due to its relationship to Stillitano, and found that USSF could enforce the agreement essentially because it was an intended beneficiary thereof.) Because arbitration before the PSC can only involve individuals (not corporations), this Court ruled in 2008 that Stillitano, though not a party, could arbitrate on Plaintiff's behalf.

In its petition here, USSF argued that the relevant relationship arises out of the commercial contracts between Plaintiff and USSF (that Stillitano executed as CEO and, in some cases, a FIFA-licensed match agent), and that the award is foreign and/or has a reasonable relation to a foreign country because: (a) FIFA was a named respondent in the CAS proceeding; (b) the seat of arbitration was Switzerland; and (c) the CAS panel said that it would apply FIFA statutes and, complementarily, Swiss law. *See* Pet. 4.

Plaintiff appears to agree that this dispute and award arise out of a commercial contractual relationship between it and USSF, but strenuously objects that neither the parties' relationship nor

the arbitral award is foreign enough to bring the award within the Convention. Plaintiff argues, in part, that FIFA's participation in the CAS proceeding — defending its ruling as the arbiter below — does not make the award arise "out of such a relationship." Pl.'s Mem. in Opp'n to Pet. 12. In essence, Plaintiff claims that FIFA's appearance before the CAS is not a sufficient (or at least, not the correct) "relationship" to bring the CAS ruling within the Convention.

In its reply, USSF raised several alternative arguments for the first time, including that the award also arose from a *relationship* (as opposed to an *award*) not entirely between U.S. citizens, because FIFA had issued the match agent license. Further, USSF argued, the Court can enforce the award pursuant to Chapter 1 of the FAA, or under the doctrine of issue preclusion (regardless of whether the award is confirmed). *See id.* at 6-7 n. 7 & 8. The Court sought briefing from Plaintiff in response to these new arguments, *see* DKT 430, which is now complete.

### 1. Applicability of New York Convention

Although the parties do not express it as such, they seem to construe the second sentence of § 202 differently, giving the phrase "which is entirely between citizens of the United States" different modifiers. If it modifies "an agreement or award," Defendant's construction is plausible – the CAS "award" is arguably "between" the parties and FIFA. If it modifies "such a

- 20 -

relationship," however, the commercial relationship identified in the first sentence of § 202 must have included FIFA or another foreign entity to bring the award within the Convention. (USSF partially adopted the "relationship" construction in its reply, as noted above.)

It is unsurprising that courts need not often distinguish between the two constructions, and even use them interchangeably. *Compare, e.g., Lander Co., Inc. v. MMP Invs., Inc.*, 107 F.3d 476, 482 (7th Cir. 1997) (noting that the Convention applies to "any arbitration agreement or arbitral award arising out of a [commercial] legal relationship . . . provided only that *if the relationship* is entirely between U.S. citizens, it must involve performance abroad or have some other reasonable relation with a foreign country.") (internal quotations omitted, emphasis added); *with Jain v. de Mere*, 51 F.3d 686, 689 (7th Cir. 1995) ("Chapter 2 mandates that any commercial arbitral *agreement*, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention.") (emphasis added).

The Court finds that the construction in *Lander* comports most closely with the statutory language and the rule of the last antecedent. Furthermore, *Lander* involved, as here, enforcement of an arbitral award. *See also Industrial Risk Insurers v. M.A.N.*

- 21 -

*Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440-41 (11th Cir.1998) (noting that § 202 excludes "those awards that arise out of . . . a commercial relationship which is entirely between citizens of the United States[.]") (Internal alterations omitted). *But cf. Nomanbhoy v. Vahanvaty*, No. 11 C 2456, 2011 WL 6736052, at *4 (N.D. Ill. Dec. 21, 2011) (noting that the parties "dispute whether the Award has a reasonable relation to foreign state" and concluding that where the parties and dispute were domestic but the arbitration occurred abroad, the award fell within art. 1(1), but outside of § 202.).

This construction — whereby art. 1 of the Convention is limited by § 202, which focuses on the parties' relationship — helps to reconcile two sets of cases: those which find the parties' relationship or dispute insufficiently foreign to warrant arbitration or enforcement of an award (like *Nomanbhoy* and the salvage cases, such as *Jones v. Sea Tow Svcs.*, 30 F.3d 360, (2d Cir. 1994)), on the one hand, with cases which stress that an award is "nondomestic" under art. 1 if it is "made within the legal framework of another country, *e.g.*, pronounced in accordance with foreign law [or involves foreign parties.]" *See, e.g., Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983).

Accordingly, the Convention applies if (a) a non-U.S. citizen is a party to the commercial relationship, or (b) the relationship involves property, performance, or enforcement abroad or "some

other reasonable relation with one or more foreign states." There appears to be no dispute that the relationship never contemplated performance abroad. With that in mind, the Court turns to the parties' arguments as to whether the USSF-ChampionsWorld commercial relationship involved a foreign party.

USSF argues that FIFA was "integral" to the "relationship giving rise to the arbitration" in that it issued Stillitano's match agent license and thus was party to the arbitration agreement. Rep. in Supp. of Pet. 3.

Plaintiff rejoins, in essence, that the USSF-ChampionsWorld relationship is between domestic entities and related to soccer matches played in the United States. It is too domestic to fall within the Convention, Plaintiff argues, because its foreign elements are too incidental; FIFA never signed the contracts and was largely inactive in the parties' relationship. Courts, it notes, have found that mere agreements to arbitrate internationally or apply foreign law are insufficient to trigger the Convention. *See* Pl.'s Resp. to Court's Questions 7-8. Plaintiff analogizes this case to ones in which courts have found that, *e.g.*, having an international parent company does not invoke the Convention, and points out that USSF evidently allowed Plaintiff to put on a significant number of matches before Stillitano became a FIFA-licensed match agent. Id.

- 23 -

The Court notes that the USSF-ChampionsWorld contracts do refer to FIFA — for example, noting that the USSF would be responsible for fees owed to FIFA, and requiring Plaintiff to ensure that the games were played in accordance with FIFA rules. *See, e.g.,* Pl.'s Statement of Facts in Support of Partial Summ. J., Ex. V, at Bates Nos. CW14242, 14244. Plaintiff is correct that FIFA certainly was not a signatory to these contracts. Nonetheless, as USSF points out, Plaintiff at some point found it necessary to have Stillitano become a licensed match agent. The Court also notes that FIFA is clearly acknowledged in the contracts as a relevant governing entity that directly profited from certain matches. FIFA did issue the match agent license, but it also had a broader stake in this relationship. Thus, Plaintiff's reliance on the USSF-ChampionsWorld contracts to prove FIFA's irrelevance is misplaced; the relevant commercial relationship was not, in fact, "entirely between citizens of the United States."

Furthermore, although Defendants do not make this argument, the Court's conclusion that the award falls under the Convention is buttressed by the fact that the parties' relationship also bore a reasonable relation to foreign states through FIFA, its members, and their affiliated teams. Frankly speaking, this is a close case. In the end, however, it is unlike *Nomanbhoy* or the salvage cases, where the parties' only connection to any foreign country was the seat of arbitration or their choice of law. FIFA was an

interested party throughout – as reflected by the parties'
contracts and Stillitano's match agent status. The very nature of
Plaintiff's business was bringing foreign, FIFA-affiliated soccer
teams to play matches in the U.S. This is not a case where, as
Plaintiff argues, the relationship is insufficiently "foreign" to
warrant enforcement under the Convention (but too foreign to be
enforced under Chapter 1 of the FAA.)

Lest the Court be accused of rendering an unfairly crabbed
interpretation of the statute, it notes that while the arbitration
was conducted in New York, the award was rendered in Switzerland.
Furthermore, FIFA was a party to the Match Agent Application that
triggered the arbitration, and did participate in the CAS
arbitration, albeit due to a procedural quirk. Accordingly, even
under the alternative construction of the statute, the Convention
governs. The Court turns next to Plaintiff's objections to venue
and defenses under the convention.

## 2. Venue

9 U.S.C. § 204 makes enforcement of a Convention award
appropriate in the jurisdiction where, "save for the arbitration
agreement an action or proceeding with respect to the controversy
between the parties could be brought[.]" USSF argues that because
the USSF-ChampionsWorld contracts' forum selection clause
designated this district, "save for" the arbitration agreement, the
suit would have proceeded here.

Plaintiff objects that the forum selection clause cannot control because this Court lacks jurisdiction over Stillitano and the contracts are not personally imputable to him. Plaintiff purports to resurrect, on his personal behalf, all arguments in its previous brief opposing the motion to compel arbitration. Pl.'s Opp'n to Pet. 13 n. 7. It proposes no alternate venue.

USSF argues that the Court has jurisdiction over Stillitano, who sought Chicago-based USSF's help to get his match agent license, and that Stillitano is bound to the contracts as a party "closely related" to Plaintiff. USSF's Rep. in Supp. of Pet. 6. & n.7. Moreover, it argues that Plaintiff's counsel represented him in arbitration, presenting the same arguments there as here. *Id.* at 6. Finally, USSF notes (correctly) that this Court ruled in 2008 that Stillitano could arbitrate on behalf of both himself and Plaintiff. *Id.* Neither party's cited cases are directly on point. The Court is inclined to agree that Plaintiff's jurisdiction-based objections miss the mark. USSF is not trying to enforce the arbitral award against Stillitano personally; the procedural history of this case, untidy as it is, makes clear that Stillitano arbitrated on Plaintiff's behalf because it, as a corporation, could not. The arbitration arose out of the dispute over the requirements of the match agreements — which contained a forum selection clause, making venue proper here. Hence, this is the proper Court to confirm the award.

### 3. *Convention Defenses*

There are a limited number of defenses to enforcement under the Convention. *See* Convention Art. V. Plaintiff relies on three, arguing that: (a) Stillitano was "unable to present his case" due to USSF's alleged discovery violations; (b) the arbitral procedure "was not in accordance with the laws of the country where the arbitration took place" because review was not *de novo*; and (c) enforcement of the CAS decision would violate public policy. The Court addresses each in turn.

#### a. *Ability to Present the Case*

Plaintiff argues that Stillitano could not adequately present his case in arbitration because USSF withheld critical evidence. An arbitral award will not be enforced if the challenging party shows that "he was not given a meaningful opportunity to be heard as our due process jurisprudence defines it" — at least "adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997). Nonetheless, parties to arbitration should not expect full judicial proceedings. *Id.* Arbiters are not bound to hear all of the proffered evidence; vacating an award is proper only when the exclusion of relevant evidence "actually deprived a party of a fair hearing[.]" *Slaney v. Intern. Amateur Athletic Fed'n*, 244 F.3d 580, 592 (7th Cir. 2001).

- 27 -

Plaintiff argues that Stillitano could not adequately present his case because USSF concealed proof that it "did not purport to impose sanctioning fees upon non-members of USSF until 1999" – specifically that it failed to disclose its pre-1999 bylaws and policies until after arbitration. Pl.'s Resp. To Pet. 14. Accordingly, Plaintiff argues, Stillitano was precluded from disproving USSF's claim "that it has supposedly 'always' understood and embraced FIFA's statutes and regulations as independently mandating USSF's exercise of sanctioning authority over 'all' promoters of international games." *Id.*

USSF contends that the objection is a red herring, because Plaintiff never requested the pre-1999 bylaws through discovery or the arbitration document request procedures. Furthermore, USSF argues that discovery of new evidence after an arbitral proceeding does not violate due process if the evidence is not central to the arbitration. USSF stresses that the key question was USSF's authority under FIFA's statutes and regulations, not USSF's rules or beliefs.

In *Generica*, a party was not "unable to present its case," despite restrictions on its ability to cross-examine an important witness. This was so because the arbiter did not consider the issue raised by the challenging party to be central to its ruling, and gave the witness' testimony less weight in light of the restrictions. *Id.* at 1130-31.

In *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* the Fifth Circuit similarly faced a claim that a Convention award should not be enforced because one party withheld material information (about the existence of an insurance policy). *Karaha Bodas*, 364 F.3d 274, 306-07 (5th Cir. 2004). Although that party did not argue that it unable to present its case, the court's analysis is instructive. It began from the premise that courts may refuse to enforce a Convention award if a party gave perjured evidence or procured the award by fraud. *Id.* at 306. On the facts before it, however, the court found no evidence that the withholding party deliberately misled the arbitral tribunal, and noted that the challenging party had not pressed the issue when it arose during arbitration or in seeking discovery. *Id.* at 307. The court accordingly found that the failure to disclose did not violate public policy or preclude enforcement of the award. *Id.*

As discussed in Section IV(C)(2) below, Plaintiff's specific discovery requests did not clearly encompass the pre-1999 materials, nor did its general request for relevant documents put USSF on notice of a need to produce them – at least until it actually had them and recognized their relevance. Although Plaintiff claims that USSF deliberately delayed in obtaining these materials from its own Hall of Fame Archives, it offers no further evidence of willfulness. (Indeed, given that Defendants rely

- 29 -

extensively on the documents, it seems unlikely that they withheld them for fear that they were too damaging.)

More significantly, the Court agrees with USSF that its bylaws were not central to the CAS Ruling. Indeed, both the PSC and CAS repeatedly explained that their holdings were limited to what FIFA's statutes and regulations provided from 2001 onward. *See, e.g.,* 2011 CAS Ruling 24-26, ¶¶ 10.19-10.26. Therefore, evidence regarding USSF's actual sanctioning practices pre-2000 would have been minimally relevant. The Court notes that based on this record, the CAS's only discussion of USSF's bylaws appears to be in the "factual background" section of its *first* ruling – which simply notes that USSF's bylaws state that it exclusively governs men's professional soccer in United States, and that all professional soccer matches therefore require its approval and payment of any sanctioning fee. 2009 CAS ruling, 3 at ¶ 3.4. This hardly demonstrates that USSF's pre-2000 bylaws would have been central to the CAS panel's *second* decision, as to what, if any, authority FIFA granted USSF beginning in 2001. Accordingly, the Court cannot conclude that USSF's failure to obtain these documents before arbitration deprived Stillitano of a fair hearing on the issues that the CAS panel actually decided.

        *b. CAS Disregarded Its Own Standard of Review*

The CAS explained it standard of review as follows:

> although the CAS reviews appeals *de novo*, sporting
> federations are afforded broad discretion when

> interpreting their own statutes and regulations.
> Accordingly, the panel will not substitute its own
> judgment for the judgment of the PSC unless the PSC's
> judgment was "manifestly erroneous or plainly
> inconsistent with the clear wording of the regulations,
> or was rendered in violation of a party's fundamental
> right policy."

2011 CAS ruling at 24, ¶ 10.18 (citing CAS precedent).

Plaintiff argues that the arbitral procedure was "not in accordance with the law of the country where the arbitration took place[,]" Convention art. V(1)(d), because the CAS acknowledged that under Swiss law it had to conduct a *de novo* review, but under "any kind of legitimate de novo review, there is no way the FIFA ruling could have been affirmed." Pl.'s Opp'n to Pet. 14. Specifically, Plaintiff objects, the CAS Ruling rendered the 2004 amendment to the FIFA statutes (which added explicit authorization to sanction international club games) "a nullity" and improperly concluded that FIFA's interpretation of its own pre-2004 regulations was not "manifestly erroneous[.]" *Id.* at 15.

Plaintiff points to nothing other than the CAS Ruling to indicate that *de novo* review in the ordinary sense was required either by CAS precedent, rules, or Swiss law. (Indeed, if it violated Swiss law, one might expect Stillitano to have appealed to the Swiss Supreme Court.) Instead, it merely asserts that any kind of rigorous review would have rejected the PSC's decision. Plaintiff cannot shoehorn its true complaint – that the PSC and CAS rulings are wrong — into an objection that the arbitral procedure

defied Swiss law (at least not without citing Swiss law or other applicable authority).

### c. Public Policy

Finally, Plaintiff argues that enforcement in this case would be contrary to U.S. public policy. *See* Convention art. V(2)(b). This is so, Plaintiff argues, because "[e]verything about this process offends basic notions of fairness to Stillitano." *Id.* Plaintiff points to this Court's previous discovery opinion, arguing that USSF and FIFA routinely and improperly engaged in private discussions about the arbitration.

Plaintiff neglects to mention that in that opinion this Court rejected Plaintiff's allegations that USSF had tampered with the arbitration or was otherwise guilty of egregious misconduct. *See, ChampionsWorld LLC v. U.S. Soccer Federation*, 276 F.R.D. 577, 586 (2011). (The CAS likewise rejected Plaintiff's allegations of impropriety. *See* 2011 CAS Award, 21 ¶10.5.) Furthermore, USSF's merely arguing that FIFA's participation in the arbitration brought the award within § 202 does not demonstrate any manifest unfairness. The Court finds that enforcing the award would not violate the public policy of the United States. The award is accordingly confirmed.

### 4. Applicability of Chapter 1 Of the FAA

Having concluded that the CAS award falls within the Convention and rejected Plaintiff's claimed defenses, the Court

need not address USSF's alternate argument that the award is enforceable under Chapter 1 of the FAA.

### 5. *Collateral Estoppel*

Similarly, the Court need not address Defendant's argument that, even if unconfirmed, the award would bind ChampionsWorld through issue preclusion. That said, the Court must still make the case-by-case determination of what weight to give the award. Arbitration rulings impinging on certain federal statutory rights are not given preclusive effect. *See, e.g., Coleman v. Donahoe*, 667 F.3d 835, 854 (7th Cir. 2012) (noting that arbitration rulings lack preclusive effect in later Title VII litigation). Some courts have given arbiter's findings estoppel effect in, *e.g.,* subsequent RICO litigation. *See Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1361 (11th Cir. 1985) (giving preclusive effect to an arbiter's findings in a later RICO case, where the RICO claims were based on issues "[t]he determination of [which] was directly within the scope of the contractual arbitration clause and the arbitrators' expertise."). Accordingly, the Court turns to the parties' collateral estoppel arguments.

Because this, a federal court, confirmed the award, the federal common law of preclusion applies. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 689 (7th Cir. 2012). For collateral estoppel to apply: "(1) the issue sought to be precluded must be the same as that involved in the prior action,

(2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *In re Grand Jury Proceedings,* 347 F.3d 197, 201-02 (7th Cir. 2003). The party against whom the ruling is to be enforced must have had a chance to fairly present its claim. *See Snider v. Consolidation Coal Co.,* 973 F.2d 555, 559 (7th Cir. 1992).

USSF argues that the Ruling is fully preclusive. *See* Defs.' Mot. For RICO Summ. J. 15 n. 13. Plaintiff, unsurprisingly, disagrees. First, Plaintiff argues that the CAS award is essentially irrelevant, because the CAS determined that FIFA's rules, in a vacuum, authorized USSF to exercise the challenged authority — not the critical question of whether USSF was "ever vested with the original sanctioning authority over non-members in the first instance[.]" Pl.'s Resp. to Court's Questions 1. Plaintiff contends that because the CAS did not consider that question or Plaintiff's evidence related to it, the CAS award cannot bar this Court from ruling in Plaintiff's favor. *Id.* Plaintiff further contends that none of the elements necessary for issue preclusion are met here.

As discussed above, the Court concludes that ChampionsWorld was represented by Stillitano and its own counsel in the arbitration proceedings. The Court also notes that the CAS panel

- 34 -

wrote a comprehensive opinion setting forth the parties' arguments and its own reasoning and conclusions. *See Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997) (noting that preclusive effect is inappropriate when arbiter fails to explain its findings or follow reliable procedures.) The Court turns to the remaining considerations.

### a. Identity of Issues

First, as noted above, Plaintiff argues that the issues presented to this Court and CAS are different, because CAS never determined whether USSF has "original authority" to sanction all professional games or charge fees to non-members. If an issue presented in the arbitration is not the same as the issue presented in later litigation, collateral estoppel does not apply. *See, e.g., Coleman*, 667 F.3d at 854 (collateral estoppel did not apply where arbiter determined that an employee did not constitute a true threat, and the court had to determine whether the employer genuinely *believed* that she did.)

For reasons discussed below in Section IV(D)(2), the Court disagrees that Plaintiff's is the legally operative inquiry. (Indeed, the Court implicitly rejected that argument, which was raised in Plaintiff's briefing on the stay in favor of arbitration, in denying Plaintiff's request to lift the stay in 2008. *See* Pl.'s Resp. to Mot. to Continue Stay, DKT 104, 9-10.). More importantly, however, Plaintiff's argument that the CAS Ruling is not

- 35 -

dispositive of all issues does not mean that the ruling is not preclusive as to the issues the panel *did* decide. In deciding to continue the stay pending arbitration in 2008, this Court specifically noted the risk of inconsistent rulings regarding the effect of FIFA's rules on USSF's authority. That central issue, the Court noted, is "intertwined through all of Plaintiff's seven claims*." ChampionsWorld, LLC v. U.S. Soccer Federation*, No. 06 C 5724, 2008 WL 4861522, at *3 (Nov. 7, 2008). Despite Plaintiff's arguments to the contrary, even a cursory review of the complaint shows that one issue squarely presented here is whether FIFA does or can authorize USSF to take the challenged actions.

Plaintiff next argues that the issues are not identical, because "the CAS award was issued under Swiss law[,]" and where an issue has been tried in another jurisdiction, the Seventh Circuit permits retrial. Plaintiff's cited authority, however, stands for the more general proposition that "the same general legal rules" must govern both cases and "both cases [must be] indistinguishable as measured by those rules." *Wasau Underwriters Ins. Co. v. United Plastics Grp. Inc.,* No. 04 C 6543, 2010 WL 538544, at *5 (N.D. Ill. Feb. 10, 2010) (quoting 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4425 (2d ed. 2002)). However, Plaintiff has identified no point at which the CAS applied anything other than FIFA's statutes and regulations. Nor has it identified any differing rule that this Court would apply in determining the scope

of USSF's authority under FIFA's rules. This is simply not a case where a party must be permitted to relitigate an issue because the legal standards that apply are entirely different in, for example, Illinois than in California. *Cf. Boomer v. AT & T Corp.,* 309 F.3d 404, 422 n. 10 (7th Cir. 2002).

The Court therefore finds that the issue to be precluded (USSF's authority under FIFA rules) is the same one squarely decided by the arbitration panel, under the same framework that would be applied by this Court. *Cf. Slaney v. Intern. Amateur Athletic Fed'n,* 244 F.3d 580, 590, 594 (7th Cir. 2001) (essentially applying issue preclusion to bar state law claims, because examining the plaintiff's claims would require assessing the accuracy of the Convention arbitral ruling.).

### b. *Opportunity to Litigate Fully*

Plaintiff next argues that collateral estoppel is inappropriate because Stillitano could not fully and fairly present his case, including certain critical evidence:

> the CAS was not concerned with the extensive evidence concerning USSF's false construction of "authority" premised fundamentally upon the Ted Stevens Act. The CAS ruled that such matters of U.S. law were outside the scope of arbitration. Therefore, the important presentation made by ChampionsWorld to this Court concerning USSF's history of relying upon the Ted Stevens Act, and never upon FIFA alone, as USSF's source of vesting authority, was never litigated before the CAS (or, for that matter, before FIFA). Nor was Chuck Blazer's important testimony part of the CAS's consideration (Mr. Blazer testified in this case over three months after the parties filed their submissions and records with the CAS).

- 37 -

Pl.'s Resp. To Court's Questions, 14 (cross-reference and emphasis omitted). Plaintiff further argues again that Stillitano was hampered by USSF's late disclosure of its pre-2000 bylaws and policies.

Whether important evidence was unavailable in the original proceeding is important in determining whether collateral estoppel is appropriate. *Butler v. Stover Bros. Trucking Co.*, 546 F.2d 544, 551 (7th Cir. 1977). As explained above, however, the evidence relating to USSF's historical rules and bylaws was tangential to the CAS Ruling. Therefore, Plaintiff's inability to present that evidence does not make it unjust to apply collateral estoppel here. As to whether Stillitano had the opportunity to present additional relevant information such as Chuck Blazer's testimony and USSF's reliance on the Ted Stevens Act, Plaintiff again fails to explain why this information is important to the limited inquiry undertaken by the CAS. The Court recognizes that the CAS did not determine whether and by whom USSF was "originally vested" with authority over all professional soccer in United States. Nonetheless, Plaintiff's argument does not demonstrate that, for the questions the CAS did answer, that it was precluded from introducing critical evidence. Whether or not, for example, USSF actually charged sanctioning fees in the years before 2001 was, at best, marginally relevant.

As for Blazer's testimony, the Court assumes that Plaintiff finds his testimony important for the same reasons it gives in the summary judgment briefing – its claim that he established that FIFA vests no new authority in its members, even *vis-à-vis* other members. The Court has thoroughly reviewed the provided transcript excerpts, however, and finds that Plaintiff's generalizations and inferences from Blazer's testimony cannot be supported.

Blazer testified that:

1.   "[P]eople apply to be [FIFA] members. We don't go around the world and say ah, there's a country that's not affiliated, let's go pick someone to run it. Not our job. Our job is people decide that they want to voluntarily belong to our organization, they apply, we look to see whether or not they're qualified and whether they meet the standards; and if they do, then the Congress decides ultimately to grant membership." Blazer Dep., Pl.'s Statements of Material Fact, Ex. H, 96:7-17.

2.   In determining whether a group is qualified to join CONCACAF and ultimately FIFA, an important consideration is whether or not it already regulates the highest level of soccer played in that country. *See, e.g., id.* at 84:7-85:23; 88:10-94:18.

3.   Several times, when a national government has tried to "do away with" a FIFA member and replace it with another governing body, FIFA suspended the country and its member until the issue was resolved. Blazer emphasized that FIFA determines its own membership and considers government interference improper. *Id.* at 99:8-103:17.

4.   From FIFA's perspective, a member would have authority over a hypothetically unregulated element of soccer in that it is "the only body that would have the right to advance the team from their organization to the world championship, so

therefore they have authority with regard to the organization of it. Whether or not they choose to organize it and whether someone else organizes it is another matter entirely." *Id.* at 84:9-24.

5.  FIFA authorizes its members to belong to continental confederations such as CONCACAF. FIFA lets confederations elect members to FIFA's body, and designates them to identify, *e.g.*, regional champions. *Id.* at 58:12-61:4. It was up to the individual FIFA members, however, to form the confederations in the first instance, and therefore CONCACAF's 'authority' over its members is dependent on their joining it. *See id.* at 61:6-66:4.

The logical leap from this testimony to Plaintiff's conclusion is simply too great, even if the Court draws every reasonable inference in Plaintiff's favor.

That aside, however, Plaintiff fails to explain why Blazer's deposition was not taken until after submissions to the CAS were complete (especially given the length of discovery in this case), or whether it tried to bring the testimony to the CAS's attention after it was obtained. Absent such information, the Court has difficulty concluding that Stillitano was unfairly prevented from fully and fairly litigating claims actually before the CAS.

Accordingly, the Court finds that it would not be fundamentally unfair to apply collateral estoppel in this case, despite the narrower class of evidence that Stillitano was able to present. The effect of this issue preclusion on Plaintiff's claims is discussed below.

## C. Evidence Before the Court

Obviously, the evidentiary issues and disputes vary motion to motion. Nonetheless, there are many repeating themes, and so a few brief notes are in order.

Ultimately, many of the parties' proposed facts are irrelevant to the Court's decisions on summary judgment. "Therefore it makes little sense to address each paragraph individually. The more efficient course is to attempt to determine the relevant material facts for summary judgment from the agreed statements and resolve any factual disputes according to the appropriate summary judgment standard." *McGrath v. Am. Family Mut. Ins. Co.*, No. 07 C 1519, 2008 WL 4531373, at *3 (N.D. Ill. April 29, 2008).

Each side accuses the other of including too much in its Local Rule 56.1 statements. The Court notes that violations on both sides were myriad, but declines to strike the responses on that basis. However, statements that are disputed by only: general denials, citations to attorney argument (or whole briefs), or citations to evidence not provided to the Court are deemed admitted. *See* Local Rule 56.1(b)(3)(B),(C).

Although the Seventh Circuit has stated that a party must offer admissible evidence at summary judgment, *see Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009), the more precise statement is that it must offer "evidentiary material which, if reduced to admissible evidence," could carry its burden at trial.

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 823 (7th Cir. 2011).

### 1. Annual Meeting Transcripts

Both parties challenge each other's use of transcripts from USSF annual meetings. The Court notes that many of those records are offered for non-hearsay purposes. *See Wielgus v. Ryobi Technologies, Inc.*, No. 08 C 1597, 2012 WL 2277851, at *5 (N.D. Ill. June 18, 2012). Furthermore, the transcripts include some official statements by USSF officers and employees, and portions may be admissible as records of regularly conducted activity. *See* FED. R. EVID. 801(d)(2)(D); *Wielgus,* 2012 WL 2277851 at *4 (noting that meeting minutes generally fall within the exception). Specific uses are addressed as necessary below.

### 2. Holaday and Howard Declarations, with Exhibits

The Court now turns back to the dispute over USSF's late production of its Constitution, Association Rules and Regulations, and Administrative Rulebooks dating from 1933 through 1997. These documents are offered through the declarations of Ted Howard and James Holaday.

Fed. R. Civ. P. 37 provides that: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), [it] is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." It also permits

- 42 -

alternative or additional sanctions. FED. R. CIV. P. 37(c)(1). In considering whether and what sanctions are appropriate, the Court considers:

> (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfullness involved in not disclosing the evidence at an earlier date.

*David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

According to his declaration, Ted Howard was once the Executive Director of the now-defunct men's professional North American Soccer League (the "NASL"). During his time with NASL, Howard served on USSF's National Council, and on its International Games Committee (from roughly 1984 through 1998). Since 1998, he has been the Deputy Secretary General of CONCACAF. Attached to Howard's declaration are all or part of the USSF's Administrative Rule Book for certain years spanning 1975-1997. Also included are the International Games Committee's report at the 1995 USSF annual meeting, a 1991 memo from Chuck Blazer regarding CONCACAF sanctioning fees, and correspondence from 1991-1995 between Howard and several match promoters.

James Holaday ("Holaday") manages the National Soccer Hall of Fame Archive, which is stored by Sports Endeavors, Inc. According to his declaration, counsel from Latham & Watkins and a USSF representative reviewed archive materials on July 19-21, 2011 and selected certain documents which were then shipped to the firm

after Holaday's review.  Attached to his declaration are copies of USSF's Association Rules and Regulations for 1933-34, 1936-37, 1944, 1951, and 1964.

Plaintiff primarily objects to the Howard declaration and its exhibits.  *See, e.g.,* Pl.'s Mem. in Opp'n to Defs.' Mot. for RICO Summ. J., 2, 8 n.6; Pl.'s Mem. in Opp'n to USSF's Pet. to Enforce CAS Ruling, 4-5, 7 n.4.  However, the late-disclosed materials appear to include the Bates numbers for Holaday exhibits, as well.  Therefore, the Court applies Plaintiff's objections, as applicable, to both.

Plaintiff contends both that Howard is a previously undisclosed percipient witness and that the untimely production of these documents (on or around September 1, 2011) deprived it of the opportunity to cross-examine Defendants' witnesses regarding USSF's pre-1999 International Games rules and policies.  Plaintiff argues that USSF failed to educate its Rule 30(b)(6) witness regarding USSF's claimed historical authority over professional soccer, and then deliberately waited until discovery had closed and the CAS had ruled to turn over materials from its *own* Hall of Fame.  *See* Pl.'s Opp'n to Pet. to Enforce CAS Ruling, 5.  Rather than asking that the materials be excluded, Plaintiff argues that USSF should not be allowed to offer evidence or explanation as to what they mean, giving Plaintiff the last word.  *See, e.g.,* Pl.'s Mem. in Opp'n to Defs.' Mot. for RICO Summ. J., 2, 8 n.6.

Defendants contend that they need not have turned over the documents, given that their Rule 26 disclosures indicated that they would rely on USSF bylaws and policies, and that Plaintiff limited its discovery requests (including USSF bylaws and policies) to January 1, 2000 and later. *See* Defs.' Rep. in Supp. of Defs.' Statement of RICO Material Facts 17-18. Further, they argue, excluding the materials is not warranted even if there was a discovery violation, because ChampionsWorld has not been prejudiced and did not object to the production at the time. *Id*.

Defendants further argue that Howard was disclosed as a possible witness in that USSF stated that it may call "other former USSF officers and board members," and MLS identified CONCACAF representatives as possible witnesses. (Howard is both.) Defendants note that Plaintiff's request to identify USSF's officers and directors was limited to those after January 1, 2000. Finally, Defendants argue that Howard was routinely discussed during depositions and in discovery materials, putting Plaintiff on notice that he could have relevant information. *See Id.* 20-23.

The Court concludes that Defendants need not have amended their Rule 26 disclosures as to Howard, because Plaintiff, through the initial disclosures and subsequent discovery, had been adequately apprised of the chance that he had relevant information. *See Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004). As to the documents, even assuming that Defendants should

- 45 -

have clarified in their disclosures that they would rely on pre-
2000 policies, or should have produced them earlier in response to
Plaintiff's catchall document request, the Court finds sanctions
inappropriate.

First, despite the parties' practice throughout this case, the
mere say-so of one attorney is not sufficient to prove the bad
faith of another. As to prejudice, the record makes clear that
Plaintiff had ample opportunity to incorporate these materials into
its briefing. The Court concedes that Plaintiff's counsel may have
found it helpful to review these documents before deposition.
Nonetheless, in light of how little historic understanding the
30(b)(6) witness seemed to have, cross-examining him with these
documents would likely have been unfruitful. Furthermore, the
Court is not aware that Plaintiff insisted on a better 30(b)(6)
witness, or sought additional time or discovery in response to the
production of these documents, which undermines its prejudice
argument. *See id.* Defendants will not be precluded from discussing
or using this evidence.

### D. Plaintiff's Motion for Summary Judgment

#### *1. Preliminary Matters*

Plaintiff seeks summary judgment against USSF as to liability
on Counts VII and VIII for unjust enrichment and restitution under
the USSF-ChampionsWorld contracts, on the theory that the contracts

were invalid for lack of consideration.  A few preliminary notes
are in order.

As noted above, this Court ruled in July 2010, that the Ted
Stevens Act gives USSF no more of an antitrust exemption, or
authority over professional soccer, than necessary for it to
oversee Olympic and related events.  *ChampionsWorld LLC v. U.S.
Soccer Federation*, 726 F.Supp.2d 961, 975.  USSF now argues that
ruling was preliminary and entirely confined to the antitrust
question.  *See* USSF's Opp'n to Pl.'s Mot. for Sum. J. 19 n. 14.
Alternatively, USSF argues that this Court should modify the ruling
based on the current record.  *Id.*

USSF's request for  reconsideration is denied.  USSF seems to
argue that the 1975-77 President's Commission on Olympic Sports'
final report, which notes that USSF was unique among the national
governing bodies in that it had professional members, compels
reconsideration.  *See id.;* USSF's Resp. to Pl.'s Statement of
Material Facts, Ex.38, at 182.  Even assuming that Congress noted
that fact in passing the Act, this is insufficient to change this
Court's conclusion as to the law *as Congress actually adopted it*.
That law was directed at the authority of the national governing
bodies ("NGBs") relating to amateur and Olympic sports.  A note in
the Commission's report that USSF exercised authority over its
professional members does not mean that the Act *bestowed* any such
authority.

- 47 -

Second, this Court has discussed at length its decision to give collateral estoppel effect to the 2011 CAS Ruling. This includes the findings that FIFA's rules gave USSF the authority to sanction matches played between foreign national and club teams, and to charge sanctioning fees to non-member promoters promoting FIFA-connected matches. *See* 2011 CAS Ruling 24-25, ¶ 10.19-10.26.

### 2. *USSF's Sanctioning Authority over ChampionsWorld Games*

The parties agree that USSF's authority is a question of law. *See* Pl.'s Mem. in Supp. of Mot. For Partial Summ. J. 1; USSF's Opp'n 3. Plaintiff maintains that it is entitled to partial summary judgment for the same reason that the CAS Ruling is inapposite: the CAS did not ask, and USSF cannot show, when and if USSF was "vested" with "original authority" over professional soccer beyond that played by its members. Pl.'s Mem. in Supp. of Partial Summ. J. 1. In effect, Plaintiff argues that the Ruling misses the point because FIFA's rules presume (erroneously, in USSF's case) that members have authority over all of professional soccer before joining. Assuming *arguendo* that Plaintiff could avoid the preclusive effect of the Ruling through such an argument, the Court considers its supporting evidence.

Plaintiff's theory proceeds in several steps. First, it asserts that FIFA does not vest members with any new authority; instead, FIFA merely coordinates its member's existing authority. Second, Plaintiff asserts that USSF's only authority is that over

- 48 -

its members and that derived from the Ted Stevens Act (USSF having failed timely to produce admissible evidence that it had any greater professional soccer authority before joining FIFA). Once this Court rejected the idea that the Act gave USSF authority over all of professional soccer, Plaintiff argues that USSF necessarily lacked the authority to sanction its games or charge it fees. All that being true, Plaintiff contends, it is entitled to summary judgment on it Counts VII and VIII because the match agreements were void for lack of consideration; USSF merely extorted money in return for a sanction that it had no authority to grant.

USSF undisputedly exercises authority over its members. Plaintiff's claim that USSF's only other authority comes from the Act relies on the fact that if USSF were not the NGB under the Act, another organization would fill that role. If that occurs, the Act directs the USOC to recommend that new NGB for FIFA membership. Because FIFA usually only permits one member per nation, if FIFA accepted the new NGB as a member, USSF would be displaced. Therefore, because the Act is USSF's "key to remaining in FIFA," Plaintiff argues, it circumscribes the scope of USSF's authority as a FIFA member. *See* Pl.'s Mem. in Supp. of Partial Summ. J. 5.

Plaintiff's argument fails at the first step. Generally, it seems to misconceive the nature of voluntary membership associations, which can confer rights and obligations upon their members regarding the group and its other members. *Cf. Banks v.*

*Nat'l Coll. Athletic Ass'n*, 977 F.2d 1081, 1090 n.11 (7th Cir. 1992) (noting that the NCAA is a private voluntary membership organization and that members' athletes must follow its rules to compete).  Of course, this does not explain what rights and obligations FIFA actually imposes on members.  After the CAS Ruling, however, Plaintiff's evidence cannot carry the day.

In support of its theory that FIFA merely coordinates its members' existing authority, Plaintiff relies on three pieces of evidence: Charles Blazer's testimony, FIFA's Regulations Governing the Admission of Associations to FIFA, and an e-mail in which ChampionsWorld's Lino DiCuollo relates a conversation he ostensibly had with a Ms. Kronert Moore of FIFA.  *See, e.g.,* Pl.'s Mem. In Supp. of Mot. for Partial Summ. J. 7-9 and corresponding statements of fact.

### a.  DiCuollo E-Mail

The DiCuollo e-mail states that Ms. Kronert Moore ("Moore") told him that "National Federations are generally established by governmental laws and legislative decrees, so FIFA leaves it to the particular Federation's government to establish the fees to be collected by the particular Federation (or NGB)[,]" and that "in most instances, the governments set the guidelines for the fees, which FIFA respects."  Pl.'s Statement of Material Fact, Ex. J. USSF objects that her statements are double hearsay, and Plaintiff proved neither her identity nor her authority to speak for FIFA.

- 50 -

Plaintiff variously argues that the statements are those of an adverse party, against interest, and subject to the residual exception in Fed. R. Evid. 807. Moore's statements fall within Rule 807, Plaintiff claims, because USSF has long known that Plaintiff planned to use them, and because Plaintiff obtained no discovery directly from FIFA, making the e-mail "more probative than other evidence concerning FIFA's position[.]" Pl.'s Resp. to USSF's Obj. Pl.'s Evid. In Supp. of Partial Summ. J. 59-60.

Even assuming that Plaintiff could overcome the first-level hearsay problem, the Court finds that FIFA is not an adverse party here (regardless of its role in the arbitration), nor would Moore's statements be admissible against USSF. *See United States v. McGee*, 189 F.3d 626, 632 (7th Cir. 1999) (statements by a party-opponent must be offered against the party.) Unless FIFA was a defendant, Plaintiff offers no reason why Moore's statements were against its interest or hers. Pl.'s Resp. to USSF's Obj. To Pl.'s Evid. 59-60. Finally, absent more information about Moore's role and identity, the Court cannot agree that the statements fall within Rule 807. *Cf. United States v. Dumeisi*, 424 F.3d 566, 576 (7th Cir. 2005). Accordingly, Plaintiff's Ex. J is excluded as inadmissible hearsay.

### b.  Chuck Blazer Deposition

Plaintiff rests most of its argument on Blazer's deposition. However, as discussed above (and even assuming that he testified on FIFA's behalf), his testimony cannot bear the weight Plaintiff

places on it, particularly where USSF is entitled to all reasonable inferences.

### c. FIFA's Regulations Governing the Admission of Associations to FIFA

The same is true of Plaintiff's reliance on FIFA's Regulations Governing the Admission of Associations to FIFA. Article 3(e) of those regulations requires FIFA applicants to furnish "[d]ocuments detailing [their] standing as a sports organization under the law of the country (state constitution, extracts from relevant laws, state directives, state subsidies, membership of other sports organizations in the country, etc.)." Pl.'s Statements of Material Fact, Ex. I, at 4. Even if Art. 3 requires, as Plaintiff argues, proof of some governmental designation as a governing body, it fails to establish the converse proposition; even if FIFA requires its members to have some governmental sanction, it does not necessarily follow that once they are members, FIFA bestows no new rights upon them, even regarding other FIFA members.

Plaintiff's evidence simply does not create triable issues of fact as to whether FIFA merely coordinates its members' authority, or can require USSF to sanction games played on U.S. soil by FIFA-affiliated foreign teams, even if USSF lacked such sanctioning power independently. This case, and in particular these contract-related claims, are not about "all" of professional soccer. They are about whether USSF had authority over Plaintiff's admittedly FIFA-affiliated matches. Although USSF's FIFA membership in some

sense depends upon its status as an NGB under the Act, Plaintiff has not shown that USSF is a limited-purpose FIFA member that cannot exercise the membership rights and obligations which the CAS Ruling established that it has. Accordingly, the CAS Ruling is not, as Plaintiff claims, inapposite. In fact, it disposes of Plaintiff's motion.

Having found Plaintiff's summary judgment theory untenable, the Court need not address its other arguments. Because Plaintiff offers the same theory in response to Defendants' motions, however, the Court notes that when the standard is reversed, Plaintiff's inferential leap is still too great to withstand judgment against it; non-movants are only entitled to reasonable inferences. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

### 3. *Counts VII and VIII: Unjust Enrichment and Restitution*

Plaintiff's Count VII proceeds on the quasi-contract theory of unjust enrichment. It must show that USSF gained "a benefit to the [P]laintiff's detriment, and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience." *Wooley v. Jackson Hewitt, Inc.*, 540 F.Supp.2d 964, 978 (N.D. Ill. 2008) (citing *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 679 (Ill. 1989). As previously noted, when a relationship is contractual, one may plead unjust enrichment only if the contract is invalid or fails to cover the claim. *See Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d

683, 688 (7th Cir. 2004); *Wilmot Mountain, Inc. v. Lake Cnty. Forest Pres. Dist.*, --- F.Supp.2d ----, No. 11 C 7088, 2012 WL 930215, at *6 (N.D. Ill. Mar. 19, 2012).

Plaintiff argues that the contracts were invalid because they lacked true consideration — the only thing that USSF promised was a sanction it had no authority to provide. *See* Pl.'s Mem. in Supp. of its Mot. for Partial Summ. J. 23-27. Under Illinois law, illusory promises are insufficient consideration to support a contract. *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1206 (7th Cir. 1998). An illusory promise is one which, upon closer inspection, reveals that the promissor has not promised to do anything, or that performance is optional. *Id.* at 1206-07. Plaintiff's Count VIII seeks restitution under the same theory of contract invalidity.

USSF argues both that it had sanctioning authority (and thus that a sanction was adequate consideration) and that the contracts contained other consideration, in the form of other services rendered to promoters. *See* USSF's Opp'n to Pl.'s Mot. For Partial Summ. J. 33-34. Plaintiff is right, however, that most of these services are not mentioned in the contracts (which contain integration clauses). *See, e.g.,* USSF's Resp. to Pl.'s Statement of Material Facts, Ex. 52, at 5. The contracts do refer, however, to USSF's appointing the necessary "game officials." *See, e.g.,*

*id.* at 4, ¶ 11(o) (noting that Plaintiff must pay the fees and expenses for the game officials to be appointed by USSF).

Even if providing game officials is not enough, however, the Court finds that USSF's sanction was adequate consideration. This Court has adopted the CAS Ruling, and there seems to be no dispute that the relevant teams would not have participated in unsanctioned games. *See* USSF's Resp. to Pl.'s Statement of Material Facts, Ex. 32, at 36; Clark Dep., *Id.* at Ex. 5, 154:13-16. ChampionsWorld thus received something of value under the contract, and USSF's promise was adequate consideration; the contracts do not fail. *Regensburger,* 138 F.3d at 1207. Plaintiff's Motion for Partial Summary Judgment is therefore denied.

### E. Defendants' Motion for Summary Judgment on the RICO and State Law Claims

#### 1. *RICO Claim*

Plaintiff alleges that Defendants violated 18 U.S.C. §1962(c), which makes it unlawful for associates of "any enterprise" affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." A "pattern of racketeering activity" requires "at least two acts of racketeering activity" within 10 years. 8 U.S.C. § 1961(5). "Racketeering activity" includes a

variety of specific unsavory acts prohibited by federal and state law. *See* 18 U.S.C. §1961(1).

Plaintiff alleges that USSF and MLS formed an association-in-fact enterprise, operating together "to carry out the extortionate fraudulent scheme" of obtaining sanctioning fees and performance bonds, in unreasonable and discriminatory amounts, without any actual authority to do so. Compl. ¶ 198. Specifically, Plaintiff claims that USSF and MLS committed extortion under 18 U.S.C. 1951 by "obtain[ing] property from Plaintiff on at least two dozen occasions . . . with consent from Plaintiff that was induced by the wrongful use of fear through economic threats and by the color of official right." *Id.* at ¶ 201.

Plaintiff also alleges that USSF and MLS committed mail and wire fraud in that they "orchestrated a scheme to defraud Plaintiff of money through the employment of the material misrepresentation that USSF had the exclusive legal authority to sanction all professional soccer matches in the United States," when they knew that it did not. *Id.* at ¶ 205. Plaintiff claimed in the complaint to have justifiably relied on that misrepresentation, *id.* at ¶ 206, but now argues that FIFA and others did so, instead.

Plaintiff alleges that the pattern of racketeering activity is both closed- and open-ended in that Defendants engaged in at least 24 predicate acts over five years, and also pose a threat of continued criminal activity. *Id.* at ¶¶ 209, 211. Each wrongful

- 56 -

act appears to be simultaneously alleged as extortion and mail and/or wire fraud.

### a. Mail and Wire Fraud

Wire fraud under 18 U.S.C. § 1343 involves: (1) a defendant's participation in a scheme to defraud, (2) its intent to defraud, and (3) its use of interstate wires in furtherance of the fraud. *United States v. Sheneman*, --- F.3d ----, 2012 WL 1959551, at *3 (7th Cir. 2012). Mail fraud (§ 1341) has the same elements, substituting use of the mails for use of interstate wires. *See Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298-99 (7th Cir. 2003). The Court applies the same standard to both. *See Carpenter v. United States*, 484 U.S. 19, 25 n. 6 (1987).

According to the Complaint, the relevant alleged misrepresentation is "that USSF had the exclusive legal authority to sanction all professional soccer matches in the United States [.]" ¶ 205. However, as noted above, Plaintiff has standing to challenge USSF's conduct as applied to the kinds of games that Plaintiff promoted — those involving foreign professional men's FIFA-affiliated soccer teams. The CAS ruling made clear that USSF has sanctioning authority over such matches. Therefore, as relevant here, USSF's statement was not false, and Plaintiff's mail and wire fraud claims fail.

### b. Extortion

The Hobbs Act prohibits affecting commerce by, *inter alia*, extortion. 18 U.S.C. § 1951(a). Extortion means obtaining "property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The Seventh Circuit has recently summarized liability under the Hobbs Act thus:

> extortion under the Hobbs Act can occur outside of the labor context when a person uses physical violence or the threat of violence to obtain property, whether or not the defendant has a claim to the property. If a defendant has no claim of right to property, the use of fear to obtain that property—including the fear of economic loss—may also amount to extortion. In contrast, where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred.

*Rennell v. Rowe*, 635 F.3d 1008, 1012 (7th Cir. 2011). Thus, where, as here, the alleged extortion arises from an effort to "obtain property through fear of economic loss," the first question is whether the defendant has a claim of right; that question, in turn, depends upon the parties' relationship. *Id.* In *Rennell*, one joint venturer sued another for buying out his interest extremely cheaply, while threatening to "run him out of the business" by publicizing the end of their relationship. *Id.* at 1014.

The *Rennell* court noted that "as a matter of theory" using economic fear to obtain property even under a claim of right could "be so unreasonable that a claim-of-right defense would not

insulate the actor from extortion liability. . . ." *Rennell*, 635 F.3d at 1014. Nonetheless, even though the court took the plaintiff at his word that he was subjected to economic duress, the Court declined to find a Hobbs Act violation where the plaintiff was treated to "unpleasant hard dealing" but retained the right to reject the offer and sue. *Id.*

In doing so, it contrasted the situation before it with the one in *United States v. Castor*, wherein a defendant endeavored to obtain a marketing agreement by threat of force. *Castor*, 937 F.2d 293, 295 (7th Cir. 1991). The *Renell* court noted that the imagined case in which economic fear would suffice despite a claim of right would be "along the lines of *Castor*[.]" *Rennell*, 635 F.3d at 1014.

Defendants argue that because USSF "had a lawful and contractual right to the sanctioning fees," as well as to notify FIFA about delinquent promoters, there can have been no Hobbs Act violation. Defs.' Mot. For RICO Summ. J. 17.

Plaintiff argues that even if USSF had authority to require sanctioning fees and performance bonds, there is a triable issue as to whether USSF acted 'wrongfully,' because its claim of right was expressly circumscribed by its own Bylaw which requires fees and bonds to be "reasonable and non-discriminatory." Pl.'s Mem. In Opp'n to Defs.' Mot. for RICO Summ. J. 22. Plaintiff argues that it has created triable issues of fact as to the reasonableness and discriminatory nature of USSF's fees and bonds and shown that it

submitted to those costs only under the threat of being reported as a promoter in bad standing (and thus put out of business). Together, it argues, these create a triable Hobbs Act claim. *Id.* at 22-23.

Plaintiff relies on *Renell's* discussion of the imagined claim-of-right case, as well as a California district court case allegedly holding that improperly applying a contract term to obtain unreasonable fees violates the Hobbs Act. *Id.*, citing *All World Prof'l Travel Servs., Inc. v. Am. Airlines,* 282 F.Supp.2d 1161 (C.D. Cal. 2003). *All World* is distinguishable, however, because that court, considering a motion to dismiss, accepted Plaintiff's allegations that, *inter alia*, the defendant had applied the contract term to obtain funds to which it had *no lawful right at all*. *Id.* at 1175.

Despite Plaintiff's argument about USSF's allegedly circumscribed claim of right, the Court finds this case closer to *Rennell* than *Castor.* Plaintiff's argument ultimately boils down to one of economic duress, which the Seventh Circuit deemed insufficient in *Rennell*. Therefore, even a breach of USSF's internal rule requiring reasonable and non-discriminatory fees, like the breach of the duty of good faith and fair dealing in *Rennell*, does not rise to the level of extortion in this Circuit.

Having concluded that, even construing the facts in its favor, Plaintiff can establish neither its mail and wire fraud claims nor

its Hobbs Act claims, Plaintiff's RICO claim fails.  The Court need not, therefore, consider Defendants' alternate arguments.

### 2.  *Plaintiff's State Law Claims*

Defendants have also moved for summary judgment on the remaining state law claims — Counts VI through IX.

### a.  *Count VI: Fraud in the inducement against USSF*

"In Illinois, fraudulent inducement requires proof of five elements:  '(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.'"  *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (citation omitted).

Plaintiff argues that it has created a triable issue of fact because there is evidence in the record to show that: (a) USSF lacked the authority to govern any professional soccer in the U.S. beyond games of its members; (b) it knowingly put forth a false theory of authority under the Ted Stevens Act (but never independently under FIFA's rules); (c) Plaintiff reasonably relied on USSF's threat to list it as "in bad standing" if it wouldn't pay; and (d) Plaintiff was injured as a result.  *See* Pl.'s Mem. In Opp'n to RICO Summ. J. 27.  Plaintiff has essentially conceded that its only argument for fraud is that USSF lacked the authority to

sanction its games. Because the CAS Ruling precludes such a finding, USSF is entitled to summary judgment.

   *b.  Count VII: Unjust Enrichment against MLS and USSF*

As noted above, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.,* 656 F.3d 511, 516 (7th Cir. 2011). The Seventh Circuit recently suggested that in Illinois, "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim — and, of course, unjust enrichment will stand or fall with the related claim." *Id.* at 516-17. This appears to be just such a case.

Plaintiff's briefing makes clear that this Count stands or falls with Plaintiff's theory in its motion for summary judgment and with the fraud and extortion Counts that this Court has already rejected. Pl.'s Mem. In Opp'n to RICO Summ. J. 28-29. Accordingly, USSF is entitled to summary judgment as to Count VII. Plaintiff has voluntarily withdrawn Count VII against MLS.

   *c.  Count VIII: Restitution Against USSF for
       the Match Agreement Contracts*

As discussed above, this claim for restitution is predicated on the alleged lack of consideration in the USSF-ChampionsWorld

match agreements. This Court has already rejected that contention, however, and summary judgment in favor of USSF is therefore appropriate. The Court need not reach USSF's alternative argument that it is too late for Plaintiff to rescind the contracts.

### d. Count IX: Restitution Against USSF Concerning Unconscionability

In Illinois, an unconscionability finding "may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006). Unconscionability is a question of law. *Piper v. DPFA, Inc., No. 09 CV 1220,* 2010 WL 2836814, at *3 (N.D. Ill. July 20, 2010). It is, however, a fact-dependent inquiry.

In Count IX, Plaintiff contends that even if USSF had sanctioning authority, the USSF-ChampionsWorld match agreements were nonetheless unconscionable, and so void and unenforceable. Compl. ¶ 229. Plaintiff alleges that: (a) it lacked bargaining power against USSF; (b) no party in *bona fide* negotiations would require the "exorbitant" fees and performance bonds that USSF did; and (c) that USSF's fee and bond terms were "shocking and grossly unreasonable, thereby making USSF's contracts with plaintiff improvident, oppressive and totally one-sided." *Id.* at ¶¶ 230-31. Plaintiff claims that it had no alternative to USSF's unreasonable terms other than to forgo its events entirely, and that it was damaged by these contracts "in an amount to be determined at trial[.]" *Id.* ¶ 234.

The Seventh Circuit recently declined to pass on whether unconscionability gives rise to a stand-alone claim for damages under Illinois law; USSF, however, has not pressed such an argument. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 535 (7th Cir. 2011). Instead, USSF argues that Plaintiff can prove neither substantive nor procedural unconscionability.

### i. Procedural Unconscionability

In Illinois, procedural unconscionability consists of "some impropriety during the process of forming the contract depriving a party of meaningful choice." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647 (Ill. 2011) (citations omitted). Relevant factors include whether a term was "so difficult to find, read, or understand that the party could not fairly be said to have been aware she was agreeing to it," and the parties' relative bargaining power. *Estate of Davis*, 633 F.3d at 535.

Plaintiff lumps together its arguments on procedural and substantive unconscionability. It adopts this Court's discussion from the ruling on the motion for judgment on the pleadings that USSF "misrepresented its authority over professional soccer and used its artificially enhanced bargaining power to compel ChampionsWorld to pay exorbitant fees[.]" *See* Pl.'s Opp'n to RICO Summ. J. 31, quoting 726 F. Supp. 2d at 973-74. Plaintiff objects that USSF blames it for agreeing to unfair terms, without acknowledging "the gun that USSF had pointed at [its] head." Pl.'s

Opp'n to Defs.' Mot. for RICO Summ. J. 31. In light of the CAS Ruling, the misrepresentation claim fails.

Having reviewed Plaintiff's Complaint, briefing, and supporting evidence, the Court finds that the bulk of Plaintiff's argument goes to substantive rather than procedural unconscionability — there is no claim, for example, that any contractual terms were hidden or incomprehensible. Plaintiff simply argues that the terms were terribly unreasonable, and that it was forced to accept them due to its relative bargaining power. Even its claim that USSF failed to negotiate in good faith is based on the allegedly unfair contract terms. *See* Compl. ¶ 230.

Plaintiff's overblown rhetoric aside, there can be little dispute that there was a disparity in bargaining power here – if ChampionsWorld wanted to promote matches with FIFA-affiliated teams in the United States, USSF was the only game in town. Illinois courts, however, are "reluctant" to hold that "inequality in bargaining power alone suffices to invalidate an otherwise enforceable agreement." *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006) (discussing an arbitration agreement). *See also Streams Sports Club, Ltd. v. Richmond*, 457 N.E.2d 1226, 1232 (Ill. 1983) ("mere disparity of bargaining power is not sufficient grounds to vitiate contractual obligations[.]"). Here, both parties were sophisticated actors and Plaintiff was represented by counsel in agreeing to a substantial number of the contracts. *See*

Defs.' RICO Statement of Facts, Ex. 42, at 103-110. Nothing indicates that Plaintiff could or did not know what it agreed to. Accordingly, the contracts had an element of procedural unconscionability, but not so much that they must be invalidated on that basis. *Cf. Kinkel v. Cingular Wireless LLC,* 857 N.E.2d 250, 266, (Ill. 2006) (finding the degree of procedural unconscionability insufficient to render a class action waiver unenforceable, but noting that it would be considered in evaluating substantive unconscionability). With that in mind, the Court turns to Plaintiff's contentions of substantive unconscionability.

## ii. *Substantive Unconscionability*

USSF argues that the contracts were not substantively unconscionable because they were not so one sided that only one "under delusion" would agree to it, and because Plaintiff agreed to the same terms over and over. *See* Defs.' Mot. for RICO Summ. J. 34-35 (citing *In Re Estate of Croake*, 578 N.E.2d 567 (Ill. App. Ct. 1991) and *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, No. 90 C 2727, 1991 WL 28218, at *6 (N.D. Ill. Feb. 26, 1991)). Further, USSF argues that the contracts are not unconscionable just because Plaintiff is unhappy with how things turned out. *See id.* at 35 (citing, *e.g., Reuben H. Donnelley Corp. v. Krasny Supply Co., Inc.*, 592 N.E.2d 8, 12 (Ill. App. Ct. 1991)). Plaintiff, as discussed above, argues that the terms were patently unreasonable, citing testimony by USSF's Tom King that the fees'

reasonableness had not been studied. King Dep., Pl.'s Resp. to Defs.' RICO Statement of Material Facts, Ex. B, 204 (pages 205-07 were not provided to the Court.)

The Court notes that the Illinois Supreme Court rejected USSF's cited standard of unconscionability in 2006, as true but substantially underinclusive. *Kinkel v. Cingular Wireless LLC,* 857 N.E.2d 250, 269 (discussing *Croake* by name). Instead, the Court described as "apt" the Arizona Supreme Court's definition:

> Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.

*Id.* (citing *Maxwell v. Fidelity Financial Services, Inc.,* 907 P.2d 51, 58 (Ariz. 1995)). However, considerations like Plaintiff's being a sophisticated actor which accepted the same terms repeatedly over several years remain relevant under the new standard. Although the parties' briefing on this issue is, charitably speaking, scant, the Court finds that summary judgment is appropriate in favor of USSF. Although there is arguably some evidence that, for example, a significant cost-price disparity exists, Plaintiff has generally either not cited to it, cited to it only by incorporating, *e.g.*, an entire brief, or not provided the Court with a copy of the cited evidence. The evidence with

Plaintiff actually cites and offers is insufficient to withstand summary judgment against it.

## F. Defendants' Motion for Summary Judgment on the Antitrust Claim

To succeed under § 1 of the Sherman Act, Plaintiff must prove: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Coll. Athletic Ass'n*, --- F.3d ---, 2012 WL 2248509, at *3 (7th Cir. 2012). There are three frameworks for evaluating whether actions have anticompetitive effects, but the parties agree that Plaintiff's claims are subject to the Rule of Reason. *See* Defs.' Mot. for Antitrust Summ. J. 25; Pl.'s Mem. In Opp'n to Antitrust Summ. J. 21. Accordingly, Plaintiff bears "the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Id.* "[A] plaintiff's threshold burden under the Rule of Reason analysis involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Id.* at *6.

Products are in the same market if they are reasonably interchangeable for the purposes for which they are produced. *See Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 250 (1959). That is, the "outer boundaries of a product market are

- 68 -

determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Reifert v. S. Cent. Wisc. MLS Corp.,* 450 F.3d 312, 318 (7th Cir. 2006) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962)). The definition of the relevant market is a question of fact; however, Plaintiff must offer evidence in support of its market definition to avoid summary judgment. See *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 725 (7th Cir. 2004). (Under Plaintiff's market definition the relevant "product" is actually a service (promoting soccer matches); nonetheless, the Court retains the "product" language for ease of discussion.)

Markets have "both a product and a geographic dimension." *Id.* at 738. Correctly identifying the relevant geographic market therefore requires analysis both "of the market area in which the seller operates, and to which the purchaser can practically turn for supplies." *Id.*

Before proceeding to the merits, the Court must consider whether Plaintiff's proffered expert testimony on market definition is admissible, and thus turns to the motion to exclude the report and testimony of Rodney Fort ("Fort").

### 1. *Motion to Exclude*

#### a. *Legal Standard*

The Court applies the ordinary standard to determine whether offered expert testimony is admissible, considering whether the expert is qualified, his process is reliable, and his testimony is helpful to the jury. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

### b. *Relevant Market*

Rodney Fort is a professor of Sport Management at the University of Michigan's School of Kinesiology. As relevant here, Fort opines that the relevant market in this case is "the promotion of men's, professional, first-division, international soccer matches in the United States[,]" and that the relevant consumers are those who attend such matches. (Defendants do not seem to challenge that these are the relevant consumers.) Fort claims that those fans were harmed by the alleged antitrust violations because after ChampionsWorld left the market, consumers paid the same amount for lower-quality soccer matches. *See* Supplemental Op. of Rodney Fort, April 29, 2011, Ex. A to Defs.' Mot. to Exclude, at 3-4 ("Fort Op.").

As noted above, relevant markets have product and geographic dimensions, which must be analyzed from both the supply and demand sides. See *Republic Tobacco Co.,* 381 F.3d at 738. The Court finds Fort's opinion unreliable and unhelpful on both dimensions, and grants the motion.

### i. The Product Dimension

### I. Background

As noted, Fort defined the relevant market (evidently without intending to differ from Plaintiff's proposed definition) as the promotion of "men's, professional, first-division, international soccer matches" (hereinafter "MPFI matches") in the United States. To reach his market definition, Fort considered "the business organization choices of USSF, MLS, and SUM and stated perceptions of the market by their principals in testimony." Fort Op. 23. Fort noted that SUM created SUM International as a distinct entity to promote MPFI matches, from which he concluded that SUM and MLS recognized that MPFI match promotion was a separate market from the promotion of other soccer matches, including MLS matches. *Id.* at 24.

Fort further noted that USSF's sanctioning fee guidelines differentiate matches within his stated market from, *e.g.*, domestic matches. In deposition, Fort added that the "double-header discount" (in which the sanctioning fee for an MPFI match is based on only 50% of the gross gate receipts if the match is part of a doubleheader with an MLS game) reflects USSF's recognition that domestic and MPFI matches were different markets, appealing to different fans (otherwise, he claims, attributing 50% of the crowd to each match would be nonsensical). *See,* e.g., Fort Dep. 218:8-219:15 (rejecting MLS, women's, and amateur soccer matches as

- 71 -

substitutes for MPFI matches based on the double-header discount and statements of industry members). Every MPFI match promoter subject to USSF's policies is, therefore, within the market as Fort defines it.

From there, Fort conducted a multiple regression analysis to determine whether, despite his belief that industry members view MPFI match promotion as a separate market, other substitute "products" should be included in the market. Specifically, he looked at what he considered the most salient aspects of MPFI soccer (that it is an elite men's professional first-division team sport played in the summer), and then for any similar sports that would be substitutable from a fan's perspective. Fort Op. 24. He concluded that Major League Baseball ("MLB") was the closest substitute based on those factors, and additionally noted that both MLB and international soccer have substantial Hispanic fan bases. *Id.* at 25. Fort then ran a regression analyzing whether an MPFI match played on the same day as, and within 50 miles of, an MLB game affected attendance at the baseball game. *Id.* If not, he concluded, the two were not substitutes and not only MLB games but also "more distant substitutes" (like concerts) could be excluded from the relevant market. *Id.* at 25-26.

Fort's regression analysis factored in variables including "price, team quality, day of the week, month of the year, stadium quality, the month the game was played, and any general city-

effects[.]" *Id.* Fort did not isolate the impact of the "high-caliber" matches at the heart of his opinion, but did include a variable for soccer match attendance. Fort Dep. at 207:18-210:18. Taking all of those factors into account, Fort concluded that the presence of a nearby MPFI match on the same day as an MLB game had no statistically significant effect on MLB attendance. *See id.*; Fort Op. App'x at 2-3. Therefore, Fort detected "no substitution worth mentioning in the eyes of baseball fans between MLB games and [MPFI] matches." Fort Op. App'x at 4. Fort did not study the effect of a nearby MLB game on soccer attendance. Fort Op. App'x at 2; Fort Dep. 202:9-13.

Defendants criticize this "product" opinion on a number of levels. First, they argue that Fort relied on "cherry-picked" documents and colloquial discussions of an MPFI soccer "market." For example, they note that Fort relied on a variety of documents in which the MPFI "market" is discussed, but was not familiar with Plaintiff's own post-match "debriefs" which blamed low attendance at certain matches on market saturation for professional sports and, in one instance, an MLB game played on the same day as a ChampionsWorld match. Defs.' Joint Mot. to Exclude the Testimony of Rodney D. Fort ("Fort Mot."), at 6 & Exs. C & G. In deposition, Fort conceded that he had not been aware of that evidence, but deemed it irrelevant because his statistical analysis trumped such

anecdotes and subjective impressions.  *See, e.g.,* Fort Dep. 205:18-207:17.
Defendants next object that Fort did not use any generally accepted
test to determine the relevant market.  Indeed, Fort admitted in
his deposition that he did not define the market by conducting a
Small but Significant and Non-transitory Increase in Price
("SSNIP") test, and was not familiar with the Hypothetical
Monopolist Test ("HMT").  Fort Dep. 186:20-187:12.  (These tests
provide a framework for evaluating the smallest relevant market in
which a hypothetical monopolist could profitably impose a price
increase.)  He ran no study at all on consumer sensitivity to MPFI
match ticket prices.  *Id.* at 187:18-22.  (Fort testified that he
asked for the pricing data, but did not receive it.  *Id.* at 509:16-
22.)  Regarding the quantitative analysis that Fort did undertake,
Defendants argue that his regression analysis tested the wrong
thing — asking whether soccer games impacted MLB attendance, not
whether higher ticket prices for MPFI matches would lead consumers
to select other entertainments.  Fort Mot. 8-9.

Defendants also contend that Fort did not consider enough
possible substitutes.  Relying on a recent Sixth Circuit opinion,
Defendants argue that Fort had to consider the possible
substitutability of *all* entertainment alternatives, separately and
cumulatively, to assess whether MPFI match promotion is its own
market.  *Cf. Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto
Racing, Inc.*, 588 F.3d 908 (6th Cir. 2009).  Indeed, Defendants

- 74 -

point out, Fort's own book states that fans view "all manner of other entertainment" as possible substitutes for sports. Fort Mot. 9 *citing,* RODNEY D. FORT, SPORTS ECONOMICS 24 (3d ed. 2011). *Cf. Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992) (noting that sports are a small fraction of TV entertainment, and basketball of TV sports).

## II. Regression Analysis

Defendants criticize the regression analysis itself – noting for example that Fort conducted it with data including soccer matches outside of his defined market. The Court, however, finds those objections better fodder for cross-examination than for striking the report. The Court accordingly presumes for now that Fort properly tested what he endeavored to – the effect of a nearby soccer match on attendance at an MLB game. Even so, the Court finds too great a logical gap between Fort's test and the conclusions he purports to draw from it.

Plaintiff argues that in light of the highly differentiated nature of the sports market, *see generally* James Seal, *Market Definition in Antitrust Litigation in the Sports and Entertainment Industries*, 61 Antitrust L.J. 737 (1993), and the limited available data, a comprehensive SSNIP or HMT test was neither feasible nor necessary. Plaintiff argues that the Department of Justice's 2010 Horizontal Merger Guidelines indicate that the HMT and SSNIP are not the exclusive means of finding the relevant market, and

suggests that these new guidelines render all previous case law "obsolete." Pl.'s Mem. In Opp'n Fort Mot. 16 n. 11. Those guidelines, however, are only persuasive authority. *See United States v. Dean Foods Co.,* No. 10-CV-59, 2010 WL 1417926, at *4 (E.D. Wis. Apr. 7, 2010).

Even apart from Defendants' fair concern about Fort's failure to test price sensitivity in any form, the Court independently finds Fort's assumption of market symmetry troubling. Even assuming that a formal HMT or SSNIP analysis was unnecessary, Fort studied the wrong thing. If MLB games and MPFI matches were very good mutual substitutes, Fort's approach would likely expose their relationship. As Fort notes in his book, however, other sports and non-sport entertainment are imperfect substitutes for a particular sporting event. FORT, SPORTS ECONOMICS, 24-25. Furthermore, both sides have claimed in this case that soccer has a smaller fan and financial base in the United States than, say, baseball. Given this differentiation, Fort should have tested substitutability from the perspective of soccer fans rather than baseball fans. *Cf.* GUNNAR NIELS ET AL., ECONOMICS FOR COMPETITION LAWYERS 48-50 § 2.4.6 (2011) (in the context of the HMT, noting that markets can be asymmetric in that one product may be included in another's market without the converse being true); *id.* at 51-52 § 2.4.8 (noting that cross-price elasticities can be asymmetric).

Prof. Fort's regression analysis is insufficient to support his conclusion that MLB games are not a part of the MPFI match promotion market from the perspective of possible soccer match attendees. There is too great a gap between his analysis and conclusions; the Court finds his opinion neither reliable nor helpful to the jury. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### III. *Practical Indicia of a Separate Market*

The regression analysis is not the only basis for Fort's opinion; the question is now whether his remaining analysis is sufficient. The Supreme Court has identified at least seven "practical indicia" that a separate market or submarket exists: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962).

Though some parts of Fort's report could be construed as indirectly addressing some of the other *Brown Shoe* factors (for example, the alleged distinctiveness of the fan base), it is indisputable that his market definition opinion rests almost exclusively on his conclusion that MLS/SUM, USSF, and ChampionsWorld think that MPFI match promotion is a separate market. *See, e.g.,* Fort Op. 23-24; Pl.'s Mem. in Opp'n Fort

Mot. 6-7 and n. 5 & 6 (noting that Fort ruled out MLS games as a substitute because: (1) USSF had identified a separate MPFI market; (2) MLS had recognized the distinction and "repeatedly acknowledged its inability" to capture MPFI fans; and (3) SUM's Nelson Rodriguez noted that most MPFI fans would not consider women's or second-division men's soccer substitutes.)

Some courts have assumed that such "practical indicia" of a separate market can suffice in the absence of economic evidence. *See In re Live Concert Antitrust Litigation*, --- F.Supp.2d ----, 2012 WL 1021081, at *17 (C.D. Cal. March 23, 2012). As Plaintiff concedes, that is not the law of this Circuit. *See* Pl.'s Mem. in Opp'n to Fort Mot. 11-13; *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 318, 320 (7th Cir. 2006) (noting that while the *Brown Shoe* practical indicia are important, they do not displace the need for economic analysis). Any of the cited cases that even arguably suggest the contrary, *e.g., JamSports and Entm't, LLC v. Paradama Prods., Inc.*, 336 F.Supp.2d 824 (N.D. Ill. 2004), either arose outside of the Seventh Circuit or predate its explicit command in *Reifert.*

Moreover, where as here, an expert has focused almost entirely on evidence that an industry recognizes a submarket, courts have excluded their testimony as not sufficiently thorough and reliable. *See In re Live Concert Antitrust Litigation*, 2012 WL 1021081, at *20-24. This Court agrees. (Incidentally, the record does not

uniformly support Fort's findings on industry perceptions — as noted above, he conceded that he was not familiar with certain contrary evidence. The Court notes this inconsistency not to refute Fort's opinion, but to "underscore the importance of performing a thorough analysis of the [*Brown Shoe*] practical indicia[.]" *Id.* at 20 n. 13.)

Plaintiff argues that Defendants' expert followed a similar methodology to Fort's. The Court agrees that there are some concerns with Prof. Kalt's market definition; nonetheless, the Court cannot conclude that Fort's analysis meets the professional standards in the field.

While the Court cannot agree with Defendants that Plaintiff had to conclusively rule out *every* alternate form of entertainment, individually and cumulatively, it needed to do more than Prof. Fort did here. *Cf. Ky. Speedway,* 588 F.3d at 916-20 (affirming exclusion of an expert report where the expert considered too few potential substitutes for NASCAR races, and applied a modified SSNIP test.)

*ii. Geographic Dimension*

Fort opines that the geographic scope of his market is "the United States," based on his understanding of the antitrust laws' reach and that USSF charges it sanctioning fees nationwide. Fort Op. 23; Fort Dep. 239:19-241:14. The relevant market is national, not local, he explained, because the market is about the *promotion*

of MPFI games, and promoters are generally not geographically constrained. Fort Dep. 143:8-12. Therefore, his geographic scope opinion focuses on the distribution of games nationwide, not on attendees of a particular game. *See id*, 143:8-145:10.

A market's geographic scope, however, must be studied from both the supply and demand sides. Fort says that the "ultimate customers" in his market are those who buy tickets to soccer matches. *Id.* at 145:11-20. Those people make their entertainment choices locally. (This is presumably what led Fort, in running his regressions, to study whether a soccer game played within *50 miles* of a baseball game impacted baseball attendance. Fort Op. App'x 2.) This disconnect — between the geographic scope of Plaintiff's market when examined from the supply versus demand sides — was readily apparent in Fort's deposition. *See* Fort Dep. 512:14-515:23. In short, he defined the market as nationwide from the supply side and conceded that the end-users (as he defines them) are locally constrained, but failed to truly reconcile this tension.

In defense of the definition, Plaintiff argues that the challenged practice here is a conspiracy to use USSF's international games sanctioning policies to suppress competition, and that there were "no alternative suppliers of USSF's sanction[.]" Pl.'s Resp. to Fort Mot. 19. Of course, the market as Plaintiff defines it is for promotion of MPFI matches, not for

sanctioning authority, Plaintiff having dropped Sherman Act § 2 claim.

The scope and aim of the challenged conduct is certainly relevant to determining the contours of the relevant market. *See Fishman v. Estate of Wirtz,* 807 F.2d 520, 568-69 (7th Cir. 1986)(Easterbrook, J. dissenting in part); Seal, *Market Definition,* 61 Antitrust L.J. at 764 (1993). Nonetheless, Plaintiff had to identify a geographically coherent market – from both the supply and demand sides – to survive summary judgment. Given that Fort failed to identify and support such a definition, the Court finds his relevant market opinion neither sufficiently reliable nor sufficiently helpful to warrant admission under FED. R. EVID. 702. Accordingly, Defendants' Motion to Exclude Fort's market definition opinion is granted.

### 2. *Summary Judgment on the Antitrust Claims*

As noted above, Plaintiff must introduce sufficient evidence in support of its market definition in order to defeat summary judgment. In its Opposition to Defendants' motion for summary judgment on the antitrust claim, Plaintiff explicitly incorporates and relies upon the discussion of "relevant market" in Prof. Fort's opinion and the related briefing. *See, e.g.,* Pl.'s Mem. in Opp'n to Antitrust Summ. J. 20 n. 11, 22.

The Court having rejected Fort's opinion as inadequate, Plaintiff cannot carry its burden on the threshold requirement of

- 81 -

demonstrating a cognizable market and concomitant market power in the Defendants. (The Court notes that it is not holding that Plaintiff *could not* have established a relevant market, merely that it did not.) That being the case, the Court has no occasion to address the remainder of the parties' arguments on Defendants' antitrust claim, and grants summary judgment to Defendants.

## V. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Dismisses Count VII as to MLS;

2. Grants USSF's Petition to Confirm the Arbitral Award;

3. Denies Plaintiff's Motion for Partial Summary Judgment;

4. Grants in part and denies in part Defendants' Motion for Summary Judgment on Plaintiff's RICO and state law claims;

5. Grants Defendants' Motion to Exclude the testimony of Rodney Fort; and

6. Grants Defendants' Motion for Summary judgment on the antitrust claim.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 8/17/2012